**FOR PUBLICATION**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                          )
ZEV AND LINDA WACHTEL, *et al.*,          )     Civ. Docket No.  01-4183
                                          )     Hon. Faith S. Hochberg, U.S.D.J.
            Plaintiffs                    )
                                          )
        v.                                )
                                          )
GUARDIAN LIFE INS. CO., *et al.*,         )
                                          )
            Defendants.                   )
_____)

_____
                                          )
RENEE MCCOY, individually and on          )
behalf  of all others similarly situated, )     Civ. Docket No.  03-1801
                                          )     Hon. Faith S. Hochberg, U.S.D.J.
                                          )
            Plaintiffs                    )     **OPINION**
                                          )
        v.                                )
                                          )     Date: August 5th, 2004
HEALTH NET, INC., HEALTH NET              )
OF THE NORTHEAST, INC., and               )
HEALTH NET OF NEW JERSEY, INC.            )
                                          )
            Defendants.                   )
_____)

**HOCHBERG, District Judge:**

**Introduction:**

This Matter is brought pursuant to the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C.  § 1001 et. seq. and calls upon the Court to determine:1) whether to grant

Defendants' motion to dismiss for failure to exhaust;[1] and 2) whether to grant class certification in each of the above-captioned cases. "ERISA was enacted to 'promote the interests of employees and their beneficiaries in employee benefit plans' and 'to protect contractually defined benefits.'" Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109, 109 S.Ct. 948, 956 (1989) (quoting Shaw v. Delta Airlines Inc., 463 U.S. 85, 90, 103 S.Ct. 2890, 2896 (1983) and Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 148, 105 S.Ct. 3085, 3093 (1985)). Although ERISA plans frequently grant discretion to plan administrators and fiduciaries, giving them more freedom to determine eligibility for benefits and to construe the terms of the plan, the fundamental purpose of ERISA remains the protection of beneficiaries. Ultimately, this Court will have to determine whether Health Net abused the substantial discretion it has by acting contrary to the best interests of its beneficiaries.

The Plaintiffs sue under ERISA § 502 (a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) which permits a civil action by a plan participant or beneficiary "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," and under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) for various alleged breaches of fiduciary duties. 29 U.S.C. § 1132(a)(3) permits a participant or beneficiary to "A) enjoin any act or practice which violates any provision of this title or the terms of the plan or B) to obtain other appropriate relief i) to redress such violations or ii) to enforce any provisions of this title or the terms of the plan." The Plaintiffs also bring claims under

---

[1] The Defendants are Health Net, Inc., Health Net of the Northeast, Inc., and Health Net of New Jersey, Inc. Guardian Life Insurance Company was dismissed by stipulation of the parties on March 22, 2004. Health Net, Inc. and its subsidiaries will be referred to as "Health Net" in this opinion.

ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4) for failure to supply information upon request and under ERISA § 102, 29 U.S.C. § 1022 for failure to issue appropriate Summary Plan Descriptions.

This opinion sets forth a detailed analysis of the factual questions presented in order to ensure that the reader understands the Court's determination as to whether common questions of law and fact exist sufficient to warrant class certification. The merits of disputed facts are not reached at this time.

**Factual Background and Procedural History:**[2]

## I.      Overview:

The named Plaintiffs in both actions are beneficiaries of two different employee benefit

health plans offered by Health Net of New Jersey, Inc.[3]   They seek class certification for

Health Net beneficiaries nationwide to address alleged misconduct by Health Net in

administering health plans for beneficiaries who utilize out-of-network or non-participating

_____

[2]The above-captioned actions are consolidated pursuant to Fed. R. Civ. P. 42(a).  These actions have already been consolidated for pre-trial purposes.  According to Fed. R. Civ. P. 42(a),"[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." The Wachtel and McCoy matters contain significant common questions of law and fact.  Both actions turn on allegations that Health Net breached the terms of its health plans and breached its fiduciary duties by using improper and undisclosed means of reimbursing health plan beneficiaries who chose to use out-of-network providers.  In both cases, common issues of law and fact relate to allegations that, *inter alia*, Health New used outdated data to determine Usual, Customary, and Reasonable charges, applied improper reimbursement methods, and failed to provide adequate disclosures to beneficiaries. Consolidation is necessary to facilitate the administration of justice.  Consolidating the two actions will avoid confusion, unnecessary costs, and delay by promoting judicial economy. Ellerman Lines Ltd., v. Atl. & Gulf Stevedores, Inc., 339 F.2d 673, 675 (3d Cir. 1964); Easton & Co. v. Mut. Benefit Life Ins. Co., Nos. Civ. 91-4012, 92-2095, 1992 WL 44879, at * 4 (D.N.J. Nov. 4, 1992).

[3]The plans are administered by Health Net of New Jersey, Inc. On January 1, 1999, First Option Health Plan of New Jersey, Inc. merged with Physician Health Services and changed its name to Physicians Health Services of New Jersey, Inc.  In 2001, Physicians Health Services became Health Net.   Health Net, Inc. is the parent company of Health Net of the Northeast, Inc. Health Net of the Northeast is a holding company with a number of regulated subsidiaries, including Health Net of New Jersey, Inc., Health Net of New York, Inc., and Health Net of Connecticut, Inc.  Currently, Health Net's subsidiaries operate plans in New Jersey, New York, Connecticut, Oregon, California, and Arizona.  Until 2001, Health Net operated plans in Florida. Until 2000, Health Net operated plans in Ohio and West Virginia.  In 2000, Health Net stopped operating plans in Western Pennsylvania, and as of January 2004, Health Net discontinued its plans in the rest of Pennsylvania.

health care providers under the terms of their plans.

Health Net offers three main types of health benefits plans: 1) health maintenance organizations; 2) preferred provider organizations; and 3) point-of-service plans ("POS plans"). Plaintiffs have point-of-service plans which permit the subscriber to use in-network or out-of-network providers. An out-of-network (or non-participating) provider is a provider who is not part of Health Net's network and does not have a contracted-for rate with Health Net. If a subscriber decides to go to an out-of-network provider, the subscriber is subject to deductible, coinsurance, allowable amounts, reasonable and customary amounts, and/or usual, customary, and reasonable charge limitations.

Health Net maintains plans for large and small employer groups. A small employer is one with more than two but less than 50 employees. Within the large and small employer categories, Health Net maintains various plans. Therefore, Health Net maintains separate contracts governing the rights and responsibilities of Health Net and its subscribers. The contract is known as the Explanation of Coverage ("EOC"). Beneficiaries receive EOCs and Summary Plan Descriptions ("SPD").[4] Although the various POS plans issued by Health Net may vary in their details, the crucial provisions are highly similar. For example, different POS plans will state that out-of-network reimbursements will be calculated based on the usual, customary, and reasonable charge for the particular service, but the plans may use slightly different words to define the usual, customary, and reasonable charge. The crux of the allegations against Health Net for breach of fiduciary duty and breach of contract is its alleged failures to disclose and

---

[4]Health Net explained that it issues EOCs and Summaries of Benefits and that employers may incorporate the Summaries of Benefits into the SPDs that they distribute to employees.

failures to administer reimbursements to its beneficiaries in accordance with the plans.

**II.    Reimbursement Methods For Beneficiaries Who Choose Out-of-Network Providers:**

      A.      <u>Reductions Based on the Usual, Customary, and Reasonable Charge</u>:

An important component of the Plaintiffs' allegations is Health Net's use of outdated data to determine Usual, Customary, and Reasonable ("UCR") charges. Health Net's plan contracts do not cover an entire fee charged by an out-of-network provider. Rather, it pays a percentage of a certain allowed charge, which is most often defined as the Usual, Customary, and Reasonable charge for the service provided. The beneficiary pays the remaining percent of the UCR charge and is responsible for the rest of a medical bill that exceeds the UCR charge. The percent of the UCR charge for which the beneficiary is responsible is known as the coinsurance rate.

Thus, the coverage for out-of-network treatment that a beneficiary receives depends heavily on how UCR is defined. Disclosure of how UCR is defined and calculated for the plan beneficiaries becomes important when patients' doctors are outside Health Net's list of in-network providers. For example, in order for beneficiaries to estimate in advance the amount of money they may have to pay to make up the difference between the allowed amount and the actual charge, they would need to know how Health Net will determine the UCR calculation. Knowledge about UCR calculations would also facilitate intelligent comparison of two different insurance plans. Plans may have the same coinsurance percentages, and may state that allowed amounts are determined based on UCR rates, but if the plans define UCR in undisclosed ways, beneficiaries may be unable to determine the basis from which their coinsurance rate will be calculated, and thus be left to ask: "I am responsible for a percentage of **what**?"

In its Northeast plans, Health Net makes UCR determinations by referring to a nationwide

database, compiled by Ingenix, Inc. Ingenix distributes two similar databases, the Prevailing

Health Care Charge System ("PHCS") and the MDR/Medicode database.[5] The subscriber

reference materials for the PHCS database and the MDR database indicate the substantial

similarities between the two databases. In Health Net's California and Oregon plans, Health Net

uses the MDR database to determine UCR for out-of-network claims.[6]

Plaintiffs allege that Ingenix documents incorporate a disclaimer stating that the data in

the PHCS database does not constitute UCR. Health Net bases its UCR determination on the

PHCS and MDR databases unless the procedure is not included in the database. In July 2001, for

example, Health Net issued Operations Alert # 493 which implemented a hierarchy for

determining what fee schedule would be used to determine the allowed amount for a provider

charge. First, Health Net would consult the 1998 HIAA fee schedule. If the procedure was not

included, then Health Net would apply the 2000 PHCS fee schedule. If this schedule did not

contain the procedure, then the current MDR fee schedule would apply. If the MDR fee schedule

did not contain the procedure, then Health Net used 70% of the V1 price category. (The V1 price

category remains unexplained.) Finally, if the procedure was not found in any of these listings,

Health Net chose to pay 35% of the billed charges.

