**NOT FOR PUBLICATION**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____
)
ZEV AND LINDA WACHTEL, *et al.*,           )     Civ. Docket No.   01-4183
)     Hon. Faith S. Hochberg, U.S.D.J.
Plaintiffs           )
)
v.                    )
)
GUARDIAN LIFE INS. CO., *et al.*,              )
)
Defendants.          )
_____)

_____
)
RENEE MCCOY, individually and on           )
behalf  of all others similarly situated,           )     Civ. Docket No.   03-1801
)     Hon. Faith S. Hochberg, U.S.D.J.
)
Plaintiffs           )     **OPINION**
)
v.                    )
)     Date: August 5th, 2004
HEALTH NET, INC., HEALTH NET           )
OF THE NORTHEAST, INC., and           )
HEALTH NET OF NEW JERSEY, INC.           )
)
Defendants.          )
_____)


**HOCHBERG, District Judge:**

     This matter calls upon the Court to determine whether <u>In re Kensington Int'l Ltd.</u>, 368

F.3d 289 (3d Cir. 2004), cited widely by Defendants[1] in their Motion for Recusal, or any other

---

     [1]The Defendants are Health Net, Inc., Health Net of the Northeast, Inc., and Health Net of
New Jersey, Inc.  In this opinion, they will be referred to collectively as "Health Net."  Guardian

authority pursuant to 28 U.S.C. § 455(a), persuades me that I should not continue to preside over this case. I have considered the parties' briefs and written submissions. I must evaluate whether I am biased for or against any of the parties, and must determine whether a reasonable person could conclude that there is a potential appearance of bias based on all the relevant circumstances raised in the submissions by counsel.

**Factual Background:**

A detailed discussion of the factual allegations and applicable law is not necessary for the purposes of this recusal motion, but it is important to understand the nature of the action in order to evaluate the Defendants' assertion that recusal is warranted due to an appearance of partiality. Therefore, a relatively brief summary of the allegations and issues involved in this long and complex litigation follows.

Wachtel et al. v. Guardian Life Ins. Co., et. al. was filed in 2001, and was nearly three years old when the Defendants filed their recusal motion in the late afternoon preceding the day scheduled for oral argument of the Plaintiffs' class certification motion. McCoy v. Health Net, Inc., Health Net of the Northeast Inc., and Health Net of New Jersey, Inc., was filed in 2003. These cases have been consolidated for pre-trial purposes. The Plaintiffs in both actions are beneficiaries of two different employee benefit health plans offered by Health Net of New Jersey, Inc. They seek class certification for Health Net beneficiaries nationwide to address alleged misconduct by Health Net in administering reimbursements to its health plan beneficiaries who choose out-of-network health care providers. The Plaintiffs allege that Health Net breached its

---

Life Insurance Company was dismissed by stipulation of the parties on March 22, 2004.

fiduciary duties and the terms of its health plan contracts by: concealing information; providing

insufficient Summary Plan Descriptions; failing to provide information upon request; using

improper, undisclosed, and self-serving reimbursement reduction methods for beneficiaries who

opt to use out-of-network providers; and deterring the filing of grievances and/or appeals through

misleading statements.

At the core of the Plaintiffs' claims are their allegations regarding Usual, Customary, and

Reasonable Charges ("UCR").[2]  Plaintiffs contend that when a patient uses an out-of-network

provider, Health Net pays a percentage of a certain allowed charge.  Often, the allowed charge is

to be determined by the UCR charge for the service provided.  Health Net covers a percentage of

the UCR charge and the beneficiary is responsible for the remaining percent of the UCR charge

as well as for the remainder of the doctor's bill that exceeds the Usual, Customary, and

Reasonable charge.   Thus, the amount of insurance coverage that such a Health Net beneficiary

receives is heavily dependent on how UCR is defined.

The Plaintiffs object to various methods that Health Net uses in calculating UCR.  A

central, but not exclusive, component of the Plaintiffs' allegations is Health Net's use of outdated

data to calculate UCR charges.   To determine UCR charges for out-of-network services, Health

Net refers to a nationwide database compiled by Ingenix, Inc.  The database includes amounts

charged by various providers for medical services and is updated twice a year.  For a three-year

period from 1999 to 2002, Health Net's executives decided to use 1998 data to make its UCR

---

[2]On November 20, 2003, December 10, 2003, and March 3, 2004, the Court held an evidentiary hearing on Plaintiff McCoy's motion for a preliminary injunction.  The witnesses were Health Net employees.  The transcript of the hearing spans 552 pages, and the facts referenced in this opinion are drawn from the testimony at that hearing.

determinations.  The Plaintiffs assert that the use of such outdated data without disclosure to the beneficiaries violated the terms of the plans and Health Net's fiduciary duties.  In addition, Plaintiff McCoy objects that the database is flawed and not reflective of the true UCR charge for services rendered.

Although the vast majority of Plaintiffs' contentions focus on Health Net's practices in calculating UCR charges, they also allege that Health Net used other improper and/or undisclosed methods to determine reimbursements for beneficiaries who use out-of-network providers.  They argue that, regardless of the prevalence of these methods in the health care industry, they are not properly applied to Health Net beneficiaries because Health Net does not explain or define these rules in its plan documents.  For example, the Plaintiffs argue that Health Net improperly applied in-network fee schedules to out-of-network reimbursements without properly informing beneficiaries and  improperly applied various insurance rules known in the vernacular as the "multiple procedure  (multiple surgery) rule," the "assistant surgeon (co-surgeon) rule," "downcoding," and "bundling"[3] without proper notice to beneficiaries.