_____

[5]The Health Insurance Association of America ("HIAA") produced PHCS data until
1998. HIAA developed the database in 1973, and it consisted of charges for out-of-network
services submitted to HIAA by numerous insurance companies. (In certain documents, PHCS is
referred to as HIAA data). In October 1998, HIAA sold the PHCS database to Ingenix, Inc. a
for-profit wholly owned subsidiary of United Healthcare. The PHCS database includes amounts
charged by various providers for medical services and is updated twice a year.

[6]In California, Health Net uses the MDR database to determine UCR for out-of-network
services for members with POS plans. For non-POS plans in California, Health Net uses the
RBRVS database to process some out-of-network claims. In its Oregon plans, Health Net uses
the MDR database to process all out-of-network claims.

Plaintiffs allege that Health Net does not disclose to beneficiaries in the small or large employer group plans: 1) the data that comprises the PHCS or other similar databases; 2) the disclaimer accompanying the data; 3) the way these databases are operated; 4) the way that data is compiled nor the way that average charges are determined by Ingenix.[7]  Plaintiffs allege that Health Net does not independently evaluate the database to ensure its accuracy as a basis for UCR purposes.[8]  In support of their motions for class certification, the Plaintiffs argue that

---

[7]The Plaintiffs complain about alleged database flaws, including, without limitation: 1) that Ingenix does not verify or audit the charges it includes in the database for accuracy; 2) that the PHCS data contributors are not audited and do not supply complete data; 3) that the PHCS data submission has high error rates; 4) that the PHCS database does not collect or contain a provider's identity and therefore cannot factor in or consider a provider's qualifications, specialty, training, or experience; 5) that the PHCS data cannot identify how many different providers' data has been included; 6) that the PHCS data cannot identify an amount which is most often charged for a given service by a Provider within the same geographic area; 7) that the PHCS data includes the charges of non M.D. providers and fails to differentiate between charges from M.D.'s and charges from non-M.D.'s; 8) that the PHCS database combines geographic areas based on the first three digits of the postal zip code (which does not constitute a medical service area) resulting in combined locations with disparate economic characteristics and different charging patterns; 9) that the PHCS data use "USA means" and other national norms that are not geographic-specific; 10) that the PHCS data ignore modifiers and otherwise fail to account for unusual circumstances or complexity; 11) that the PHCS data do not consider the specific services rendered; 12) that the PHCS data is edited and eliminates a number of charges for being "too high;" 13) that the PHCS database is systematically manipulated and skewed downward; 14) that the PHCS database is a secret database labeled "proprietary and confidential;" and 15) that the PHCS data is not disclosed to beneficiaries.

[8] To provide an example of the allegedly flawed nature of the database, the Plaintiffs submitted email correspondence regarding the database.  Through the email correspondence, a Health Net employee was trying to determine, after an inquiry from a beneficiary to the New Jersey Commission on Banking and Insurance, why there were significant variations from year to year in the allowed amount for a single procedure.  In this particular 1998 example, the UCR allowed amount was $6,850.  In 2000, the UCR allowed amount was $947.  In 2002, the UCR allowed amount was $7,500.  Based on this one example, Plaintiffs allege that the UCR for the same procedure can vary from $947.00 to $7,500.  The claim is that Health Net knew that the database was unaudited and constantly shifting and that it averaged paraprofessionals' fees together with doctors' bills to reduce UCR.

whether the PHCS and/or MDR database is a valid basis for UCR determinations is common to all members of McCoy's class.

In New Jersey small employer group plans, New Jersey state regulations require Health Net to use the most recent PHCS data in calculating UCR.[9]  Health Net's other plans (large employer plans in New Jersey and small and large employer plans outside New Jersey) are not subject to expressed state regulations requiring the use of the most recent PHCS data.   Plaintiffs contend that silence does not condone back-dating.  Health Net asserts in its Brief opposing class certification that as to these plans it has the right to use "any years' database that it chose." (Health Net's Br. in Opp'n to Class Certification at 8.)  Whether such an assertion is true, fair, and reasonable and what disclosures to beneficiaries are required when a fiduciary runs its business based on such an assertion, is at the heart of this litigation.

Definitions of UCR in Health Net's plans in different states are similar.  In most of Health Net's large employer plans in New Jersey, UCR is defined in the EOC as:

> the amount [Health Net] determines to be the reasonable charge for a particular Service in the geographical area in which it is performed based upon a percentile of a modified nationwide database used for reimbursement to physicians, providers, and hospitals.  Further, UCR shall also be based upon certain rules which [Health Net] utilizes in reimbursing Plan providers (e.g. multiple surgical rules, multiple treatment and/or modality rules, assistant surgeon charges, bundling of charges, and the like) such

---

[9]The regulation  provides, ". . .carrier shall pay covered charges for medical services on a reasonable and customary basis, or actual charges, and for hospital services, based on actual charges.  Reasonable and Customary means a standard based on the Prevailing Health Charges System profile for New Jersey or other state when services are provided in such state. . . ."  N.J.A.C. § 11:21-7.13(a). The regulation further provides that UCR "shall be based on the 80th percentile of the profile" and requires that insurance companies "shall update their databases within 60 days after receipt of periodic updates released by the Prevailing Healthcare Charges System."  N.J.A.C. § 11:21-7.13(a)(2).

that the rules by which [Health Net] reimburses Plan Providers shall also be utilized as reimbursement rules for Non-Plan Providers.

Similarly, in small employer plans in New York, UCR means:

the lesser of: (a) the amount charged for a service or supply; and (b) the amount we determine to be the reasonable charge for a service or supply in the geographical area in which it's performed or supplied. UCR charges are based upon: (a) a percentile of a modified nationwide database applicable to the specific type and licensure of provider (e.g. hospital, physician, laboratory etc.); and/or certain industry standards (e.g. multiple surgical rules and assistant surgeon charges, etc.)

In Health Net's California plans, Customary and Reasonable is "a charge which falls within the common range of fees billed by a majority of physicians for a procedure in a given geographic region or which is justified based on the complexity or the severity of treatment for a specific case. Members who are provided services by out-of-network providers will be reimbursed based on the Customary and Reasonable Charge."

The definition in the Oregon plan is similarly based on the fee "usually charged by the Provider and data obtained by us regarding fees charged by Providers for the same service within the same geographic area." Health Net distributes a fact sheet to its Oregon subscribers explaining that UCR is based on data from Ingenix and that Health Net uses data from the 70th percentile of the Ingenix database.

    B.    <u>Health Net's Use of Outdated PHCS Data to Calculate UCR</u>:

It is undisputed that on June 7, 1999, Health Net issued Operations Alert # 333, telling its employees to begin using HIAA data from 1998 to calculate UCR for certain treatments and

procedures.[10]  Health Net did so because it believed that its premiums did not reflect current

prices.  This decision to revert to 1998 data applied to both small and large employer plans in the

Northeast.  Health Net expanded its rollback to 1998 data in July 2001.  Operations Alert #  493

directed that as of July 31, 2001, all out-of-network claims be reimbursed based on the 1998

HIAA fee schedule.  Operations Alert # 493 determined that if Health Net staff could not find a

price in any designated schedule, then the procedure would be priced at 35% of the provider's

billed charge.

During the Preliminary Injunction hearing, Health Net's canned telephone scripts were

produced that instructed customer service agents what to tell beneficiaries who called to ask

about lower reimbursement levels.  The explanation was to be that Health Net had mistakenly

used a different version of the HIAA database and had since adjusted to the appropriate database.

The telephone scripts did not mention that the version to which Health Net reverted was based on

1998 data.  Beneficiaries who did not affirmatively inquire were not told anything about the UCR

data rollback.  Beneficiaries who did call were also to be told that their prior reimbursements

were too high, but that Health Net would not ask for a refund.

The New Jersey Commission for Banking and Insurance ("Insurance Commission")

investigated Health Net for, *inter alia*, its use of outdated PHCS data.[11]  Health Net signed a

consent order with the New Jersey Insurance Commissioner on December 23, 2002.  In late

---

[10]Plaintiffs allege that there is a lag time between the collection and publication of PHCS data, such that 1998 HIAA data actually reflect fees charged in 1996-1997.

[11]In Health Net's answers to interrogatories and court papers, Health Net had represented that it was in compliance with New Jersey regulations governing the company.  Health Net did not disclose the state investigation nor the consent order.

2002, Health Net paid $814,000 in restitution to 4,700 subscribers, for the period July 1, 2001 to October 27, 2002. The Plaintiffs allege that Health Net had actually been using outdated data as far back as June 1999. In November 2003, Health Net contacted the Insurance Commission and agreed to reimburse New Jersey small employer beneficiaries approximately $500,000 more for the additional time period.

C.     The FOHP Fee Schedule:

In some instances, Health Net used its First Option Health Plan (FOHP) fee schedule, to calculate out-of-network reimbursements. This fee schedule is a discounted fee schedule that is based on in-network provider's negotiated discounted amounts. Plaintiffs assert that it is impermissible for Health Net to use a discounted in-network fee schedule to reimburse beneficiaries who choose out-of-network providers, without informing beneficiaries that the schedule is based on in-network providers' negotiated discount charges.

D.     Other Alleged Reimbursement Practices:

The Plaintiffs object to a variety of other allegedly improper and/or undisclosed methods of reducing reimbursements, such as the multiple surgery (multiple procedure) rule,[12] the co-surgeon (assistant surgeon) rule, bundling, downcoding, and Average Wholesale Pricing ("AWP") for prescription drugs. Plaintiffs allege that the multiple surgery rule and the co-surgeon rule are not properly defined and disclosed to beneficiaries. The Plaintiffs allege that the AWP is not properly disclosed and is an unreasonable calculation of UCR for pharmaceuticals because it is much lower than the ordinary retail price. Plaintiffs object to Health Net's alleged

---

[12]Although the definition of UCR for most large employer plans in New Jersey refers to reduction rules such as the multiple surgical rule, these rules are not defined elsewhere in the EOC. Nor are these rules defined in the plans covering Wachtel and McCoy.

use of downcoding[13] and bundling,[14] alleging that these are not properly defined for beneficiaries.