**Procedural History:**

The Wachtels' Complaint was removed from state to federal court on August 31, 2001, and was assigned to me.  On April 23, 2003, Plaintiff Renee McCoy ("McCoy") filed her initial

---

[3]Under the multiple procedure rule, Health Net pays 100% of UCR for the first procedure, 50% of UCR for the second procedure, and 25% of UCR for the third and subsequent procedures.  Similarly, Health Net pays only a certain percent of the charge for services performed by co-surgeons or assistant surgeons. "Downcoding" refers to an alleged practice by which Health Net calculates reimbursements by using a lower procedure code than the one entered by the health care provider; "bundling" refers to an alleged practice by which Health Net groups various codes listed by a provider and gives the combination a lower value than the sum of the individual codes.

Complaint, accompanied by motions for preliminary injunction and class certification. That case was likewise assigned to me. On July 24, 2003, Magistrate Judge Shwartz consolidated the two matters for pre-trial purposes because they involved significant common questions of law and fact.

Since August 2001, I have issued various pre-trial orders and legal decisions on motions, and have spent considerable time in an effort to learn the factual and legal issues involved in this complex case. In April 2002, Health Net moved to dismiss the <u>Wachtel</u> case on the grounds that Health Net's reimbursement policies were in strict compliance with New Jersey regulations. In May 2002, Health Net paid $32,000 to the Wachtels and then moved to stay discovery. In June 2002, Health Net moved for summary judgment on the grounds that the Wachtels' claims were moot; the motion for summary judgment was denied. At or about the same date in June 2002, the New Jersey Commission of Banking and Insurance ("Insurance Commission") was investigating Health Net's various reimbursement practices; it found, *inter alia,* that Health Net violated the New Jersey regulation governing small employer health plans by using outdated data for reimbursements to beneficiaries. (Wachtel was a member of a small employer health plan.) Health Net reached a consent decree with the Insurance Commission in December 2002 and paid restitution to beneficiaries of small employer health plans in New Jersey.

Health Net and its counsel averred in counsel's certifications and witness affidavits supporting their motion papers and in discovery that Health Net was in strict compliance with the New Jersey regulations and that Plaintiff McCoy's concern over outdated data was unfounded. Health Net did not disclose the state investigation to the Plaintiffs or this Court. Based on a

concern that counsel's statements and witnesses' averrals might be at odds with the actual facts brought to my attention about the state investigation, some discomforting questions were posed to the Defendants.[4]

The Wachtels filed a third Amended Complaint on October 17, 2003, accompanied by a renewed motion for class certification; McCoy filed an Amended Complaint on August 11, 2003 and moved for class certification. At the request of the Defendants, Magistrate Judge Shwartz postponed briefing on the motions for class certification in both matters in order to permit the Defendants to complete all discovery related to class certification. Magistrate Judge Shwartz permitted fact discovery to continue until March 5, 2004. She extended this deadline to April 29, 2004, and then again to September 30, 2004, at the request of the parties. Health Net's opposition to the Plaintiffs' motions for class certification was due April 1, 2004, and this Court extended that deadline to April 13, 2004, at the Defendants' request.

Although the class certification motions were continued to permit time for discovery, I conducted a full hearing on McCoy's preliminary injunction motion, based upon alleged breach of fiduciary duty. The hearing took place on November 20, 2003, December 10, 2003, and March 3, 2004.

On December 22, 2003, the Plaintiffs filed motions seeking partial summary judgment. At that time, I also requested the parties to brief whether or not I should decide the partial summary judgment motions prior to deciding the class certification motions. Defendants urged

_____

[4]For example, I required the Defendants to provide the information they used to make the assertions in their interrogatories, affidavits, briefs, motions, and pleadings, representing compliance with the New Jersey regulations and to explain why the Insurance Commission's investigation was unmentioned.

that I should not do so. During a scheduling conference held during a break in the preliminary injunction hearing, the parties recommended that my decisions on the preliminary injunction motion and on the motions for partial summary judgment await the decision on class certification.

The class certification motion was scheduled for oral argument on June 15, 2004. In the late afternoon of June 14, 2004, the Defendants sent to chambers, via facsimile, the instant 88 page motion for recusal and requested that this Court stay the Class Certification oral argument on June 15, even though the motion had already been fully briefed. Defendants submitted no legal authority in support of a stay, and it was thus denied.

Several motions are pending, including, *inter alia*, motions for class certification, a motion for interim relief alleging that Health Net violated its fiduciary duties under ERISA, and motions for summary judgment based on Health Net's use of outdated data in calculating UCR. However, I must first determine whether, in light of all the circumstances, I harbor any bias or whether an appearance of partiality exists such that a reasonable person might question my ability to render an unbiased judgment. Consideration of the class certification motion was well underway by the time this Court received the Defendants' motion for recusal, but, after hearing oral argument, further consideration was postponed to determine whether there was any basis at all for even a perception of bias by me.

**Analysis:**

**I.      Legal Standard:**

28 U.S.C. § 455(a) states that a judge shall recuse herself whenever her impartiality

"might reasonably be questioned."  The test for determining whether recusal is required under § 455(a) is whether "a reasonable person, knowing all the acknowledged circumstances, might question the district court judge's continued impartiality."  <u>Alexander v. Primerica Holdings, Inc.</u>, 10 F.3d 155, 164 (3d Cir. 1993).  The question is not whether the judge has actual bias, but whether a reasonable person could perceive bias.  <u>In re Kensington, Int'l Ltd.</u>, 368 F.3d 289, 294 (3d Cir. 2004).  The reasonable person standard refers to the average lay person, rather than a person familiar with the type of complex litigation at issue.  <u>Id.</u> at 302-303 (refusing to depart from the "man on the street" standard and explaining that § 455(a) was enacted by Congress because " 'people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges.'") <u>Id.</u> at 302 (citing <u>In re School Asbestos Litig.</u>, 977 F.2d 764, 782 (3d Cir.1992)(quoting <u>Liljeberg v. Health Servs. Acquisition Corp.</u>, 486 U.S. 847, 864-865, 108 S.Ct. 2194 (1988)).  The trial judge herself must rule on a motion to recuse under § 455.  <u>Lambert v. Blackwell</u>, No. 96 Civ. 6244, 2001 WL 410639, at * 2 n. 2 (E.D.Pa. Apr. 20, 2001).