## III. Plaintiff Representative Wachtel:

Zev and Linda Wachtel brought this action on behalf of themselves and their children, Tory, Jesse, and Brett. Zev Wachtel was employed by New Jersey Anesthesia, P.A., a small employer. He was a participant in Health Net's Healthcare Solutions plan, a "Choice" plan for which subscribers pay a premium for the option of obtaining health care services from physicians outside Health Net's provider network. Tory Wachtel was struggling with the aftermath of brain cancer suffered during his infancy and childhood. The Wachtels allege that Health Net's reimbursement practices for their son's operations violated the terms of the plan, the New Jersey regulation governing small employer plans, and Health Net's fiduciary duties.

Their plan provides that subscribers will be reimbursed for 80% of the UCR charge for the services provided by out-of-network providers after the subscriber reaches the deductible amount of $250 per individual or $500 per family. The Wachtels allege that their 20% coinsurance obligation ceases after the total allowed amounts for out-of-network treatments reach $10,000, the coinsurance charge limit. Above this limit, Health Net is to pay 100% of the actual charge or UCR, whichever is less.[15]

---

[13]Downcoding refers to a practice in which health care companies calculate reimbursement by using a lower code than the one entered by the health care provider.

[14]Bundling refers to a practice in which health care companies group various codes listed by a provider together and give the combination a lower value than the sum of the individual codes.

[15]Beneficiaries who choose out-of-network providers have deductible and coinsurance obligations. As explained above, Health Net contracts to pay a particular percentage of the allowed amount of a provider's charge. First Health Net determines the allowed amount by calculating the UCR charge for the service. Until the beneficiary reaches the plan deductible,

In Wachtel's health plan, UCR is defined as follows:

> Payment for covered services out-of-network is based on usual, customary and reasonable (UCR) charge limitations, except in cases of emergency. UCR is based largely on data compiled and reviewed by outside agencies, which determine customary charges within a certain geographic location. The charges will vary by provider specialty and specific service(s) rendered. UCR allows us to keep your premium at an affordable level and is used by almost all insurers for out-of-network expenses. UCR represents our 'allowed amount' or 'allowed charges' for out-of-network services.

Because Wachtel is part of a small employer group plan, the New Jersey Regulation requires Health Net to calculate UCR as equal to or greater than the 80th percentile of the most current PHCS database.

In May 2002, after this suit was filed, Health Net paid the Wachtels $32,000, after which Health Net moved for summary judgment on the grounds that the Wachtels' claims were moot. This Court denied Health Net's motion in an Opinion and Order dated October 8, 2002.

The Wachtels also received payment pursuant to Health Net's consent decree with the New Jersey Commissioner of Banking and Insurance. However, they allege: 1) that these payments are incomplete; 2) that they were not reimbursed in several instances where Health Net used outdated data or arbitrarily paid only 35% of the charge; 3) that Health Net failed to calculate adjustments in deductibles and coinsurance limits to account for the increased UCR; 4)

---

Health Net does not cover any of the allowed amount. The deductible is based on the allowed amount, not the actual charge. In other words, if the beneficiary has a deductible of $250, he will not receive coverage until he has paid out-of-pocket an "allowed" amount of $250, even if he has paid actual charges that substantially exceed $250. When the beneficiary has satisfied the deductible, Health Net pays a percentage of the allowed amount. The beneficiary is responsible for the remainder of the allowed amount (known as the coinsurance obligation) and the remainder of the provider's charge. After the beneficiary has paid a certain amount out-of-pocket, the beneficiary's coinsurance obligation ceases.

that the restitution is insufficient because it did not cover the entire time period during which

Health Net used outdated data;[16] and 5) that the restitution omitted other instances in which

Health Net allegedly improperly reduced out of network reimbursements below the 80th

percentile of the PHCS database.[17]

## IV.     Plaintiff Representative McCoy:

Plaintiff Rene McCoy is a nurse at Pascack Valley Hospital in New Jersey.  She and her

employer pay premiums to Health Net for a fully insured health insurance plan.  McCoy is

enrolled in a POS plan.  She pays an additional premium for the right to use out-of-network

providers.  In January 2002,  McCoy was diagnosed with breast cancer and was advised that she

needed a masectomy.  She chose to have her surgery performed at Memorial Sloan Kettering, a

cancer institute. Dr. Kimberly Van Zee, who is not a member of the Health Net provider network,

performed the surgery.  After the surgery, McCoy received extensive care, including

chemotherapy from other out-of-network providers.

McCoy's plan defines reasonable and customary as:

> An amount that is not more than the usual or customary charge for
> the service or supply as [Health Net] determined based on a
> standard approved by a separate entity.  We are currently utilizing a
> standard set forth by the Board of Directors of the New Jersey
> Small Employer Health Benefits Program.  No matter what
> standard we choose, the chosen standard is an amount which is
> most often charged for a given service by a Provider within the

---

[16] Health Net's Operation Alert # 333 indicates that Health Net may have begun to use outdated data for procedures designated with HCPC codes as early as June 7, 1999.

[17] Although the use of outdated data is a major portion of the Wachtels' Complaint, they also allege that Health Net used other unauthorized, undisclosed, and/or undefined procedures such as: 1) the  multiple surgery rule; 2) the co-surgeon/assistant surgeon rule; 3) provider discounts from a third-party vendor; and 4) a program called Code Review.

same geographic area.[18]

This definition differs from the definition in other large employer plans in so far as it incorporates the standard set forth by the Board of Directors of the New Jersey Small Employer Health Benefits Program, codified at N.J.A.C. § 11:21-7.13(a).

Neither the EOC nor the SPD states that UCR is used to determine the allowed amount for an out-of-network provider charge. Rather, both define the allowed amount in terms of the FOHP fee schedule. The SPD provides that McCoy has a coinsurance obligation of 20% of the FOHP fee schedule, whereas the EOC provides for a coinsurance obligation of 25%. It is undisputed that Health Net used UCR to determine the allowed amounts for certain of McCoy's out-of-network services. Health Net contends that by applying UCR, it actually paid McCoy more than she would have received had Health Net relied on the FOHP fee schedule,[19] and that use of outdated data does not violate large employer plans. McCoy alleges that whenever UCR is applied, Health Net should be required to use valid and current data.[20]

_____

[18]In July 2003, the Court questioned the parties about whether they had provided the Court with the correct insurance plan for McCoy. Health Net then realized that it had submitted the incorrect plan.

[19]For example, for four procedures performed during the course of McCoy's cancer treatment, the total charge was $10,510.00. McCoy was reimbursed $6,630.08, apparently based on 1998 UCR rates, and was responsible for $3,879.92. Health Net asserted, in an affidavit dated August 4, 2003 and at the Preliminary Injunction hearing on March 3, 2004, that the proper reimbursement amount, based on the FOHP fee schedule and other additional reductions was only $1,097.14, leaving McCoy responsible for $9,412.86. Health Net also contends that the reimbursement was properly reduced by a "multiplan discount." According to the chart submitted with the August 4, 2003 affidavit, multiplan discount is defined as 90% of the provider charge, but Health Net actually paid 90% of the UCR for the procedure. These are but among the various issues to be resolved at trial.

[20]McCoy also objects to other allegedly improper, undisclosed, and/or undefined reimbursement reduction methods.

**Analysis:**

**I.      Motion to Dismiss for Failure to Exhaust Administrative Remedies:**

In their opposition to class certification, the Defendants argue that failure to exhaust is a jurisdictional defect.[21]  Because the Defendants have raised the issue of jurisdiction, the Court must examine the facts proffered regarding exhaustion to determine whether the plaintiffs have demonstrated exhaustion or its futility.  See, e.g., Tobias v. Elec. Util. Corp., Civ. A. 03-5861, 2004 WL 1047829, at * 2 (E.D.Pa. May 6, 2004) (explaining that when the defendants challenge the existence of subject matter jurisdiction in fact, on the grounds of failure to exhaust, the court may consider " 'any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction.'" (quoting Frankford Hosp. v. Davis, 647 F. Supp. 1443, 1445 (E.D.Pa. 1986)); James Moore, Moore's Federal Practice, §12.30[3] (3d ed. 2002). Therefore, although the Court  will not determine the merits of the Plaintiffs' motions for preliminary injunction and partial summary judgment at this time, the Court has reviewed all documents submitted on this question of exhaustion, in order to decide its own jurisdiction.

 The Plaintiffs' allegations fall into two categories: 1) claims for breach of fiduciary duty and 2) claims for breach of the Health Plan contract.  In the Third Circuit, exhaustion is not required for claims alleging that substantive ERISA provisions have been violated.  Gavalik v. Cont'l Can Co., 812 F.2d 834, 849 (3d Cir. 1987); Zipft v. AT & T, 799 F.2d 889, 891 (3d Cir. 1986).  Therefore, exhaustion is not required to assert a claim for breach of fiduciary duty.  With

---

[21]Defendants also filed a motion to dismiss for failure to exhaust administrative remedies in the McCoy matter, and asserted failure to exhaust as a defense to McCoy's motion for a preliminary injunction and to both McCoy's and the Wachtels' motion for partial summary judgment, and as a basis on which to deny class certification.

respect to the breach of contract claims, exhaustion need not be established if the Plaintiffs can show either that it would have been futile or that Health Net did not maintain adequate administrative claims procedures.[22]

A.    Alleged Breach of Fiduciary Duties:

The Plaintiffs' claim for breach of fiduciary duty is a claim for a substantive statutory violation.   The Defendants argue that the Plaintiffs have merely cast their claims as statutory ones when their resolution rests on a determination of the terms of the plan.  See, e.g., Harrow v. Prudential Ins. Co. of Am., 279 F.3d 244, 253 (3d Cir. 2002).  The following allegations, *inter alia*, if true, would constitute breaches of fiduciary duties:

1) Health Net concealed material information from beneficiaries. See Bixler v. Cent. Pa. Teamsters Health and Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1993) (holding that once a beneficiary has requested information from a fiduciary, the fiduciary must provide complete information material to the beneficiary's circumstances even if the information pertains to elements not specifically inquired about by the beneficiary).

2) Health Net purposefully discouraged or deterred beneficiaries from appealing denials of claims.