**II.      Timeliness of the Defendants' Motion for Recusal:**

Although 28 U.S.C. § 455 does not contain an express timeliness requirement, courts have concluded that parties seeking recusal must do so in a timely manner.  <u>Kensington</u>, 368 F.3d at 312 (citing <u>In re IBM Corp.</u>, 45 F.3d 641, 643 (2d Cir. 1995); <u>In re Apex Oil Co.</u>, 981 F.2d 302, 304 (8th Cir. 1992)).  Although "[t]he judicial process can hardly tolerate the practice of a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they

are not forthcoming," timeliness is only one of the factors a court considers in determining whether to grant a motion to recuse.  Kensington, 368 F.3d at 312 (quoting Smith v. Danyo, 585 F.2d 83, 86 (3d Cir. 1978)).

In certain circumstances, when considering the timeliness of the recusal motion, the court may find that the party seeking recusal had constructive knowledge or imputed knowledge of the alleged grounds for recusal.  See, e.g., Nat'l Auto Brokers Corp. v. Gen. Motors Corp., 572 F.2d 953, 958-959 (2d Cir. 1978)(finding that the motion to disqualify was untimely because the judge's former membership in the defendant's law firm had been public knowledge for years); Martin v. Monumental Life Ins. Co., 240 F.3d 223, 236 (3d Cir. 2001)(denying motion for recusal where six years had elapsed since judge resigned from law firm representing the defendant and where the judge's employment with the firm was public information); Universal City Studios, Inc. v. Reimerdes, 104 F. Supp. 2d 334, 349-350, 352-353 (S.D.N.Y. 2000)(holding that motions to recuse under 28 U.S.C. § 144 and 28 U.S.C. § 455 were untimely and imputing knowledge to the defendants when another partner in the defendant's law firm had knowledge of the alleged basis for recusal under § 144).  However, in order to find constructive or imputed knowledge, the moving party's connection to the available information must not be too attenuated.  Kensington, 268 F.3d at 314-315.

A time line of key events is useful in considering the timeliness of the Defendants' motion:

August 31, 2001:     Wachtel matter removed to federal court and assigned to me.

April 2002:          Health Net moved to dismiss asserting it had complied with New Jersey regulations.

| | |
|---|---|
| May 2002: | Health Net paid $32,000 to the Wachtels. |
| June 2002: | Health Net moved for summary judgment on the grounds that the Wachtels' claims were moot. Insurance Commission investigated Health Net and found in December 2002, *inter alia*, that Health Net used outdated data for UCR calculations, in violation of the New Jersey regulations. |
| April 23, 2003: | Complaint filed in the <u>McCoy</u> matter and assigned to me. |
| July 2003: | This Court inquired as to the Evidence of Coverage ("EOC") that applied to McCoy, after this Court found a discrepancy between the EOC Health Net represented as McCoy's, and the EOC that McCoy had presented. |
| August 4, 2003: | Health Net confirmed that it had provided the incorrect EOC. |
| October 21, 2003: | Preliminary Injunction hearing was scheduled for November 20, 2003. Health Net was required to bring as witnesses, the executives who: 1) could explain Health Net's unawareness of the proper contract with McCoy and 2) provided the information used in interrogatories, affidavits, briefs, motions, and pleadings in which Health Net represented it was in compliance with the New Jersey regulations governing small employer plans, in apparent conflict with the administrative finding that the opposite was true. |
| November 20, 2003: | First day of Preliminary Injunction hearing. |
| December 10, 2003: | Second day of Preliminary Injunction hearing. |
| December 22, 2003: | Plaintiffs moved for partial summary judgment on the issue of outdated data. |
| March 3, 2004: | Final day of Preliminary Injunction hearing. (Health Net witness acknowledged signing an affidavit without knowledge of the facts represented.) |
| April 2004: | Defense counsel suddenly discovered 1995, 1997, and 1999 <u>New Jersey Law Journal</u> articles forming basis for recusal motion. |
| May 3, 2004: | Briefing complete on class certification motions. |

| June 3, 2004: | Oral argument on class certification set for June 22, 2004. After the Defendants indicated they were unavailable on that date, the Court changed the date to June 15, 2004. |
|---|---|
| June 14, 2004: | Defendants made FOIA request to Justice Department and FBI about "judicial spouse." Defendants faxed lengthy motion for recusal late in the afternoon, stating that the factual basis was first discovered in April 2004 (just after completion of the Preliminary Injunction hearing). |
| June 15, 2004: | Oral argument held on class certification. |

The Defendants' motion for recusal is premised in large part on articles dated December 11, 1995, April 18, 1996, and October 25, 1999, printed in the New Jersey Law Journal, a local publication read by many members of the New Jersey bar, that speculate about my nomination to the bench. The articles in 1995 and 1996 discuss a Justice Department investigation of certain doctors affiliated with the Newark Cardiovascular and Thoracic Surgery Group ("the Group"), and the 1999 article discusses a dispute about who would succeed me as U.S. Attorney if I were to be confirmed as a judge. The recusal motion is also premised on comments made during the Preliminary Injunction hearing held on November 20, 2003, December 10, 2003, and March 3, 2004. There is no allegation of *ex parte* communications.

Several of the comments and questions the Defendants now cite as demonstrating bias were posed during the first day of the hearing on November 20, 2003. The Defendants did not object then, nor at any other time until the day before oral argument on class certification, seven months later.