---

[22]The Plaintiffs also argue that this Court should follow courts in other jurisdictions that have declined to require exhaustion in the absence of a specific plan provision requiring exhaustion.  Sibley-Schreiber v. Oxford Health Plans, Inc., 62 F. Supp. 2d 979, 989 (E.D.N.Y. 1999).  However, the Third Circuit requires exhaustion of administrative remedies for non-substantive ERISA claims, regardless of whether exhaustion is specifically included as a requirement in the contract.  Weldson v. Kraft, 896 F.2d 793, 800 (3d Cir. 1990)(except in limited circumstances, a federal court will not entertain an ERISA claim unless the plaintiff has exhausted the remedies available under the plan); Berger v. Edgewater Steel Co., 911 F.2d 911, 917 (3d Cir. 1990); Carducci v. Aetna U.S. Healthcare et. al., 247 F. Supp. 2d 596, 609 (D.N.J. 2003).

3) Health Net was purposefully dishonest in providing explanations to beneficiaries' questions about UCR determinations.

4) Health Net implemented cost-saving reimbursement policies without regard to the best interests of the beneficiaries.  Varity Corp. v. Howe, 516 U.S. 489, 506, 116 S.Ct. 1065, 1074 (1996).

These allegations are not claims for plan benefits.  Rather, their resolution rests on an interpretation and application of ERISA itself.  Contrast, D'Amico v. CBS Corp., 297 F.3d 287, 291 (3d Cir. 2002).

      B.     Alleged Breach of the Terms of the Plan:

In contrast to a claim for breach of fiduciary duty, exhaustion of administrative remedies ordinarily is required for claims alleging breach of the terms of the plan.  D'Amico, 297 F.3d at 291 (holding that exhaustion is required when resolution of a claim is based on the application of the plan rather than on the application of ERISA).  Because the plan's terms are developed by the administrator, and are not imposed by the statute, a claim for breach of the plan contract is not considered a violation of a substantive ERISA provision.

Exhaustion is not required if plaintiffs can demonstrate that it would be futile.  To determine whether to apply the futility exception to the rule of exhaustion, the Court considers: 1) whether the plaintiff diligently pursued administrative relief; 2) whether the plaintiff acted reasonably in seeking immediate judicial review under the circumstances; 3) the existence of a fixed policy denying benefits; 4) the failure of the insurance company to comply with its own internal administrative procedures, Berger v. Edgewater Steel Co., 911 F.2d 911, 917 (3d Cir. 1990); and 5) the testimony of plan administrators that any administrative appeal was futile.

<u>Harrow</u>, 279 F.3d at 250.

This Court has heard and considered testimony from Health Net representatives relating to the exhaustion issue. A Health Net representative submitted an affidavit stating that McCoy did not exhaust her administrative remedies, but he testified that he signed the affidavit without any personal knowledge of its accuracy or the facts contained in the affidavit. His affidavit also averred that McCoy's complaints about the use of outdated data were unfounded, but he testified that he did not know whether Health Net had used outdated data to determine her claims and could not state how he knew that her complaints were unfounded.

Health Net's documents were also considered. Health Net issued two Question and Answer ("Q&A") scripts regarding UCR that relate to the futility of appealing claims calculations based on UCR. One Q&A advises Health Net employees to tell beneficiaries who question UCR determinations that UCR determinations are virtually never overturned. The Q&A instructed Health Net employees to give the following answer to beneficiaries who asked whether they could grieve a UCR determination:

> Technically, a member has the right to file a grievance on this issue. However, in reality, UCR issues virtually never get overturned. One reason for this is that Health Net has the contractual right to calculate UCR according to what Health Net determines as reasonable. Since our sources use valid data from so many claims as a basis for calculating the reasonable amount, a member would need to submit an impossible number of claims to show that our data is not appropriate. Even if it were possible to do so, it is still within our contractual right to come up with a figure we deem reasonable. . .

(<u>Q & A for UCR issues</u>.)

Health Net employees were also told not to suggest that members file grievances of UCR

determinations because "this unfairly causes the member to believe that there is a chance that his grievance will be overturned and the claim reprocessed."  Id.

A second Q&A, attached to Health Net's Operations Alert # 493, instructed employees to inform beneficiaries who questioned their benefit rollback (due to the undisclosed use of outdated data) that the previous, higher payment was too high, but that Health Net had decided not to seek a return of the excess payment.[23]  That the reduction in benefits was due to the decision to revert to older PHCS data was not stated and thus grievances or appeals may well have been deterred.  (HIAA Change Effective July 15, 2001, Q&A, Op. Alert 493.)

Futility is not limited to appeals of UCR issues.  Health Net's documents include another

---

[23]

Q: I am a Health Net member and have been receiving a course of treatment for the last six months from a non-participating provider.  In August, my doctor required me to pay more out of pocket.  Is this an error?
A: Health Net pays out of network providers according to a geographically based database provided by HIAA.  At the beginning of this year upon the request of several large employer groups, Health Net began using a different version of this database that was funded by the requesting employer group.  The change was inadvertently made for our entire membership instead of just these selected employer groups.  When this was brought to our attention, we returned to the original database for the groups not impacted by the change.  This caused your financial responsibility to change.  We apologize for any inconvenience this may have caused and will not require any of our members to return monies due to the error.
Q: Can I file a grievance or appeal this decision?
A: You have the right to submit a grievance or appeal this decision.  However, the reimbursement you received for dates of service prior to 7/15 was based on a database that would, in most cases, result in reimbursement in excess of the amount we were obligated to pay.  The amount that was reimbursed after the 7/15 date of service is based on the appropriate reimbursement methodology for this year, though we will not ask you or the provider to return the monies that were paid in error.
(HIAA Change Effective July 15, 2001, Q&A, Op. Alert 493)

Q&A telling employees to tell beneficiaries who question denials of benefits: "I understand that you may want to initiate an appeal regarding this denial, and that is your right. However, I want to point out that since this denial is contractually based, the decision will not be overturned on appeal. . . ." (<u>Benefit Limitation Scripting Questions and Answers</u>.)

Evidence has been proffered to show that the data used to determine reimbursements are not reviewed when appeals are processed. Health Net merely checks that the claim was matched to the corresponding number within the database that Health Net has already set. There would thus be no administrative consideration of McCoy's complaint that Health Net relies on a flawed and outdated database in the appeal process. <u>Fallick v. Nationwide Mut. Ins.</u>, 162 F.3d 410, 419-420 (6th Cir. 1998) (holding that exhaustion is futile for appealing UCR determinations based on HIAA data when review consists merely of checking the number rather than reviewing the methodology). Health Net argues that the appeal process is not futile because 33% of a certain sample of claimants received more money on appeal. As in <u>Fallick</u>, the insurer's correction of "obvious miscalculations in accounting," does not demonstrate "that it would alter or even consider altering its underlying methodology." <u>Id.</u>, 162 F.3d at 419.

As a separate and independent basis for this ruling, Plaintiffs have also demonstrated that Health Net's appeals procedures, and the information it provides to beneficiaries, fall short of the requirements in 29 U.S.C. § 1133, resulting in deemed exhaustion. 29 C.F.R. § 2560.503-1.[24] The statute requires the benefit plan to set forth specific reasons for claim denials in a manner

_____

[24]"If there is a failure to establish or follow claims procedures consistent with the requirements of this section, claimant shall be deemed to have exhausted administrative remedies." 29 C.F.R. § 2560.503-1(1).

calculated to be understood by the participant.[25]  Grossmuller v. Int'l Union, United Auto. Aero.

and Agric. Workers of Am., 715 F.2d 853, 858 (3d Cir. 1983)(holding that a beneficiary whose

claim is denied is entitled to an opportunity to examine the evidence used by the plan to deny the

claim); see also, Skretvedt v. E.I. DuPont de Nemours & Co., 268 F.3d 167, 178 n. 8 (3d Cir.

2001).  The Plaintiffs have made a sufficient showing that Health Net has not adequately

explained its basis for denying appeals.[26]

Exhaustion is not required for the breach of contract claims in this case.  Plaintiffs have

made a "clear and positive" showing that beneficiaries' resort to administrative remedies would

have been futile,[27] (D'Amico, 297 F.3d at 293; Harrow, 279 F.3d at 249) and that there is deemed

---

[25]"In accordance with regulations of the Secretary, every employee benefit plan shall–1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant; and 2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim. 29 U.S.C. § 1133.

[26]For example, the Wachtels appealed the claim relating to Tory's August 8, 2000 surgery.  In the level 1 appeal, Health Net wrote: "[t]he claims were paid correctly according to your out-of-network benefits of your contracted plan."  In the level 2 appeal, Health Net wrote: "PHS Health Plans' General Manager, Joseph Singer, M.D. has reviewed the documentation provided and has determined that the claims were paid correctly according to the multiple surgical reimbursement rules and the members [sic] point-of-service benefit plan."

[27]In exploring the issue of Health Net's appeal process to determine whether exhaustion is required in this case, this Court has also inquired as to whether Health Net pays claims timely. This question has not been resolved, and the Court did not consider this issue in determining that exhaustion is futile.  The Court does note that at the Preliminary Injunction hearing, Health Net represented that it does not make money by delaying claims and appeals because Health Net is required to pay interest on any additional reimbursement ultimately found to be owing. However, Plaintiffs cite a Market Conduct Report issued by the Insurance Commission that found that Health Net failed to pay interest in 42% of the cases in which beneficiaries appealed and won.  No findings are made on this issue at this time.  It shall await further evidentiary proceedings.  Market Conduct Examination of the Physicians Health Services of New Jersey, Inc., p. 16-17.

exhaustion pursuant the Federal Regulations for the administration and enforcement of ERISA. 29 C.F.R. § 2560.503-1(1).