With respect to the old legal trade press articles, Defense counsel asserts that he first saw them in April 2004. However, the Defendants waited nearly two months to initiate their request

for information pursuant to the Freedom of Information Act, 5 U.S.C. §§ 552 and 552(a) ("FOIA") (urged as a basis for a stay) and then did so only on June 14, 2004, the afternoon preceding the Class Certification oral argument. Newspaper articles are about as "public" as one can get in setting out the information in 1996. Moreover, partners of McCarter & English served on the board of the <u>New Jersey Law Journal</u>, making it a near certainty that at least some partners at McCarter & English did have actual knowledge of these old articles at or about the time they were written.[5]

Kensington does not preclude a court from finding constructive or imputed knowledge. Rather, the Third Circuit stated that "[t]here may be instances in which constructive knowledge is so pervasive, it is tantamount to actual knowledge," 368 F.3d at 314 and ". . . . imputed knowledge can, under limited circumstances, render a recusal motion untimely. . . ." <u>Id</u>. This motion may well present one of those instances, given that McCarter & English is based in Newark, New Jersey, and my nomination to the District Court for the District of New Jersey was reported in various newspapers and journals, including the <u>New Jersey Law Journal</u>. Thus, Defendants' connection to the public information on which they now base their recusal motion is much more substantial than in <u>Kensington</u>. However, because of the conclusions below, it is not necessary at this time to reach the question of constructive or imputed knowledge of McCarter & English nor the issue of Defendants' timeliness.[6]

---

[5]Indeed, one current partner at McCarter & English was at that time one of my deputy chiefs at the U.S. Attorney's Office while I was United States Attorney, and knew about these articles.

[6]The FOIA request, urged as a basis for a stay, was untimely.

**III.    This Court's Comments at the Preliminary Injunction Hearing:**

The Defendants state that my questions and comments during the Preliminary Injunction hearing support their motion for recusal.  Although they did not object at that time, they now object to comments and questions regarding: 1) the ability of beneficiaries to understand their contracts of insurance; 2) consumers' expectations about what data is used to calculate UCR; and 3) the potential for financial benefit if Health Net does not timely pay claims.  I asked these questions in an effort to understand the issues in this case.  I required answers to these questions in order to adequately consider McCoy's ability to demonstrate likelihood of success on the merits and irreparable harm, and to assess the validity of Health Net's defense that the Plaintiff failed to exhaust her administrative remedies and thus should be denied relief.

According to the extra-judicial source doctrine, alleged bias stemming from facts gleaned from the judicial proceedings will rarely be grounds for recusal.  Securacomm Consulting, Inc. v. Securacomm Inc., 224 F.3d 273, 278 (3d Cir. 2000); Liteky v. U.S., 510 U.S. 540, 555, 114 S.Ct. 1147, 1157 (1994); In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 343 (3d Cir. 1998).  Thus, judicial remarks during the course of litigation do not ordinarily support a bias or partiality challenge, even when those remarks are critical or disapproving of the parties or their cases.  Securacomm, 224 F.3d at 278;  U.S. v. Bertoli, 40 F.3d 1384, 1412 (3d Cir. 1994).  It is only when the remarks show a deep-seated favoritism or antagonism, demonstrating an inability to render fair judgment, that recusal is appropriate.  Liteky, 510 U.S. at 444; Bertoli, 40 F.3d at 1412.

Defense counsel repeatedly urged me to look at the alleged lack of irreparable harm and

not to look at the facts of Health Net's conduct. I patiently explained each time that I was looking at both prongs of the injunction test. The Defendants' brief suggests that to apply the extra-judicial source doctrine is to disregard Kensington. This is baseless. Kensington simply reiterated that, under § 455(a), the appearance of bias can require recusal. The decision cannot reasonably be read to change well-settled precedent holding that a judge's questions or comments regarding factual and legal issues that have arisen in the litigation are not a basis for recusal, unless the questions and comments display a deep-seated favoritism or antagonism.[7]

    A.    <u>Beneficiaries' Understanding of their Plans</u>:

No reasonable person could perceive this Court's effort to determine whether ordinary beneficiaries would understand the terms of their plans to exhibit bias. Surprisingly, the Defendants argue that my questions about the beneficiaries' ability to understand their plans "cannot possibly be aimed at developing or understanding issues in either case because the law is clear that the applicable standard under ERISA is simply whether Health Net acted arbitrarily or capriciously in applying the terms of the health plans. Consumer expectations are wholly irrelevant as to agreements between the plan members and Health Net. . . ." (Health Net's Brief in Supp. of Mot. for Recusal at 12.) However, the consumers are the plan beneficiaries, and Health Net is their fiduciary. In order to apply the correct legal standard to this case, the

---

    [7]In <u>Kensington</u>, the district court judge appointed consulting advisors to assist in the process of settling complex asbestos litigation. The Third Circuit determined that the advisors had a conflict of interest due to their obligation to advance the interests of future asbestos claimants in a different asbestos action. The Third Circuit was concerned that the trial court judge had received off-the-record advice from advisors with bias. <u>Kensington</u>, 368 F.3d at 304. Based on the advisors' conflict of interest, the Third Circuit held that there was the appearance of bias, though not actual bias, by the judge. <u>Id</u>. No such issues are present here.

reasonableness of Health Net's decisions is clearly relevant. Plaintiffs allege that the Defendants

failed to properly define and disclose various terms in the plans. Surely, it is relevant to this

inquiry whether Health Net's interpretations are commensurate with what the reasonable

beneficiary would understand the plan to mean. Indeed, ERISA § 503, 29 U.S.C. § 1133

explicitly requires every employee benefit plan to:

> 1) provide adequate notice in writing to any participant or
> beneficiary whose claim for benefits under the plan has been
> denied, setting forth the specific reasons for such denial, written in
> a manner calculated to be understood by the participant; and 2)
> afford a reasonable opportunity to any participant whose claim for
> benefits has been denied for a full and fair review by the
> appropriate named fiduciary of the decision denying the claim.