## II.    Class Certification:

A.    Standard:

In order for the Court to certify a class, the plaintiff must demonstrate that it satisfies the prerequisites of Fed. R. Civ. P. 23(a) as well as the requirements set out in 23(b)(1), 23(b)(2), or 23(b)(3). The Plaintiffs bear the burden of establishing that their proposed class meets the requirements of Fed. R. Civ. P. 23.  White v. Williams, 208 F.R.D. 123, 130 (D.N.J. 2002); Medicare Beneficiaries' Defense Fund v. Empire Blue Cross Blue Shield, 938 F. Supp. 1131, 1139 (E.D.N.Y 1996).  In determining whether to grant class certification, this Court does not consider the merits of the action.  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-178, 94 S.Ct. 2140, 2152-2153 (1974)(holding that it is improper to conduct a preliminary hearing on the merits to determine whether the prerequisites of Fed. R. Civ. P. 23 are satisfied); Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 252 (3d Cir. 1975) cert. denied 421 U.S. 1011 (1975). However, the Court looks beyond the mere face of the pleadings to determine whether the plaintiffs have satisfied the requirements for class certification.  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 (3d Cir. 2001)(quoting 5 Moore's Federal Practice §

_____

The NY Department of Insurance also found that appeal was futile because Health Net failed to provide beneficiaries with information regarding the use of outdated data for UCR determinations.  The state agency reasoned that without this information, beneficiaries would have no way to determine that an appeal or complaint was warranted. See  Market Report of Health Net Insurance of New York, Inc., at p. 17.  The New Jersey Commission of Banking and Insurance also found extensive violations of appeals procedures.  Market Conduct Report of the Physicians Health Services of New Jersey, Inc., at p. 10. The Court notes, but does not rely upon, these agency findings.

23.61[5]).  Class certification cannot be presumed and must only be entered after rigorous

analysis that the plaintiff has satisfied Rule 23.  General Tel. Co. v. Falcon, 457 U.S. 147, 161,

102 S.Ct. 2364, 2372 (1982).   In this case, there has been a lengthy period of full discovery

regarding class certification.  The Court has heard oral argument on the motion and has

considered extensive affidavits and exhibits as well as briefs.

The certification requirements of Rule 23 encompass two principles: 1) the necessity and

efficiency of adjudicating the claims as a class, and 2) protection of the interests of absentee

members.  Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).  Fed. R. Civ. P. 23(a) requires the

party moving for class certification to show that:

> 1) the class is so numerous that joinder of all members is
> impracticable; 2) there are questions of law or fact common to the
> class; 3) the claims or defenses of the representative parties are
> typical of the claims or defenses of the class; and 4) the
> representative parties will fairly and adequately protect the interests
> of the class.

These prerequisites are commonly known as numerosity, commonality, typicality, and adequacy.

Baby Neal, 43 F.3d at 55.

If the plaintiffs meet these requirements, they must also demonstrate that they can satisfy

one of the subsections in Fed. R. Civ. P. 23(b).  Subsection 23(b)(3), the subsection applicable to

this matter, provides that a class action is authorized if "the court finds that the questions of law

or fact common to the members of the class predominate over any questions affecting only

individual members, and that a class action is superior to other available methods for the fair and

efficient adjudication of the controversy."

To determine whether the plaintiff has satisfied the predominance prong of 23(b)(3), the

Court considers whether each member of the class, if he/she chose to bring an individual action,

would be required to prove the existence of the activities alleged by the plaintiff seeking class certification.  Cumberland Farms, Inc. v. Browning-Ferris Indus., Inc., 120 F.R.D. 642, 647 (E.D.Pa 1988); Snider v. Upjohn, 115 F.R.D. 536, 541 (E.D.Pa. 1987).  Class certification does not require that common questions be completely dispositive of a litigation as to all potential members of the class.  See Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985); Snider, 115 F.R.D. at 541; In re Mercedes-Benz Antitrust Litig., 213 F.R.D. 180, 186 (D.N.J. 2003).  The fact that damages must be assessed on an individual basis does not necessarily preclude class certification.  Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977) cert. denied, 434 U.S. 1086, 98 S.Ct. 1280 (1978).

To determine whether the Plaintiffs satisfy the superiority prong of 23(b)(3), the Court considers the alternatives to a class action.  When the alternatives would result in a great multiplicity of actions, this weighs in favor of class certification.  Snider, 115 F.R.D. at 541.  Relitigation of the same issues is an inefficient use of judicial resources.   Where maintenance of individual actions would be prohibitively expensive, precluding class members from meaningful access to the courts, class action may be the superior method of litigation.  Cumberland Farms, 120 F.R.D. at 647-648; In re Data Access Systems Sec. Litig., 103 F.R.D. 130, 142 (D.N.J. 1984), rev'd on other grounds and remanded,[28] 843 F.2d 1537 (3d Cir. 1988).

B.     Standing:

Health Net argues that McCoy and the Wachtels lack standing on the grounds that: 1) they failed to exhaust their administrative remedies; 2) they have not sustained out-of-pocket

---

[28]The district court's decision was reversed as to the statute of limitations on securities actions.

losses due to the alleged misconduct; and 3) the restitution the Wachtels have received moots their claims.

### 1. Exhaustion:

For the reasons set forth in section I of the Analysis, exhaustion of administrative remedies would be futile and is deemed to have occurred. The Plaintiffs have demonstrated that the futility of administrative appeal applies to all class members subject to Health Net's out-of-network reimbursement policies.

### 2. Out-of-Pocket Losses:

The named Plaintiffs do allege significant out-of-pocket losses. Health Net's arguments regarding a lack of damages sustained by the Plaintiffs go to the merits of the action, and not to the determination of whether class certification is warranted. See In re Mercedes-Benz Antitrust Litig., 213 F.R.D. at 190 (plaintiffs need not establish a class-wide impact to prevail on class certification). In Garofalo v. Empire Blue Cross and Blue Shield, the plaintiffs lacked standing because they conceded that they had already received complete compensation for their claims. Garofalo, 67 F. Supp. 2d 343, 346-347 (S.D.N.Y. 1999). The Plaintiffs here do not concede that they have been fully reimbursed. In addition, equitable relief is available for fiduciary duty violations, even absent monetary loss. Horvath v. Keystone Health Plan East, Inc., 333 F.3d 450, 456 (3d Cir. 2003)(holding that the plaintiff had standing to sue for injunctive relief for alleged fiduciary duty violation, despite failing to demonstrate individual loss); Brock v. Robbins, 830 F.2d 640, 647-648 (7th Cir. 1987); Liss v. Smith, 991 F. Supp. 278, 295, 313 (S.D.N.Y 1998); Chao v. Malkani, 216 F. Supp. 2d 505, 513 (D.Md. 2002).

3.     Mootness:

Health Net asserts that the Wachtels lack standing to represent the class because the restitution they have received moots their claims. The Wachtels counter that they have not been fully paid. This Court has earlier addressed mootness, finding that a payment after the case was filed did not render it moot.[29]

The Wachtels filed for class certification before they received restitution from Health Net.[30] The Third Circuit has held the named plaintiff may still represent the class as long as the plaintiff had a live claim when he/she filed the class action. Rosetti v. Shalala, 12 F.3d 1216, 1227-1228 (3d Cir. 1993)(reaffirming Wilkerson v. Bowen, 828 F.2d 117 (3d Cir. 1987)); see also, Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 135-136 (3d Cir. 2000) (stating "[s]o long as a class representative has a live claim at the time he moves for class certification, neither a pending motion nor a certified class action need be dismissed if his individual claim becomes moot"); Lusardi v. Zerox Corp., 975 F.2d 964, 974 (3d Cir. 1992) (explaining that when a named plaintiffs' claims are paid prior to a decision on class

_____

[29]See Opinion and Order dated October 8, 2002.

[30]The Wachtels filed their first motion for class certification on April 30, 2002. Then Magistrate Judge Chesler issued an order striking the motion because it was made earlier than the date he had set in an effort to accomplish the orderly scheduling of motions for case management purposes. On May 24, 2002, Health Net tendered $32,589.37 to the Wachtels, contending it constituted full payment plus interest for Plaintiffs' alleged damages. Health Net then moved for summary judgment contending the Wachtels' claims were moot. This Court, after consultation with Magistrate Judge Chesler, denied the Defendants' motion for summary judgment, holding that Magistrate Judge Chesler's order was more akin to an order of stay rather than an order of dismissal. See Wachtel v. Guardian Life Ins. Co. et al., No. 01-4193, Slip Op. at 3-4 (D.N.J. October 8, 2002) (discussing Zeidman v. J. Ray McDermott & Co., 651 F.2d 1030, 1037 (5th Cir. 1981); Salter v. Phila. Housing Authority, No. Civ. A. 99-1681, 1999 WL 997758 (E.D.Pa. Nov. 2, 1999)).

28

certification, the case is moot unless the court could not decide the class certification motion prior to the expiration of the claims); Medicare Beneficiaries' Defense Fund, 938 F. Supp. at 1143 (explaining that the defendant could not moot out a class action by providing payment in full to the named plaintiff because the claims of the class members remain open, and the named representative may continue to represent the class)(citing County of Riverside v. McClauglin, 500 U.S. 44, 52, 111 S.Ct. 1661, 1667-1668 (1991)).

The fact that the Wachtels are no longer enrolled in Health Net's plan does not prevent the Wachtels from representing the class. Medicare Beneficiaries' Defense Fund, 938 F. Supp. at 1145 (explaining that the fact that a named plaintiff leaves the plan during the course of litigation and is therefore no longer entitled to injunctive relief is not a basis on which to deny a motion to certify the class)(citing Conover v. Montemuro, 477 F.2d 1073, 1085 (3d Cir. 1975)(Adams concurring)). In Selby v. Principal Mut. Life Ins. Co., 197 F.R.D. 48, 57 n. 13, 64 (S.D.N.Y. 2000), the court required the plaintiffs to designate a new named beneficiary for the injunctive relief claims where the named plaintiff was not enrolled in the plan at the time the action was filed. In contrast to the plaintiff in Selby, Wachtel was a member of a Health Net plan when he filed the action.

C.     The Threshold Requirements of Fed. R. Civ. P. 23(a):

McCoy seeks certification of a class defined as:

All persons in the United States who are, or were, at any time during the period within six years of the date this action was filed (the 'Class Period'), subscribers or beneficiaries in any Choice plan who received medical services or supplies (including *inter alia*, surgery, anesthesia, and the like) from an out-of-network provider and for whom defendant made reimbursement determinations less than the provider's actual charge and which are unauthorized by, or inconsistent with beneficiaries' Contracts of Insurance, SPD, or

29

governing law.