B.  <u>Questions Regarding Outdated Data</u>:

The Defendants further object to questions I asked regarding Health Net's use of outdated

data. No reasonable person could view those words as aimed at anything beyond an

understanding of the very heart of this matter. One of the primary questions in this litigation is

whether Health Net's executives' decision to use outdated data in calculating UCR was arbitrary

and capricious. Whether Health Net disclosed or hid the decision is also relevant. It appears to

be undisputed that Health Net's use of outdated data violated the New Jersey regulation

governing small employer health plans. While the New Jersey regulation does not apply to all of

Health Net's plans, that standard set by the state for UCR determinations is referenced in

McCoy's plan. Thus, in an effort to determine whether McCoy has a likelihood of succeeding on

the merits of her claims and to evaluate her claim of irreparable harm, I endeavored to learn

whether Health Net informed beneficiaries that it had used outdated data and whether Health

Net's determination that it is entitled to use such data in plans other than small employer plans in New Jersey was arbitrary and capricious.[8]

## C. Questions About the "Float:"

Defendants object to my questions about the "float"– a colloquial reference to interest earned on money that is due to be paid to a beneficiary while the payment process is pending.[9] These questions are directly related to Health Net's administrative appeals process, which is part of this case. The relief Plaintiff McCoy seeks on her motion for preliminary injunction is removal of Health Net as a fiduciary. In assessing Health Net's capacity as a fiduciary, it is relevant both whether Health Net timely makes reimbursements to beneficiaries who pay for out-of-network care and whether Health Net corrects reimbursements after resolving an appeal in favor of beneficiaries. The issue of whether Health Net pays claims timely is also relevant to

---

[8]The Defendants argue that I "opined" that a consumer would expect insurers to use current data. However, each of the passages quoted by the Defendants contains questions posed regarding beneficiaries' knowledge and expectations. For example, I asked, ". . . .if you were a customer, wouldn't you assume that a customer's year data would be used unless otherwise negotiated for" (Dec. 10, 2003 Tr. 131:19-21), and "I'm thinking of it from the perspective of a consumer. In other words, how do they know what they're buying. . . ." (Dec. 10, 2003 Tr. 146: 5-8.) These questions and comments reflect the development of information obtained through this litigation. Health Net admitted, for example, that it did not inform beneficiaries of its use of outdated data for UCR determinations. In addition, a telephone script was introduced that instructed Health Net employees to answer beneficiaries' inquiries by stating that the insured actually owed Health Net a refund of reimbursement rather than the converse, but that Health Net would not seek to collect it. Health Net's executives may have struggled to answer this Court's questions about outdated data, but difficult questions are not a basis for perceived bias.

[9]I note that no memoranda about, nor computer calculations of, the financial benefit gained by delayed payment of claims have yet been produced in response to the Court's inquiry. This footnote is a gentle reminder, in case the request was forgotten in an oversight.

Health Net's defense of exhaustion.[10]  The mere fact that the Plaintiffs did not use the somewhat colloquial term "float" does not create an appearance of partiality when the Plaintiffs clearly do complain about the adequacy of Health Net's appeals process and payments.   Moreover, I used that term very early in the litigation, and there was no objection to answering my questions.

It cannot reasonably be argued that this Court's inquiry into the "float" stems from extra-judicial sources.  Had any objection been made, I would have been pleased to explain the basis for my inquiry at the time.  The inquiry stems from the numerous volumes of exhibits submitted in the hearing.  These involve, *inter alia*, the propriety of the appeals process for ERISA fiduciaries, which includes the timeliness of claims processing.  The questions stemmed from the legal and factual issues raised in the litigation, and do not form a proper basis for recusal.  Securacomm, 224 F.3d at 278;  U.S. v. Bertoli, 40 F.3d at 1412; Liteky, 510 U.S. at 545.

    D.    Other Comments:

The other passages cited by the Defendants indicate that I had not yet reached a conclusion about the proper interpretation of the ERISA plans.  For instance, as I questioned a Health Net witness regarding a beneficiary's ability to understand the terms of the insurance contract, I specifically stated, "[b]ut I'm looking forward to getting it very clear.  It is, certainly, hopefully there is a document somewhere that explain [sic] that in laymen's terms to regular people that don't have the extraordinary expertise of Mr. Sibol."  (Nov. 20, 2003 Tr. 109:2-6.)

---

[10]Timely payment is an issue in dispute.  Health Net represents that it pays claims timely because it would otherwise be forced to pay interest.  Plaintiffs counter with the Market Conduct Report issued by the New Jersey Commission of Banking and Insurance that found that Health Net failed to pay interest in 42% of the cases in which beneficiaries appealed and won.  Market Conduct Examination of the Physicians Health Services of New Jersey, Inc., p. 16-17.  This Court does not make any fact findings of disputed issues in this Opinion.

Similarly, regarding the use of outdated data, I specifically noted that I had not reached a conclusion about the issue, stating, "I'm at a no harm, no foul point. I'm trying to figure out how consumers know what they're getting."[11] (Dec. 10, 2003 Tr. 150:1-3.)

## IV. The Justice Department Inquiry:

Defendants also base their recusal motion, in substantial part, on the fact that my husband was, prior to late 1993, affiliated with the Newark Cardiovascular and Thoracic Surgery Group. The Defendants allege that my nondisclosure in 2001 of a Department of Justice inquiry into the billing practices of some doctors in the Group in or about 1996 was improper. Health Net's briefs misstate the "facts" set forth in the very exhibits they submit. Nevertheless, I struggled to discern and then to fully consider, every possible basis that the Defendants' briefs can be deemed