The Wachtels seek certification of a class defined as:

> All persons in the United States who are, or were, at any time during the period within six years of the date this action was filed (the 'Class Period'), subscribers or beneficiaries in any small employer health plan who received medical services from an out-of-network provider and for whom Defendants made a determination that did not comply with the New Jersey Regulation related to out-of-network reimbursement, or otherwise failed to comply with the New Jersey Regulations, by, for example, failing to pay fully mandated benefits. In addition, the Class includes all subscribers or beneficiaries in such small employer health plans for whom Defendants failed to disclose required or accurate information, to provide the specific reasons for a denial of a benefit, or failed to comply with the beneficiary's Summary Plan Descriptions and/or Contracts of Insurance.

### 1. Numerosity:

Numerosity requires that the class be so large that joinder of all members would be impracticable. Fed. R. Civ. P. 23(a). This means that joinder is difficult or inconvenient, not that it is impossible. Zinberg v. Washington Bancorp, Inc., 138 F.R.D. 397, 406 (D.N.J. 1990). Health Net contends that the numerosity requirement is not met because the Plaintiffs and other potential class representatives have not exhausted their administrative remedies. However, for the reasons set forth in section I of this Analysis, exhaustion is not an impediment to numerosity.

Numerosity hinges on the "examination of the specific facts of each case and imposes no absolute limitations." General Tel. Co. of the Northwest, Inc. v. E.F.O.C., 446 U.S. 318, 330, 100 S.Ct. 1698, 1706 (1980); see also 1 Newberg on Class Actions § 3.3 *Impracticability of Joinder* (4th ed. 2003). The Plaintiffs are not required to set forth the exact number of class members to satisfy the numerosity requirement. Stewart v. Abraham, 275 F.3d 220, 226-227 (3d Cir.

2001)(explaining that "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceed 40, the first prong of Rule 23(a) has been met.")   In New Jersey alone, Health Net has about 135,000 small group subscribers and 160,000 large group subscribers.  Even if only a small percentage of these members have POS plans with the right to choose out-of-network providers, the resulting number of class members who used out-of-network providers is estimated to be high enough to satisfy the numerosity requirement.  Selby, 197 F.R.D. at 57 (the court may estimate the number of persons in the class based on reasonable inferences from the evidence).  Although the group is large, it is not impracticable.  Green v. Wolf Corp., 406 F.2d 291, 298 n. 11 (2d Cir. 1968).

2. Commonality and Predominance:

The commonality prong of Fed. R. Civ. P. 23(a) overlaps with the predominance requirement of 23(b)(3).  Therefore, courts frequently examine the two requirements together.  In re The Prudential Ins. Co. of Am. Sales Practices Litig., 148 F. 3d 283, 310 n. 46 (3d Cir. 1998); Georgine v. Amchem Products, Inc., 83 F.3d 610, 626 (3d Cir. 1996) (explaining that the predominance requirement of 23(b)(3) incorporates the threshold commonality requirements of 23(a)(2)).  Commonality under 23(a)(2) is satisfied if the named plaintiff shares common questions of law or fact with the grievances of the prospective class.  Predominance, however, requires more than the existence of common issues of law and fact.  The common issues must be numerically and qualitatively substantial in relation to individual issues.  In re Mercedes-Benz Antitrust Litig., 213 F.R.D. at 186.  Nevertheless, predominance does not mean exclusivity, and the existence of some individual issues does not necessarily defeat class certification.  Id.

The Plaintiffs allege a systematic course of conduct in interpreting contracts of insurance

in an improper, undisclosed, and self-serving way in contravention of the plans and of Health

Net's fiduciary duty to beneficiaries who chose to use out-of-network providers.  In both the

McCoy class and the Wachtel class, if each member of the potential class were to bring an

individual action, each would be required to prove that Health Net's UCR and other policies

violated ERISA.  Cumberland Farms, Inc., 120 F.R.D. at 647-648.  The issues of law and fact

relating to whether Health Net fully disclosed and properly applied its reimbursement mechanisms

for out-of-network provider services are common to the class members and predominate over

individual questions.[31]

Courts have granted class certification in similar circumstances.  For example, in Brooks

v. Educators Mut. Life Ins. Co., 206 F.R.D. 96, 101 (E.D.Pa. 2002), plaintiffs satisfied the

commonality requirement where they alleged that the insurance company used improper methods

---

[31]As one example of Health Net's alleged failure to disclose its reimbursement policies, the Plaintiffs allege that the SPDs do not include explanations of Health Net's various means of reducing reimbursements for out-of-network providers.  The SPD is the dispositive plan document.  Burstein v. Ret. Account Plan for Employees of Allegheny Health Ed. & Research Found., 334 F.3d 365, 378 (3d Cir. 2003)("Today we join with the other Courts of Appeals that have considered this issue and hold that where a summary plan description conflicts with the plan language, it is the summary plan description that will control.")  Where there are ambiguities in the SPD which could mislead a beneficiary, that too, requires a decision to be reached in the beneficiary's favor.  Hansen v. Cont'l Ins. Co., 940 F.2d 971, 981-982 (5th Cir 1991) (cited by Burstein, 334 F.3d at 378, n.18).

Another example of a common question applicable to all class members is whether Health Net used discounted in-network fees to calculate the "usual" and "customary" fees of out-of-network providers, and, if so, whether this is arbitrary and capricious.  In-network providers and out-of-network providers operate under very different incentives.  See, e.g., HCA Home Health Services of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 987-988 (11th Cir. 2001).  Although the Court does not determine this issue at this time, the Court does note that the decision in Schwartz v. Oxford Health Plans, Inc., explained that Oxford's HMO reimburses both its in-network and out-of-network providers based on fee schedules derived from HIAA and RBRVS data.  Schwartz, 175 F. Supp. 2d 581, 584, n. 3 (S.D.N.Y. 2001).  It is undisputed that the FOHP fee schedule in McCoy's plan is an in-network fee schedule.

to determine UCR for anesthesia.[32] See also, Selby, 197 F.R.D. at 57 (finding commonality where the class members' claims turned on the validity of the plan administrator's method of determining insurance coverage when a doctor listed several diagnoses[33]); Gilman v. Independence Blue Cross, No. Civ. A. 96-1601, 1997 WL 633568, at * 5 (E.D.Pa. Oct. 6, 1997)(holding that the common issue of whether the defendants had miscalculated the family deductible satisfied 23(a)(3)); In re The Prudential Ins. Co. of Am., 148 F.3d at 314 (affirming lower court's finding of predominance where plaintiff alleged that defendant engaged in a 'common scheme' or uniform practice); Medicare Beneficiaries' Defense Fund, 938 F. Supp. at 1147 (finding that issues of law and fact predominated where the administrator was alleged to have misenrolled beneficiaries in Medigap coverage and failed to inform employers of changes in the law regarding Medicare and Medigap coverage).[34]

---

[32] The Defendants argued that individual questions outweighed common issues because UCR determinations were totally discretionary. The court rejected this argument holding that these determinations were not totally discretionary in that they were required to be based on data from the same geographic area. Brooks, 206 F.R.D. at 105.

[33] Where the administrator considered only the first diagnosis, and not the others listed by the beneficiary's doctor, the court held that the common questions relating to the methodology predominated over individual issues such as the various illnesses of the insureds, the potential amount of benefits each insured is due, and any defense of fraud. The Selby court did decline to certify a subclass of those subscribers who were improperly denied medically necessary services, reasoning that this would require individual assessments to determine whether each patient's claim was medically necessary. Selby, 197 F.R.D. at 59-60. Here, it is not necessary to determine the medical nature of each class member's claim because the allegedly improper methods used to reduce reimbursements do not hinge on the individual characteristics of the class members' medical claims.

[34] This Court has considered the cases cited by the Defendants in support of their argument that neither commonality nor predominance is satisfied. For example, in Ostrof v. State Farm Mut. Auto Ins. Co., 200 F.R.D. 521, 531 (D.Md. 2001), adjudication of claims required the determination of whether individual treatments were necessary, rather than a determination of whether the particular reimbursement practice has been disclosed and is lawful as to all class

The existence of different plans does not outweigh the predominance of the common questions.  Medicare Beneficiaries' Defense Fund, 938 F. Supp. at 1147; Fallick, 162 F.3d at 422 (explaining that an individual in one ERISA benefit plan has standing to represent a class of participants in numerous other plans other than his own, if the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans) (citing Sutton v. Med. Assoc. of Penn., 1993 WL 273429 (E.D.Pa. 1993)).  Health Net has not pointed to any differences among the plans that undercut the predominant commonality of issues of law and fact.  Health Net argues, for example, that the definition of UCR in the New York small employer health plans differs from other UCR definitions.  UCR is defined in the New York plan as a percentile of a modified nationwide database and/or certain industry standards.  This definition does not substantially differ from all Northeast plans using the PHCS database.

Health Net also argues that its West Coast plans are significantly different from the Northeast plans because the West Coast plans do not use the PHCS database or HIAA data.  At

---

members.

In Hylaszek v. Aetna Life Ins. Co., No. 94 C. 5961, 1998 WL 381064, at * 4 (N.D.Ill. July 1, 1998), the court held that common issues did not predominate because the court would be required to determine whether each member had exhausted his/her administrative remedies, would have to determine, for each member, whether the *de novo* or arbitrary and capricious standard applied, and would have to determine whether treatment was medically necessary in each individual case.  In this case, the Court has already determined that exhaustion is futile; the same standard of review applies for each member; and there is no individualized "medical necessity" inquiry.