---

[11]In affidavits, although not in the moving briefs, the Defendants also object to statements I allegedly made during a status and scheduling conference on March 3, 2004, in the presence of both parties. After the conference, the Preliminary Injunction hearing continued, without any objection by the Defendants to the comments supposedly made in chambers. The Defendants did not seek to place these allegedly objectionable comments on the record, and I have no transcript of exactly what was said. Defendants also submitted no notes of the informal scheduling discussion. The affidavits submitted by the Defendants suggest that I complained about the number of good in-network doctors; however, the only quoted word is "good." I do recall that I engaged, with all counsel, in a cordial conversation regarding health insurance in general. Many persons sat around a conference table freely interrupting in a casual manner, including Mr. Pendleton, Ms. Taylor, Guardian' s counsel, and Plaintiffs' counsel. The word "good" could have been said by me or anyone at the table. No reasonable person could determine that general comments, if made at all, regarding customer service and doctors in the health care industry, during the course of an amicable conversation with all parties, demonstrate an appearance of bias or partiality against Health Net. See, e.g., In re Initial Pub. Offering Sec. Litig., 174 F. Supp. 2d 70, 97 (S.D.N.Y. 2001)(holding that a judge's expression of disappointment at having lost money in stock portfolios, in a class action involving allegations that issuers of initial public offerings manipulated stock prices, did not " 'display a deep-seated favoritism or antagonism that would make fair judgment impossible.' ")(quoting Liteky, 510 U.S. at 555, 114 S.Ct. 1147). The gist of Ms. Taylor's and Mr. Pendleton's effort to reconstruct a casual conversation many months earlier is also incorrect. Although I do not believe it relevant to this litigation, I also note that members of my family use both in-network and out-of-network doctors, all of whom are excellent.

to assert in support of their argument that a reasonable person might perceive bias by me against Health Net based on the Justice Department inquiry in which I did not participate.

Specifically, the Defendants argue the inquiry would suggest bias to a reasonable person because it purportedly delayed my confirmation to the federal bench [12] and involved issues related to those in the instant litigation. Yet, there is no connection between the inquiry, my husband, and this case. Other than frankly misleading rhetoric, the Defendants provide only evidence that my husband was <u>not</u> involved in the civil settlement of the inquiry. From their own exhibits, they know that this civil settlement to which he was not a signatory occurred after my confirmation to the bench, not before. The date of my confirmation in November 1999 is a public record. Finally, there is no nexus between the Justice Department's Medicare billing inquiry and the claims of Wachtel and McCoy that their insurance carrier used undisclosed and allegedly deceptive devices to keep private reimbursements low on out-of-network claims.

Defendants' brief, penned by a McCarter & English partner, states: "Judge Hochberg did not disclose [in 2001], nor at any time thereafter, that her husband was implicated in a fraud investigation involving improper invoicing for assistant surgeons. . . ." (Health Net's Brief in Supp. of Mot. for Recusal at 3.) Defendants provide no support for this stunning assertion which seems to demand that I state (falsely) that my husband was "implicated" in some improper behavior. The plain meaning of "implicated" connotes an incriminating connection with illegal activity. Yet, Defendants' own attachments show a settlement that did not involve him. These Defendants have the benefit of hindsight that reporters did not have when the old <u>New Jersey</u>

_____

[12]This attenuated "delayed confirmation" theory for recusal is unprecedented, to my knowledge.

Law Journal articles ran.  Thus, Defendants' own submissions demonstrate to them and to any reasonable person, that no allegations of impropriety were ever made by the Department of Justice against any member of my family.

Even more inexplicably, the brief invents an explanation as to why the judicial spouse was not a signatory to the settlement, stating it was "because" he left the group in 1993. (Health Net Brief in Support of Mot. for Recusal at 3, n. 1.)  There is utterly no factual support proffered for such a remarkable fiction.  Even recusal motions must be supported by good faith factual bases.  That standard has not changed.  Kensington was surely never meant to open the door to this.

The decision in Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc., 157 F.3d 933, 944-945 (2d Cir. 1998), upholding the judge's decision to deny the plaintiff's recusal motion, is instructive, although in the instant matter, the alleged basis for recusal is far weaker. In Indep. Order of Foresters, the plaintiff alleged that the defendants had committed, *inter alia*, fraud and breach of fiduciary duties in connection with the sale of collateralized mortgage obligation derivative securities.  Id. at 936.  The plaintiffs moved for the judge's recusal on the grounds that her husband, "while an employee of Donald, Lufkin & Jenrette, had engaged in improper business practices that led to termination of his employment by DLJ, a criminal conviction, and disbarment."  Id. at 944.  The Court of Appeals for the Second Circuit upheld the district court judge's decision to deny the recusal motion on the grounds that the facts cited by the plaintiff occurred more than ten years earlier; the court had no knowledge of the facts involved; and the facts related to her husband's misconduct did not affect the litigation.  Id. at

945.

It follows *a fortiori*, after <u>Indep. Order of Foresters</u>, that recusal is not warranted here. In fact, the reasoning in <u>Indep. Order of Foresters</u> applies here with even greater force. No good faith basis, nor a single fact, has been advanced in any affidavit to show any spousal wrongdoing. Defendants' own press articles, read in chronological order, showed them that. The "judicial spouse" in <u>Indep. Order of Foresters</u> had worked for a party in the case and had committed misconduct; the "judicial spouse" here never worked for any party involved in this case and committed no misconduct.

The Defendants attempt to "tie" the inquiry to an alleged basis for recusal on the grounds that the inquiry and the information printed in the <u>New Jersey Law Journal</u> slowed my nomination and confirmation process. The suggestion is that a reasonable person would perceive me to harbor bias against a private insurer because I would have been upset about the delay in my confirmation more than five years ago, allegedly caused by a Justice Department inquiry into a Medicare billing issue involving doctors affiliated with a group practice from which my husband had resigned eleven years ago. My confirmation was not delayed to await the settlement of the inquiry, which apparently occurred about six months <u>after</u> I was on the bench.[13] Could a reasonable person think that there could be bias based on events that did not prevent my appointment? Would a reasonable person think that such supposed bias would be against a

_____

[13]I was first nominated in early 1996. That nomination lapsed at the end of the Congressional term prior to the 1996 presidential election. There were about 55 other nominations that also lapsed with mine. Senator Bill Bradley, who had selected me, retired from the senate at the same time. I was again nominated in early 1999, and confirmed in November 1999.