In re Managed Care Litig., 209 F.R.D. 678 (S.D.Fla. 2002), cited by Defendants, actually provides support for class certification by analogy to this case.  Although the court declined to certify a class of subscriber plaintiffs alleging RICO and ERISA violations against HMOs (id. at 687), it did grant class certification to a class of providers alleging the HMOs engaged in RICO violations by committing fraud through a common course of conduct, such as automated bundling practices, automated downcoding practices, and the failure to pay claims within the applicable contractual and statutory time periods.  In re Managed Care Litig., 209 F.R.D. at 694-695, 697.

oral argument, Health Net represented that it uses the RBRVS database for its West Coast plans,

rather than the PHCS database.[35]  Health Net later corrected its answer to state that Health Net

uses the MDR database (which is very similar to the PHCS database) to determine out-of-network

claims in Oregon and California.[36]

Individual issues that may arise regarding damage calculations do not defeat predominance

as to liability issues.  Bogosian, 561 F.2d at 456 ("[i]t has been commonly recognized that the

necessity for calculation of damages on an individual basis should not preclude class

determination when common issues which determine liability predominate"); In re School

Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986)("[r]esolution of common issues need not

---

[35]

THE COURT:  I asked whether the West Coast plans used the MDR Medco database or do they use the PHCS database, or do they use something entirely different?
ANSWER:  Right.  And the answer you received was they're not sure because of discovery.  And that's false.  The -- we have provided certifications from the Health Net of Oregon, Health Net of California, and Health Net of Arizona, all of which indicate that neither the MDR nor the PHCS database are used in any of those health plans.  It's a third database that is used.  The acronym of which escapes me right now, it has R and V's and S's, but it's not MDR or PHCS.
(June 15, 2004 Tr. 27:25-28:12.)

\*\*\*\*\*\*

THE COURT:  Are there differences between PHCS and HIAA on the one hand, and RBRVS on the other, that are germane to the question of class certification?
ANSWER:  Yes, Your Honor. They're completely different databases, compiled  and maintained by different entities, and the claims that the plaintiffs are making with respect to the PHCS database, their expert's claims, that the way that it is derived and  maintained is inherently flawed, he doesn't opine that as to the RBRVS database.  There's no -- nothing in his report, there's no evidence in the record, there is absolutely nothing about the RBRVS database upon which Arizona, California and Oregon all rely.
(June 15, 2004 Tr. 32:1-13.)

[36] Regardless of the name of the database, UCR is determined in much the same way in all Health Net plans, and HIAA data and RBRVS data may be used in conjunction with one another.  Schwartz v. Oxford Health Plans, 175 F. Supp. 2d at 584.  Furthermore, if certain of the allegations regarding the PHCS database do not apply to the West Coast class members, the Court may create subclasses.

guarantee a conclusive finding on liability, nor is it a disqualification that damages must be assessed on an individual basis.")(citations omitted); <u>Samuel v. Univ. of Pittsburgh</u>, 538 F.2d 991, 995- 996 (3d Cir. 1976)(rejecting the district court's decision to decertify a class because factual determinations individual to each class member would need to be made to determine the proper restitution). Damages can be addressed after liability is determined on a classwide basis. <u>In re Mercedes-Benz Antitrust Litig.</u>, 213 F.R.D. at 192; <u>Gilman</u>, 1997 WL 633568, at * 6 (explaining that appropriate restitution could be determined by applying the correct deductible formula to each class member); <u>Brooks</u>, 206 F.R.D. at 106, 108 (holding that the fact that some beneficiaries were not balance billed and that some individual determinations of damages would be necessary, did not defeat predominance as these were issues for the damages phase of the litigation). If Health Net is found liable, Health Net could be required to use its computerized system to reprocess those claims as to which a reduction method was applied that was held to be undisclosed or otherwise improper.[37] <u>See</u> <u>Selby</u>, 197 F.R.D. at 59 (explaining that class action was the superior method of adjudication where an injunction could issue requiring the reprocessing of claims, resulting in proper payment without further court action).

Health Net also asserts that individual issues predominate over common issues because the question of reliance will require individualized determinations. Individual issues regarding reliance in this case do not predominate over common issues where plaintiffs allege a common scheme of misconduct that applies to all class members. <u>See</u> <u>Eisenberg</u>, 766 F.2d at 786 (rejecting the argument that the individual questions regarding the reliance of each investor in the

---

[37]Health Net has already demonstrated its ability to use its computer system to determine beneficiaries affected by particular claims practices.

class predominated over common issues, and noting that a contrary conclusion would preclude class actions for securities fraud); In re The Prudential Ins. Co. of Am., 148 F.3d at 314 (upholding the class certification of a settlement class and rejecting the argument that individual questions regarding reliance on the allegedly deceptive sales practices meant that common issues did not predominate); Medicare Beneficiaries' Defense Fund, 938 F. Supp. at 1146-1147 (rejecting the argument that individual issues of reliance on alleged misrepresentations by the ERISA health benefit plan fiduciary predominated over common issues); In re Managed Care Litig., 209 F.R.D. 678, 696 (S.D.Fla. 2002)(granting class certification to the provider class and determining that there were no individual issues of reliance regarding the providers where they demonstrated that defendants had engaged in common practices to reduce provider reimbursements).[38]

###### 3. Typicality:

Typicality requires the Court to determine "whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members. . . ." Baby Neal, 43 F.3d at 57. Typicality ensures that the plaintiff's legal theories do not conflict with those of absent class members. Id. at 57. Commonality and typicality are similar, but commonality evaluates the sufficiency of the class itself, and typicality

---

[38]Health Net argues that Plucinski v. I.A.M. Nat'l Pension Funds, 875 F.2d 1052, 1056 (3d Cir. 1989) holds that individual questions of reliance preclude class certification in cases involving allegations that a plan administrator breached its fiduciary duties. This Court has reviewed Plucinski, but reliance is not discussed in that case. Rather, the Court held that under federal common law, "there is an equitable cause of action by employers for the recovery of contributions erroneously paid to pension funds due to a mistake of fact or law," but that the court should deny recovery, when, for example, it would result in underfunding of the plan. Plucinski, 875 F.2d at 1057-1058.

evaluates the sufficiency of the named plaintiff. Baby Neal, 43 F. 3d at 56; In Re The Prudential Ins. Co. of Am., 148 F.3d at 309. Health Net argues: 1) that McCoy is not typical of the class because the definition of UCR in her plan is unusual; 2) that no beneficiary is typical of any other because the plans vary; and 3) that unique defenses apply to the named Plaintiffs.

McCoy's insurance contract does differ from other large employer plans because it incorporates the standard set forth by the Board of New Jersey Small Employer Health Benefit Programs.[39] However, claims of the class members need not be identical as long as they are not in conflict with one another. Eisenberg, 766 F.2d at 786; In re The Prudential Ins. Co. of Am., 148 F.3d at 311 (" 'even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises from the same practice or course of conduct")(quoting Baby Neal, 43 F.3d at 58). Here, the predominant legal allegation is that the method of calculating allowed amounts was undisclosed, self-serving, and based on outdated and/or otherwise improper data. This central argument is not hinged on a specific UCR definition. McCoy also argues that Health Net used various other improper reimbursement reduction methods that apply to other plans as well.[40] If the Court deems it necessary, it can create an appropriate subclass. Brooks, 206 F.R.D. at 102 ("[t]o the extent there are differences among the claims of class members that implicate typicality, a court may create subclasses"); see also, Samuel, 538 F.2d at 996(reversing class decertification for determination

---

[39]Health Net states that there are two large employers in New Jersey which have plans incorporating the New Jersey regulation.

[40]Health Net asserts that McCoy's plan is also atypical because her out-of-pocket maximum is $2,500 whereas the out-of-pocket maximum in other plans is $3,500, and her coinsurance rate is 20% whereas the coinsurance rate in other plans may be a different percentage. These are distinctions without a difference.

of restitution and stating that the district court should have considered the possibility of creating subclasses before decertifying the class).

Health Net also asserts that neither Plaintiff is typical because the definition of UCR varies between plans, different methods of determining reimbursements are used in different situations, and different defenses may apply to different Plaintiffs. This argument is not persuasive. Health Net's own Q&A sheet about UCR issues tells its employees to be sure to quote the UCR definition from the appropriate contract, noting, "[*t*]*he meaning is the same*, but the wording does differ somewhat according to the contract." (emphasis added). Moreover, while certain allegedly improper reduction methods apply to some members and not necessarily to all, this does not defeat typicality because the Plaintiffs have alleged a common pattern of conduct in applying undisclosed and improper reimbursement methods. See In re The Prudential Ins. Co. of Am., 148 F.3d at 311-312 (holding that typicality was satisfied by the allegedly fraudulent scheme applying to all class members, even if different illegal sales practices were used on different beneficiaries).

Health Net has not proffered any unique defenses that will become the focus of the litigation, such that class certification would not be appropriate. Medicare Beneficiaries' Defense Fund, 938 F. Supp. at 1144 (citing Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner, & Smith, 903 F.2d 176, 180 (2d Cir. 1990)). While Health Net asserts that failure to exhaust, lack of damages, and waiver of payment by providers are individual defenses applicable to the Wachtels and to McCoy, these defenses are not unique and do not defeat typicality.[41]

---

[41]Health Net also asserts without specifics, that the Wachtels' plan differs from other class members in the way that allowable amounts and out-of-network reimbursements are calculated.

4.    Adequacy:

To demonstrate adequacy, the Plaintiffs must show: 1) adequacy of counsel and 2) lack of conflicts.  Wetzel, 508 F.2d at 247; Hassine v. Jeffes, 846 F.2d 169, 179 (3d Cir. 1988).  Counsel for McCoy and the Wachtels are well-seasoned and have demonstrated adequacy and tenacity during the protracted proceedings that have already occurred in this case.  McCoy and the Wachtels themselves have demonstrated sufficient personal knowledge of the central issues in the case (see In re Data Access Systems Securities Litig., 103 F.R.D. at 140-141), although, it is counsel who directs the litigation.  In re Managed Care Litig., 209 F.R.D. at 685 (finding that the plaintiffs satisfied the adequacy prong and explaining that plaintiffs' lack of understanding of some of the complexities of the case did not make them inadequate, especially when the plaintiffs are represented by zealous counsel). The Plaintiffs have also demonstrated their commitment to zealously pursuing their claims on behalf of other class members.

Neither Plaintiff has been shown to have interests that conflict with those of other class members.  Arguments that may not apply to all class members do not create a conflict.  McCoy, for example, has demonstrated that she seeks a finding that the undisclosed use of outdated data is a violation of Health Net's contractual and fiduciary duties, regardless of whether the EOC or SPD explicitly refers to a standard set by the New Jersey Board governing small employer health benefit programs.  Thus, she can adequately represent the interests of all those in her class, whether their plans incorporate the specific New Jersey regulation or not.