private insurer rather than the Justice Department? Compared to the rough road that some of my colleagues on the bench and in other comparable positions have traveled, I would be thin-skinned and naive to complain about my two Senate confirmations (the first for my position as U.S. Attorney and the second for my current position as a federal judge), which were unanimous with the exception of one senator from New Hampshire.[14]

Defendants have not proffered how a reasonable person could possibly perceive that the aforementioned Justice Department inquiry might bias me against health care insurance companies. Defendants seem to argue that because the Justice Department inquired into the Medicare billing practices of some members of the doctors' group, I might be seen as biased against the health care insurers. Where is the basis for such a leap? The Defendants' argument that I would be perceived to harbor bias based on my delayed confirmation would most logically suggest that I might be biased against the Justice Department – not insurance carriers. But, in 1996 and continuously thereafter, I prosecuted health care billing fraud cases for the Justice Department and no such concern of bias was ever perceived then by the Justice Department itself. I note with some irony that I did recuse myself for one year (1999-2000) from matters involving the Justice Department out of an abundance of caution that some members of the public might perceive me as biased in favor of the Justice Department because I had been the United States Attorney.

The Defendants nonetheless assert that "[a] reasonable person could, after being fully

---

[14] I do recall some amusing anecdotes from the confirmation hearing chaired by the late Strom Thurmond. These were reported in the press and related to my physical appearance, an issue not raised by the instant motion.

informed of these circumstances, draw a conclusion that Judge Hochberg's ability to render a fair and impartial decision has been compromised by the fact that allegations were raised against her husband that are similar to those asserted by the plaintiffs in the <u>Wachtel</u> and <u>McCoy</u> matters." (Health Net's Brief in Supp. of Mot. for Recusal at 13.)  The Defendants further state that my failure to disclose is "incomprehensible given that the plaintiffs have challenged the very same rules in the <u>Wachtel</u> and <u>McCoy</u> actions."  (Health Net's Brief in Supp. of Mot. for Recusal at 3.) First, as described above, these assertions fly directly in the face of Defendants' own submissions, that read together, show them that no allegations were ever made against my husband.  Second, Defendants have not alleged that I had any prior knowledge of either any billing practices reported in the old trade press or of Health Net's reimbursement practices about which the Plaintiffs complain.  Third, the Justice Department appears to involve doctors' charges to Medicare, while this case involves an allegation that Health Net's non-disclosures resulted in unfair reimbursement reductions.  The Defendants have provided no nexus between the two matters, and this Court can find none.

     The link the Defendants now claim is nothing more than that the words "co-surgeon" or "assistant surgeon" appear in both the newspaper articles and this litigation.  The claimed "link" is so attenuated[15] that it appears to be a creation of afterthought after Health Net's employees ran

---

[15] Although never once stated prior to this motion, Defendants now characterize the Plaintiffs' claim regarding the co-surgeon rule in a misleading manner, in a strained effort to create such a link.  The Defendants contend that the Plaintiffs object that Health Net's application of the co-surgeon rule was not in accordance with Medicare's percentages.  However, the Plaintiffs' complaint is that the co-surgeon rule was not properly defined nor disclosed to beneficiaries in their plans, and that Health Net, therefore, is not authorized to use it.  I have no opinion about such rule, nor about whether it was properly disclosed – it was barely touched upon in three long days of hearings.

into some difficult issues at the evidentiary hearing concluded barely a month before these old newspaper articles were suddenly discovered (see time line above). Based on any fair reading of the transcript of the Preliminary Injunction hearing, the complaints, as well as all the briefs filed in connection with the other motions in this case, this is a case about whether a health care insurer and fiduciary dealt with full disclosure and honesty towards its insureds in accordance with its policies and ERISA obligations. No reasonable person would see a link between these issues and the Justice Department inquiry such that an appearance of bias might arise. See Indep. Order of Foresters, 157 F.3d at 945.[16]

It is an understatement to say that this theory comes out of the blue. I sat through three full days of an evidentiary hearing replete with testimony about outdated data; the method of calculating UCR; what ERISA requires of a fiduciary; what disclosures to beneficiaries Health Net made in the Summary Plan Descriptions (or Summary of Benefits) and Explanations of Coverage; and more. Not for a moment did it, nor should it, have occurred to me that this case bore any material resemblance to the long-concluded, non-involvement of my husband in a Medicare billing dispute.

---

[16]Not only is the Plaintiffs' assertion about Health Net's improper use of the co-surgeon rule not related to the Justice Department's inquiry into the government billing practices of doctors affiliated with the Newark Cardiovascular and Thoracic Surgery Group, but it is also only a tiny part of this complex litigation. Over the course of the three-day Preliminary Injunction hearing, the co-surgeon rule was discussed only twice, and not in significant detail. Health Net of the Northeast's Director of Finance testified that he believes the assistant surgeon rule is a CMS guideline. ("CMS" was never defined.) (March 3, 2004, Tr. 136:14.) Health Net of the Northeast's Chief Financial Officer testified that he did not know whether the company had made a decision to change the reimbursement rate to beneficiaries for the services of assistant surgeons. (March 3, 2004, Tr. 5:13-16.) Similarly, the multiple surgical rule was discussed infrequently and in little detail in the Preliminary Injunction hearing.

In sum, no reasonable person would conclude that the reports of the Justice Department could affect my ability to impartially determine whether Health Net honored the terms of its plans and its fiduciary duty to act in the best interests of its beneficiaries. None of the alleged bases for recusal withstands basic analysis.