D.     The Requirements of Fed. R. Civ. P. 23(b)(3):[42]

Fed. R. Civ. P. 23(b)(3) requires the Court to find that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  The Rule contains a non-exhaustive list of the factors a Court should consider in determining whether the requirements of predominance and superiority are satisfied. They are:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

1.     Predominance of Common Questions of Law and Fact:

This Court has already discussed the predominance prong in conjunction with the threshold commonality requirement of Fed. R. Civ. P. 23(a), and has determined that common

---

[42]The Plaintiffs argue that class certification is also appropriate under Fed. R. Civ. P. 23(b)(2), that authorizes the certification of a class when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  The advisory committee notes indicate that subdivision (b)(2) is intended to reach any scenario in which the challenge would settle "the legality of the behavior with respect to the class as a whole."  "Class actions certified under Rule 23(b)(2) are restricted to those cases in which the primary relief sought is injunctive or declaratory in nature."  Reap v. Continental Casualty Co., 199 F.R.D. 536, 547 (D.N.J. 2001); see also, In re School Asbestos Litig., 789 F.2d at 1008. When a request for injunctive or declaratory relief is combined with a request for monetary relief, the monetary relief predominates unless it is incidental to the requested injunctive relief.  Reap, 199 F.R.D. at 547; Osgood v. Harrah's Entm't Inc., 202 F.R.D. 115, 129 (D.N.J. 2001). Because the Plaintiffs have satisfied the requirements of 23(b)(3), this Court need not at this time reach the question of whether class certification would also be appropriate under 23(b)(2).

issues predominate over any individual issues such as individual illnesses and treatments. <u>See</u>

Section II(C)(2) *supra*. The legal and factual issues regarding Health Net's alleged use of

improper reimbursement practices are central to the determination of Health Net's liability to each

class member.

    2.  <u>Superiority of Class Action to Other Available Methods of Adjudication</u>:

    Class action is the superior form of litigation in this case because it ensures that potentially

meritorious claims will be addressed efficiently and without waste of judicial resources. There is

no indication that individual members of the class have a compelling interest in controlling the

prosecution of separate actions. Indeed, the high cost of prosecuting this complex case on an

individual basis suggests that the opposite is true. <u>See</u>, <u>e.g.</u>, <u>In re Prudential Ins. Co. of Am. Sales</u>

<u>Practices Litig</u>., 962 F. Supp. 450, 524 (D.N.J. 1997), <u>aff'd</u> 148 F.3d at 316. This Court is not

aware of pending litigation against Health Net by any proposed class members that would

undermine the suitability of class litigation. The high cost of this complex litigation also suggests

that meritorious claims may go unaddressed unless the Plaintiffs are permitted to proceed as a

class. <u>In re Mercedes-Benz Antitrust Litig</u>., 213 F.R.D. at 192. Relitigating the same issues and

presenting similar evidence regarding Health Net's policies and practices and non-disclosures for

out-of-network charges would be inefficient and wasteful of judicial resources. <u>Brooks</u>, 206

F.R.D. at 108. Joinder or wholesale intervention would result in a multiplicity of repetitive

actions.

    While this case is not easy, it is both desirable and manageable to litigate this case as a

class action in this forum. Even if individual damages calculations present individual issues, no

need for "mini-trials" is anticipated. Rather, if it is determined that Health Net is liable for

violations of ERISA, Health Net can recalculate its reimbursements for each class member whose benefits were determined based on improper methods. If the computation of damages becomes difficult and if exceptional conditions arise, the Court may consider whether this is an appropriate case for appointment of a special master to submit a damage report. Fed. R. Civ. P. 53(b); La Buy v. Howes Leather Co., 352 U.S. 249, 254, 77 S.Ct. 309, 312 (1957); Apex Fountain Sales, Inc. v. Kleinfeld, 818 F.2d 1089, 1096 (3d Cir. 1987); In re Mercedes-Benz Antitrust Litig., 213 F.R.D. at 192; Kyriazi v. Western Electric Co., 465 F. Supp. 1141, 1147 (D.N.J. 1979), aff'd, 647 F.2d 388 (3rd Cir. 1981); McLendon v. Cont'l Can Co., 908 F.2d 1171, 1173 (3rd Cir. 1990); Rios v. Enter. Ass'n Steamfitters Local Union, 860 F.2d 1168, 1174 (2nd Cir. 1988) (special master appointed to compute and distribute back pay in civil rights class action); Allen-Myland, Inc. v. Int'l Bus. Machines Co., 770 F. Supp. 1014, 1029 (E.D. Pa. 1991) (citing Chang v. Univ. of R.I., 606 F. Supp. 1161 (D.R.I. 1985)). In addition, after liability is determined, if damages present manageability problems, the Court may amend the class or establish sub-classes for damages calculations. In re Mercedes-Benz Antitrust Litig., at 192; In re Ikon Office Solutions, Inc., 191 F.R.D. 457, 463 (E.D.Pa. 2000)(noting that class certification is conditional until judgment is entered, and it is the court's duty to reassess class certification decisions in light of the case's development)(citing Barnes v. American Tobacco Co., 161 F.3d 127, 140 (3d Cir. 1998)).

The Court has considered that Health Net may use a different database for determining UCR for West Coast Plans and that Health Net may not have used outdated data for the West Coast plans. Because the general method of determining UCR is substantially similar even if a different database is used, the Court will not exclude these plans from the class. Rather, the Court will consider creating a subclass for the West Coast plans. In re The Prudential Ins. Co. of Am.,

148 F.3d at 315 (explaining that the court could create subclasses that group members based on similarities in state laws).[43]  Different states may have different regulations applicable to employer health benefit plans.  If such differences render it useful to create subclasses, grouping together states with similar regulations, this can be done.  Id.  Because Health Net only administers plans in the Northeast and on the West Coast, there are quite a limited number of states involved in this action, so that this will not portend any manageability problems.

        3.      Notice to Absent Class Members:

When a class is certified under Fed. R. Civ. P. 23(b)(3), the plaintiff is required to notify all absent class members, pursuant to Fed. R. Civ. P. 23(c)(2).  The Court must direct the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  The notice must include, in easily understood language:

> the nature of the action; the definition of the class certified; the class claims, issues, or defenses; that a class member may enter an appearance through counsel if the member so desires; that the court will exclude from the class any member who requests exclusion, stating when and how a class member may elect to be excluded; and the binding effect of a class judgment on class members under Rule 23(c)(3).

---

[43]In its brief in opposition to class certification, Health Net has argued that Health Net, Inc. is not a fiduciary of any of the plans offered by its subsidiaries, and that therefore, the Plaintiffs have no viable claims against it.  According to Health Net's argument, the West Coast plans should not be included in class certification because they have not been named as Defendants, and Health Net, Inc. cannot be held liable for issues related to these plans.  On December 9, 2003, this Court permitted Health Net to file a motion on this issue of whether Health Net, Inc. and Health Net of the Northeast are ERISA fiduciaries once discovery is complete.  At this stage, there is no motion pending regarding the issue of whether Health Net, Inc. is a fiduciary.  If such a motion is filed in accordance with this Court's case management Order, the Court will consider it.

Although Plaintiffs have not yet submitted a proposed method of notification, Plaintiffs will be able to notify all absent class members by referring to Health Net's records to determine names and addresses of class members. Plaintiffs are required to submit to this Court evidence of its plan for compliance with the notification requirement set forth in the rules, including dates of planned action, promptly.

E.    <u>Definition of the Classes</u>:

The Court grants class certification for the following classes:

McCoy's class:

> All persons in the United States who are, or were, at any time during the period within six years of the date this action was filed (the 'Class Period'), subscribers or beneficiaries in any Choice plan who received medical services or supplies (including *inter alia*, surgery, anesthesia, and the like) from an out-of-network provider and for whom Defendants made reimbursement determinations less than the provider's actual charge and which are unauthorized by, or inconsistent with beneficiaries' Contracts of Insurance, SPD, or governing law. In addition, the Class includes all subscribers or beneficiaries in such plans for whom Defendants failed to disclose required or accurate information, to provide the specific reasons for a denial of a benefit, or failed to comply with the beneficiary's Summary Plan Descriptions and/or Contracts of Insurance.

Wachtels' class:

> All persons in the United States who are, or were, at any time during the period within six years of the date this action was filed (the 'Class Period'), subscribers or beneficiaries in any small employer health plan who received medical services from an out-of network provider and for whom Defendants made a determination that did not comply with the New Jersey Regulation related to out-of-network reimbursement, or otherwise failed to comply with the New Jersey Regulations, by, for example, failing to pay fully mandated benefits. In addition, the Class includes all subscribers or beneficiaries in such small employer health plans for whom Defendants failed to disclose required or accurate information, to provide the specific reasons for a denial of a benefit, or failed to

comply with the beneficiary's Summary Plan Descriptions and/or Contracts of Insurance.

The Court may create subclasses if they become useful to better manage the litigation. In addition, the Court will continue to review the class definitions as the litigation progresses, to ensure that they remain appropriate. If necessary, the Court will modify the class definitions. If any party believes that the definition of the classes should be modified, or subclasses created, it may submit proposed modifications to this Court.

**Conclusion:**

This Court recognizes the complexity of this case and the important and difficult legal and factual issues it presents. Although it is complex, it is not unmanageable, and the Plaintiffs have met their burden of demonstrating that the requirements for class certification under Fed. R. Civ. P. 23(a) and 23(b)(3) are satisfied. Accordingly, the Plaintiffs' Motions for Class Certification are granted, and the Defendants' Motion to Dismiss for failure to exhaust is denied. The Plaintiffs must notify all absent class members pursuant to Fed. R. Civ. P. 23(c), and shall file a plan for notification promptly. Once the Plaintiffs have demonstrated that notice is complete and that absent class members have been given an opportunity to opt out of the class, the Court will proceed with the Plaintiffs' motion for partial summary judgment and McCoy's motion for a preliminary injunction. An appropriate order shall issue.

/s/ Faith S. Hochberg

Hon. Faith S. Hochberg