## V.     The Plaintiffs' Law Firm:

The Plaintiffs are represented by Sills Cummis Epstein & Gross, P.C. ("Sills Cummis"). I have no relation to the Sills Cummis firm, and I regularly hear matters in which the firm serves as counsel. By contrast, Health Net's own in-house counsel, Eileen O'Donnell, was formerly employed by Sills Cummis. The Defendants argue that because the late Arthur Goldberg, a former CEO of a Sills Cummis client, supported my nomination to the federal bench, I should recuse myself. There is no evidence, nor even an allegation, that Mr. Goldberg would have had any interest in the current litigation, even if he were alive today. Recusal cannot be based on the mere fact that a former principal of a Sills Cummis client, who passed away almost four years ago, and who is not connected to the parties or the issues in this action, supported my appointment five years ago. See Venuto v. Witco Corp., 809 F. Supp. 3, 5 (D.N.J 1992); U.S. v. Cherry, 330 F.3d 658, 666 (4th Cir. 2003); see also, Matter of Billedeaux, 972 F.2d 104, 105-106 (5th Cir. 1992)(the fact that the judge's husband was a member of the law firm that represented the defendant in other litigation did not warrant recusal); Martin v. Monumental Life Ins. Co., 240 F.3d 223, 236 (3d Cir. 2001)(holding that the district court judge was not required to recuse where he had formerly been a partner of the firm representing the defendant).

Like the Defendants' other arguments for recusal, this one also is absurdly attenuated.

Acceptance of the Defendants' argument regarding the deceased Mr. Goldberg would require judges to regularly investigate the former clients of every firm that appears before them to determine their position as to that judge's nomination. Even McCarter & English does not follow this approach in its own practices. It certainly does not appear that McCarter & English searched its clients' files to determine whether any past or current employees of any of its clients supported my nomination.

The Defendants also object that a former student intern who worked in my chambers is a summer intern at Sills Cummis. The Defendants mistakenly thought that Sills Cummis' part-time summer intern also serves as a summer intern in my chambers. Rather, the law student served, a few hours a week, as a spring intern for school credit. She thereafter took a position as a part-time summer intern at Sills Cummis. At the end of May, my law clerk permitted the student intern to complete an assignment on a social security case that had been pending during the spring semester. This intern did no legal research on any issue involved in this case, engaged in no discussions about the case, nor did she work on any other matter in which Sills Cummis was counsel. Once she began her part-time summer internship, the Sills Cummis firm screened her completely away from any work on this case. Furthermore, Sills Cummis alerted the Defendants about this summer intern, and told Health Net's counsel that Sills Cummis would place the intern in a different firm if Health Net objected to her internship. Health Net did not object. To thereafter allege this as a basis for my recusal borders on the disingenuous.

Moreover, it is remarkable that such a basis for recusal is asserted by McCarter & English, without itself disclosing that an associate at McCarter & English served as a full-time

law clerk for then Magistrate Judge Chesler, who shared case management responsibility for my docket while Wachtel has been pending.  This McCarter & English associate, during her clerkship, was in my chambers daily, and freely discussed and worked on all of our joint docket. McCarter & English has not addressed how it can urge recusal based on a volunteer student and fail to distinguish its own full time associate.  McCarter & English also has not indicated the written procedures it implemented to wall off such associate from the Wachtel and McCoy matters, nor whether it made proper disclosures to the Sills Cummis firm at the time she was hired.

The dicta regarding law clerks in Kensington is not applicable to a volunteer student intern who did no work on either the McCoy or the Wachtel matter at any time.  In Kensington, the court drew an analogy between the judge's appointed advisors and law clerks to help explain why the advisors' conflict of interest created the appearance of bias by the trial judge.  In Hall v. Small Bus. Admin., 695 F.2d 175, 179 (5th Cir. 1983), the Fifth Circuit disqualified the trial judge because, prior to judgment, his law clerk had accepted an offer to join the law firm representing the winning party.  However, the decision in Hall was based on the fact that the clerk had actually worked on the case.  Id. at 178, 180.  Thus, in Kensington, it was appropriate to apply the same reasoning to the judge's advisors who simultaneously represented plaintiffs in other asbestos litigation.  In contrast, this Court's student intern did not do any assignments related to any Sills Cummis cases.  See, e.g., Hamid v. Price Waterhouse, 51 F.3d 1411, 1416 (9th Cir. 1995)(holding that where the judge's law clerk, who had no involvement in the case, accepted a job offer with the firm representing one of the defendants, the judge was not required

to recuse); <u>Hunt v. American Bank & Trust Co.</u>, 783 F.2d 1011, 1016 (11th Cir. 1986)(holding that a judge is not required to recuse when the judge's clerk accepts employment with the firm representing one of the parties, especially when the clerk has not worked on the case); <u>Holbrook v. Nationwide Mut. Ins. Co.</u>, No. 98-14246-Civ-Davis, 1999 WL 737956, at * 2 (S.D.Fla. April 12,1999)(citing cases); <u>see</u> <u>also</u>, <u>Comparato v. Schait</u>, 180 N.J. 90, 101, 848 A.2d 770, 777 (N.J. 2004).  Her volunteer work in chambers, for spring-semester school credit, and on matters wholly unrelated to McCoy, Wachtel, or the Sills Cummis firm, could not possibly cause a reasonable person to perceive bias by me.

**Conclusion:**

I have carefully evaluated the issues raised by the Defendants to determine whether they could cause a reasonable person to perceive any partiality or bias by me.  I find that the Defendants have not submitted a single piece of evidence that might cause a reasonable person to question my impartiality.   The oft-cited <u>Kensington</u> decision does not call for recusal in this case.  Moreover, the theory of recusal based on supposed "delayed confirmation" bias is so far fetched that it is difficult even to state it before rejecting it.   "There is as much of an obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is."  <u>Hinman v. Rogers</u>, 831 F.2d 937, 939 (10th Cir. 1987).   Were I to recuse myself from this long and arduous case for the untenable bases set forth in the Defendants' motion,  I might well risk a collision with this doctrine of judicial ethics.   The case will proceed without further without delay.  The Defendants' motion for recusal and for a stay of the proceedings is denied.  An appropriate order will issue.

_/s/ Faith S. Hochberg_

Hon. Faith S. Hochberg, U.S.D.J.