**FOR PUBLICATION**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____
)
)
ZEV AND LINDA WACHTEL, *et al.*,       )          Civ. Docket No.   01-4183
)          Hon. Faith S. Hochberg, U.S.D.J.
Plaintiffs       )
)
v.       )
)
GUARDIAN LIFE INS. CO., *et al.*,       )
)
Defendants.       )
_____)

_____
)
RENEE MCCOY, individually and on       )
behalf  of all others similarly situated,       )          Civ. Docket No.   03-1801
)          Hon. Faith S. Hochberg, U.S.D.J.
)
Plaintiffs       )          **OPINION**
)
v.       )
)          Date: May 11, 2006
HEALTH NET, INC., HEALTH NET       )
OF THE NORTHEAST, INC., and       )
HEALTH NET OF NEW JERSEY, INC.       )
)
Defendants.       )
_____)

**HOCHBERG, District Judge:**

Plaintiff-beneficiaries have sued their health care insurance providers under ERISA 29 U.S.C.

§ 1001 *et seq.* for breach of fiduciary duty and other wrongs connected to the way in which Health

Net[1] reimburses out-of-network claims.

_____

[1] As used in this Opinion, "Health Net" or "Defendants" refers collectively to Health Net,
Inc., Health Net of the Northeast, Inc. (HNNE) and Health Net of New Jersey, Inc. (HNNJ).

This opinion calls upon the Court to decide the Defendants' objections to the Special Master's rulings on privilege, including the fiduciary exception thereto, and to decide the corollary issue in Defendant Health Net Inc.'s motion for summary judgment claiming that it is not an ERISA fiduciary.  In their appeal of the Special Master, the Health Net Defendants challenge a series of findings regarding documents they have claimed are protected from production by either attorney-client or work product privilege.  In particular, Defendants object to the Special Master's conclusion that a fiduciary exception to the attorney-client privilege applies to Defendants' claims of privilege. In its summary judgment motion, Health Net, Inc. claims that it is not a fiduciary under ERISA for health benefit plans administered by its subsidiaries.

I.      **Defendant's Objections to Special Master's Report and Recommendation**

        A.      Factual and Procedural Background

        The Special Master has reviewed 11 of the initial 13 logs produced by Defendants in this litigation.[2]  Defendants claim that over 4,000 of the documents listed in their first 11 logs are protected from disclosure to Plaintiffs by the attorney-client privilege and work product doctrines. On June 24, 2005, the Court appointed a Special Master in this case for the purpose of "considering all claims of privilege and work product protection that have been asserted over documents listed on defendants' privilege log and for such other matters as the Court may refer to the Special Master." The June 24, 2005 Order directed that the Special Master "shall make findings of fact and conclusions of law with respect to the matters presented by the parties and shall report same to the United States District Judge."

_____

        [2]  Defendants have also produced 6 additional logs, numbered 14-19, since the conclusion of this Court's Rule 37/Integrity hearing on February 28, 2006.

2

The Special Master asked the parties to address the threshold issue of whether Defendants' claims of privilege and work product protection could be pierced by the fiduciary exception. After considering the parties' briefs on the applicable legal standards, the Special Master issued an Interim Opinion and Order on August 1, 2005 (the "Interim Opinion") concluding that: (1) the fiduciary exception, which excludes from the protection of the attorney-client privilege those communications between a fiduciary and its attorneys relating to fiduciary matters, is a recognized doctrine that applies in this case; (2) Plaintiffs bear the burden to demonstrate the applicability of the fiduciary exception; (3) Plaintiffs are not required to satisfy an additional "good cause" requirement; (4) Plaintiffs have established the applicability of the fiduciary exception; (5) Defendants' documents exclusively pertaining to the establishment, amendment, modification or termination of their ERISA plans are immune from the fiduciary exception (i.e. they fall within the "settlor function exception" to the fiduciary exception); and (6) Defendants' documents that pertain solely to their civil or criminal liability are likewise immune from the fiduciary exception (i.e. they fall within the "liability exception" to the fiduciary exception).

The parties submitted additional briefing, following the Interim Opinion, in order to further clarify their positions on how the privileges and exceptions should be applied to the facts of this case and to the specific communications presented to the Special Master for *in camera* review. Plaintiffs argued that communications between the Defendants and their attorneys about members' benefits determinations were fiduciary in nature and thus subject to disclosure under the fiduciary exception. Plaintiffs' major claim in this litigation is that Defendants, in violation of N.J.S.A. § 11:21-17.13,[3]

---

[3] The State of New Jersey requires that "carriers . . . update their databases within 60 days after receipt of periodic [UCR] updates released by the Prevailing Healthcare Charges Systems." N.J.S.A. § 11:21-17.13.

and as an undisclosed misrepresentation to beneficiaries of large group plans, selected outdated data to determine Usual and Customary ("UCR") charges, resulting in beneficiaries absorbing a higher cost for medical treatment and/or services.[4]  Plaintiffs argued that Defendants function as fiduciaries when they decide which UCR data to use, and "how and when to apply the databases, what versions, what percentiles, what exceptions will apply [and] whether other reductions will be made in combination or in lieu of the database," and thus such communications should fall within the fiduciary exception and be produced.

The Special Master considered the additional briefing and instituted the following analytical framework for his review of the documents.  First, he found that Plaintiffs had waived the right to challenge the fiduciary exception as applied to documents withheld pursuant to the work product doctrine; thus where the work product doctrine was properly asserted, the Special Master recommended that such communications not be produced.  Next, if the attorney-client privilege was asserted as to a particular communication (and the work product doctrine did not apply) the Special Master reviewed the communication to determine whether the claim of privilege was proper.  If the

---

[4]  Questions about Defendants' use of outdated data, including when it began, who within the company new about it and when they knew, have played a central role in this Court's Rule 37 /Integrity hearing into alleged discovery abuses and misrepresentations to the Court.  After an inquiry by the New Jersey Department of Banking and Insurance ("NJDOBI") in 2002, Defendants admitted that they used 1998 data to determine UCR charges between July 2001 and October 2002.   On December 27, 2002, Defendants entered a consent agreement with NJDOBI to refund Health Net members for the overpayments that resulted from the "rollback" period.  In November 2003, Defendants notified the Court that their use of outdated data extended back further than originally disclosed, to January 1999, and informed the Court that they would complete a "second restitution" to reimburse members for these additional overpayments.  Over a year later, in January of 2005, Defendants admitted that the second restitution did not occur.  Based on these and other facts, this Court has found a prima facie showing that review of Defendants' purportedly privileged documents may reveal that Health Net used its attorneys in furtherance of a crime or fraud.  See May 5, 2006 Opinion and Order, 2006 U.S. Dist. LEXIS 27117.

communication did not meet the requirements of the attorney-client privilege, the Special Master recommended it be produced.

If the attorney-client privilege did apply, the Special Master next reviewed the communication to determine if the fiduciary exception would apply. If the fiduciary exception did not apply, the communication was immune from production because there was no reason to pierce the proper invocation of the attorney-client privilege. Where the Special Master determined that the fiduciary exception did apply to a communication, he continued his *in camera* inspection to determine if the communication was protected from disclosure under either the settlor and/or the liability exceptions. Documents relating to wholesale changes to plan design were generally deemed to fall within the settlor exception and were protected from disclosure. Likewise, communications exclusively pertaining to settlement and/or consent orders entered into between Defendants and governmental and/or regulatory agencies, as well as Defendants' responses to discovery requests in this litigation, were deemed to fall within the liability exception and were consequently exempt from disclosure. Documents that were generally not protected from disclosure under either exception included those regarding UCR data used for reimbursement and other management issues related to an inquiry or investigation of the propriety of using old UCR data, documents referring to Defendants' lobbying efforts or responding to compliance issues, and those that pertained to inquiries or investigations by governmental or regulatory agencies.

Where the Special Master determined that neither the settlor nor liability exception applied to a particular fiduciary communication, he recommended that it be produced because there was no bar to the fiduciary exception piercing the attorney-client privilege.

The Special Master reviewed 3,060 documents in 10 privilege logs. He reported his findings

to the Court in his October 18, 2005 Report and Recommendation ("R&R") and attached several voluminous charts detailing his analysis of each document reviewed *in camera*.

On November 3, 2005, several weeks after the Special Master filed his R&R, Defendants produced an additional privilege log ("Log 11") containing 953 privilege entries.  On November 7th, Magistrate Judge Shwartz ordered the Special Master to conduct an expedited review of certain entries from the new log before this Court resumed its Rule 37/Integrity hearing on November 15, and asked the Special Master to complete his full review of Log 11 by December 20, 2005.  The Special Master completed his initial review on November 14th and his entire review on December 13, 2005, consistent with the framework and protocols outlined above.  Defendants filed timely objections to all three of the Special Master's reports and this Court has consolidated the objections for review.[5]

B.      Legal Standard

Federal Rule of Civil Procedure 53 sets forth the standards for this Court to apply in its

---

[5] Defendants filed two additional privilege logs after the Special Master completed his supplemental review of Log 11.  Privilege Log 13 was produced on December 19, 2005.  Plaintiffs state that the log identifies 400 documents, all of which were created in 2002 or 2003, two to three years before the close of discovery.  Furthermore, all of the documents in Log 13 relate to Eileen O'Donnell, a key witness who testified at the Rule 37/Integrity hearing on November 17th and 22nd, before production of the log and identification of these documents.  Plaintiffs state that Log 12 was also just produced in late December, 2005 and consists of over 900 entries, 700 of which pertain to documents created before the close of discovery in March 2005.  Plaintiffs have filed a Motion to Strike logs #12 and #13 as untimely.  This Court held oral argument on March 9, 2006 on why Logs 12 and 13 were produced so extraordinarily untimely and will address this issue in a separate opinion.

In connection with their final objections to the Special Masters' review of Privilege Log # 11, Defendants for the first time challenged the Special Master's designation of certain documents as not meeting the initial requirements of the attorney-client privilege and work product doctrine.  Those objections, filed with this Court on January 3, 2006, are denied.  The Special Master's designations of such documents as non-privileged are adopted by this Court.

review of the Special Master's Report and Recommendation.  Under Fed. R. Civ. P. 53, the Court decides all objections to the Special Master's findings of fact and conclusions of law under the *de novo* standard of review.   Fed. R. Civ. P. 53(g)(3) and (g)(4).  This Court may set aside the Special Master's ruling on procedural matters upon an abuse of discretion standard of review.

    C.    <u>Discussion</u>

        1.    *Applicability of the Fiduciary Exception*

The attorney-client privilege protects communications between a client and an attorney made in confidence for the purpose of obtaining or providing legal advice.  <u>See</u> <u>United States v. Moscony</u>, 927 F.2d 742, 751 (3d Cir. 1991) (privilege protects from disclosure communications made by client to lawyer in furtherance of representation); <u>United States v. Amerada Hess Corp.</u>, 619 F.2d 980, 986 (3d Cir. 1980) (privilege also applies to communications from lawyer to client).  The attorney-client privilege is the oldest privilege recognized under the common law, but it is not absolute.  The Third Circuit has recognized that "because the privilege obstructs the search for truth and because its benefits are, at best, 'indirect and speculative,' it must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'"  <u>In re Grand Jury Investigation</u>, 599 F.2d 1225, 1235 (3d Cir. 1979) (quoting 9 Wigmore on Evidence § 2291 at 554 (McNaughton rev. 1961)).

The fiduciary exception to the attorney-client privilege, as it has developed in federal courts around the country, excludes from the protection of the privilege those communications between a fiduciary and its attorneys that relate to fiduciary matters.  Courts have explained that a fiduciary cannot claim an exclusive privilege to certain communications with counsel because, as a representative for its beneficiaries, the fiduciary is not the real client in the sense that it is personally

being served by its attorney.  Cobell v. Norton ("Cobell II"), 212 F.R.D. 24, 27 (D.D.C. 2002) (citing

Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co., 543 F. Supp. 906, 909

(D.D.C. 1982)).  Under this reasoning, the fiduciary's and beneficiaries' interests are aligned with

respect to certain communications, and the beneficiaries are thus entitled to review those

communications.

      The Court of Appeals for the Third Circuit has yet to decide whether to apply the fiduciary

exception.  See Depenbrock v. Cigna Corp., 389 F.3d 78 (3d Cir. 2004) (finding it unnecessary to

reach question of whether fiduciary exception applies because other issues on appeal dispensed of

case); see also Arcuri v. Trump Taj Mahal Assoc., 154 F.R.D. 97, 106 (D.N.J. 1994) (recognizing

that the Third Circuit had not yet addressed the question of fiduciary exception).  Defendants argue

that the Special Master was wrong to adopt a fiduciary exception to the attorney-client privilege in

the absence of precedent in this circuit.

      Although the Third Circuit has not spoken on the issue, other circuit courts have uniformly

recognized the existence of a fiduciary exception in a variety of settings.  See In re Lindsey, 148 F.3d

1110, 1112 (D.C. Cir. 1998) (describing as "widely followed" the principle that "corporate officers

are not always entitled to assert [attorney-client] privileges within the corporation" in order to keep

communications confidential from shareholders in litigation); Becher v. Long Island Lighting Co.

("LILCO"), 129 F.3d 268, 272 (2d Cir. 1997) (explaining that the fiduciary exception disables a

fiduciary "from asserting the attorney-client privilege against plan beneficiaries on matters of plan

administration"); Wildbur v. ARCO Chemical Co., 974 F.2d 631, 645 (5th Cir. 1992) ("[A]n ERISA

fiduciary cannot assert the attorney-client privilege against a plan beneficiary about legal advice

dealing with plan administration."); Fausek v. White, 965 F.2d 126, 132-33 (6th Cir. 1992) (where

corporation owed fiduciary duties to minority-shareholder plaintiffs, it could not prevent disclosure to plaintiffs of information relating to plaintiffs' investments); Bland v. Fiatallis North Am. Inc., 401 F.3d 779, 787-88 (7th Cir. 2005) (applying the fiduciary exception and explaining that "the attorney-client privilege should not be used as a shield to prevent disclosure of information relevant to an alleged breach of fiduciary duty"); United States v. Mett, 178 F.3d 1058, 1062 (9th Cir. 1999) (noting that the Ninth Circuit "has joined a number of other courts in recognizing a 'fiduciary exception' to the attorney-client privilege"); Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1415-16 (11th Cir. 1994) (recognizing the fiduciary exception described in Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970), but declining to decide whether it applies to disputes between a union and its members).

Similarly, the fiduciary exception "has been recognized and applied a number of times in the District of New Jersey and the Eastern District of Pennsylvania." Acruri, 154 F.R.D. at 106 (citing Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co., 131 F.R.D. 63 (D.N.J. 1990); In re Sunrise Sec. Litig., 130 F.R.D. 560 (E.D. Pa. 1989); Boswell v. Int'l Bhd. of Elec. Workers, 1981 WL 271888 (D.N.J. 1981); Cohen v. Uniroyal, 80 F.R.D. 480 (E.D. Pa. 1978); Valente v. PepsiCo, 68 F.R.D. 361 (D. Del. 1975)); see also In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 1994 WL 6883, *3 (E.D. Pa. 1994) (recognizing that the fiduciary exception applies to ERISA cases); Moskowitz v. Lopp, 128 F.R.D. 624, 637 (E.D. Pa. 1989) (finding that corporate attorney-client privilege can be overcome by a mutuality of interest between plaintiffs, the corporation, and its management at the time the privileged communications were made).

The relationship between an ERISA fiduciary and its beneficiaries is one of many fiduciary relationships where courts have found the fiduciary exception to pierce claims of attorney-client

privilege.  See, e.g., Mett, 178 F.3d at 1062-63; LILCO, 129 F.3d at 271-72 Wildbur, 974 F.2d at

645-46.  One court has described the exception as "well established in federal jurisprudence" and

noted that it has "been applied in cases involving review of the decisions of ERISA plan

administrators."  Geissal v. Moore Med. Corp., 192 F.R.D. 620, 624 (E.D. Miss. 2000).  Courts have

found the exception to derive from "an ERISA trustee's duty to disclose to plan beneficiaries all

information regarding plan administration."  See Mett, 178 F.3d 1058, 1063 (9th Cir. 1999) (citing

LILCO, 129 F.3d at 271-72).  A fiduciary's ability to invoke the attorney-client privilege to resist

disclosure sought by plan beneficiaries "turns on whether or not the communication concerned a

matter as to which the employer owed a fiduciary obligation to the beneficiaries."  LILCO, 129 F.3d

at 271.

        Defendants' argument against adoption of the exception relies on policy arguments and

citations to state cases which do not undermine the Special Master's conclusions.[6]  See e.g., Barnett

Banks Trust Co., N.A. v. Compson, 629 So. 2d. 849 (Fla. Ct. App. 1993) (acknowledging that

plaintiff, as beneficiary, had right to documents regarding administrative matters of the trust but

finding fiduciary exception inapplicable where plaintiff-beneficiary sought documents involving her

lawsuit against trust); Estate of Calloway, 1996 WL 361504 (Del. Ch. Ct.  June 19, 1996) (finding

fiduciary exception inapplicable where beneficiaries sought memo from trustee's lawyer explaining

beneficiaries' objections to trustee's petition for executor commission, assessing the merit of

_____

        [6] Estate of Fedor, 356 N.J. Super. 218 (Ch. Div. 2001), cited by Defendants, has no
bearing on the discussion of the fiduciary exception here.  In that case, the court considered
whether a temporary trustee, who was appointed to replace fiduciaries accused of
mismanagement and self-dealing, was entitled to prior communications between the fiduciaries
and the estate's attorneys.  Id.  The court held that the temporary trustee became the holder of the
attorney client privilege with respect to the communications in question but did *not* reach the
issue of the rights of the trustee as against the beneficiaries in the case.

objections, and discussing strategy). These cases articulate a liability exception to the fiduciary exception, which the Special Master here has done. The two cases that most support Defendants' view of the fiduciary exception were decided upon principles of state law that do not control the resolution of privilege questions here. See Garner, 430 F.2d at 1098 (federal courts shall apply their own rules of privilege in federal question cases predicated on federal law); Koch Materials Co. v. Shore Slurry Seal, Inc., 208 F.R.D. 109, 116-17 (D.N.J. 2002).[7]

Having considered the case law in support of the fiduciary exception among federal appellate and district courts, this Court finds that the Third Circuit would follow similar reasoning and find the existence of a fiduciary exception to the attorney-client privilege. This Court has also considered the Special Master's careful analysis on the origins and scope of the fiduciary exception and finds that he took an appropriately tailored approach. Thus this Court concludes that the fiduciary exception to the attorney-client privilege should apply to this ERISA action.

---

[7] Defendants cite Wells Fargo Bank v. Superior Court for the principle that every fiduciary is entitled to consult legal counsel and receive legal advice without the risk of non-consensual disclosure. 57 Cal. Rptr. 2d 335, 340 (Cal. App. 2 Dist. 1996). The court in that case, however, found that Wells Fargo had a duty to produce documents related to trust administration, including those that might come within the attorney-client privilege. Id. at 341. In a subsequent case cited by neither party in their briefs, the California Supreme Court superceded the opinion of the California Court of Appeal and held that "there is no authority in California law for requiring a trustee to produce communications protected by the attorney-client privilege, regardless of their subject matter." 91 Cal. Rptr. 2d 716, 720 (Cal. 2000). The California Supreme Court found that it had no authority under California law to create exceptions to the state's legislatively created attorney-client privilege. Id. at 720, 721-22. It distinguished itself from federal courts in this regard, explaining that federal courts can interpret, and in fact have interpreted, their own common law attorney-client privilege to create exceptions. Id. at 721. Thus, this case is persuasive for neither side in the matter here. See also Huie v. DeShazo, 922 S.W.2d 920, 925 (Tex. 1996) (rejecting a fiduciary exception to the attorney-client privilege under Texas law, explaining that such an exception "should be instituted as an amendment to Rule 503 through the rulemaking process").

2.      *Good Cause*

Defendants next dispute the Special Master's finding that the Plaintiffs need not show good

cause before invoking the fiduciary exception.  Defendants argue that the "good cause" requirement

laid out in Garner should be enforced when applying the fiduciary exception in ERISA cases.[8]

Of the courts that have addressed the question in the ERISA context, the majority have held

the good cause requirement to be inapplicable.  See Martin v. Valley Nat'l Bank, 140 F.R.D. 291,

323 (S.D.N.Y. 1991) (recognizing that "several, *although not most*, of the ERISA decisions . . . have

placed on the beneficiary the initial burden to show 'good cause' to pierce the privilege'") (emphasis

added); see also Hudson v. Gen. Dynamics Corp., 186 F.R.D. 271, 274 (D. Conn. 1999) (finding that

"invocation of the fiduciary exemption does not require [Plaintiff] to show 'good cause' in order to

invoke the fiduciary exception"); Jackson v. Capital Bank & Trust Co., 1991 WL 148751, *3 (E.D.

La. 1991) (finding that Magistrate did not err in not requiring good cause showing as to why the

attorney-client privilege should be pierced); Washington-Baltimore Newspaper v. Washington Star

Co., 543 F. Supp. 906, 909 n.5 (D.D.C. 1982) (finding that good cause showing does not apply in

a trustee relationship).

These courts have explained that the good cause requirement is not necessary in the ERISA

context because, unlike the corporate managers who "perform duties which run to the benefit

ultimately of the stockholders, a pension plan trustee *directly* serves the fund beneficiaries."

---

[8] According to Garner, "where the corporation is in suit against its stockholders on
charges of acting inimically to stockholder interests, protection of those interests as well as those
of the corporation and of the public require that the availability of the privilege be subject to the
right of the stockholders to show cause why it should not be invoked in the particular instance."
430 F.2d at 1104.  The court went on to list a number of factors that courts could weigh in
deciding whether good cause has been shown.

Washington Star Co., 543 F. Supp. at 909 n. 5 (emphasis added); see also Martin, 140 F.R.D. at 326 (explaining that concerns about significant differences of interests among different classes of shareholders in corporate context are not readily applicable in a trust context). Under ERISA, trustee-fiduciaries must discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries. 29 U.S.C.A. § 1104(a)(1). ERISA fiduciaries have a duty "to provide full and accurate information to the plan beneficiaries regarding the administration of the plan." LILCO, 129 F.2d at 272. As part of this duty, an ERISA fiduciary "must make available to the beneficiary, upon request, any communications with an attorney that are intended to assist in the administration of the plan." Id.

Because ERISA fiduciaries directly and exclusively serve the interests of their beneficiaries, and because the fiduciaries are obligated to provide their beneficiaries with information regarding plan administration, there is no need to impose upon ERISA beneficiaries an additional "good cause" requirement before allowing disclosure under the fiduciary exception.

### 3.    *Non-Fiduciary, Settlor Functions*

Defendants challenge the Special Master's application of the settlor exception to the fiduciary exception, which exempts from production those attorney-client communications that relate to non-fiduciary functions. In particular, Defendants object to the Special Master's finding that communications regarding selection of outdated and unlawful UCR data are not subject to the settlor exception and thus must be produced.

As the Special Master recognized, "determining whether communications in connection with Defendants' use of outdated UCR databases are subject to the settlor exception necessarily entails determining whether the communications 'reflect fiduciary functions, *i.e.* ones related to plan

13

management and administration, or non-fiduciary functions, *i.e.* ones related to the plan's design or amendment.'" See R&R (citing Coffman v. Metro Life Ins. Co., 204 F.R.D. 296, 29899 (S.D. W. Va. 2001) (citations omitted)). The Special Master concluded that selection of which UCR data to use is a discretionary act about a policyholder's eligibility regarding plan benefits. As such, he determined that selection of which year's UCR data to use in reimbursing claims is an inherently fiduciary function.

The case law on this question overwhelming suggests that claims determination is a fiduciary function. See e.g., Aetna Heath Inc. v. Davila, 542 U.S. 200, 218 (2004) (holding that a benefit determination under ERISA is generally a fiduciary act); Varity Corp. v. Howe, 516 U.S. 489, 511 (1996) (recognizing that "a plan administrator engages in a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits under the terms of the plan documents"); Carner v. MGS-576 5th Ave. Inc., 992 F. Supp. 340, 357-58 (S.D.N.Y. 1998) (finding that insurance company was fiduciary with respect to the processing of claims); Misch v. Cmty. Mut. Ins. Co., 896 F. Supp. 734 (S.D. Ohio 1994) ("Where an insurance company administers claims for an employee welfare benefit plan and has the authority to grant or deny the claims, the company is an ERISA fiduciary.").

Defendants argue that as an insurance company, as opposed to an employer, their non-fiduciary functions extend beyond limited employer settlor powers. Even if true, however, the basic principle remains that claims determination is a fiduciary function. See e.g., Molasky v. Principal Mut. Life Ins. Co., 149 F.3d 881, 884-85 (8th Cir. 1998) (finding that insurance carrier was not a fiduciary with respect to modification of participant's application but acknowledging that it was a fiduciary for claims determinations purposes); Marks v. Independence Blue Cross, 71 F. Supp. 2d

14

432, 436 (E.D. Pa. 1999) (distinguishing plaintiff's claim, which lacked merit because contract negotiation is not an act of discretionary plan administration, from potential claim based on allegations that an insurance company failed to cover properly or pay the claims of plan participants).

The Health Net Defendants' top executives were engaged in system-wide claims determinations when they decided to use outdated databases to calculate members' benefits, which they euphemistically call the "rollback" decision – i.e. they would "rollback" and use an old year's cost data for UCR when paying current claims.  Under the terms of their plans, Health Net's beneficiaries pay for coverage of out-of-network claims at a set percentage of the ususal, customary and reasonable charges (UCR) for every service they receive.  Health Net's large-group plans state that UCR is defined as "the amount [Health Net] determines to be the reasonable charge for a particular service in the geographical area in which it is performed based upon a percentile of a modified nationwide database used for reimbursement to physicians providers and hospitals."[9]   In the case of small-group plans, New Jersey regulations require that Health Net calculate UCR as equal to or greater than the 80th percentile of the charges in the most current Health Insurance Association of America ("HIAA") database.

On June 7, 1999, Health Net issued Operations Alert # 333, telling its claims administrators to begin using HIAA data from 1998 to calculate UCR for certain treatments and procedures.  This decision to revert back to 1998 data applied to both small and large employer plans in the Northeast.  In July 2001, Health Net expanded its "rollback" to 1998 data.  Operations Alert # 493 directed that

_____

[9] One of the issues at trial will be whether large-group beneficiaries reading this contract could expect they would receive benefits for out-of-network claims based on amounts currently charged by other doctors, as Plaintiffs contend, or whether the contract language "[Health Net] determines" notifies beneficiaries that Health Net can use outdated data, as Health Net contends.

as of July 31, 2001, Health Net claims administrators should reimburse all out-of-network claims based on the 1998 HIAA fee schedule. Internal documents reveal that the "rollback" decision was designed by Health Net executives to generate additional income for the company and was estimated to result in an extra $1.4 million in pre-tax income per quarter.

The decision of how to manipulate and apply UCR data in paying claims was not part of "setting the plan terms" but rather a process of administering the plan. Although the choice of *which* vendor's database (i.e. HIAA versus another database) was established by the plan settlor in the case of New Jersey small-group plans, the decision of *which year's* database to apply was not established by the plan settlor.[10]

Defendants also argue that they engaged in plan design via amendment when selecting which data to use for claims determination. See e.g., Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 443-44 (1999) (finding that altering plan terms does not implicate fiduciary duties, "which consist of such actions as the administration of the plan's assets"). Defendants' actions, however, undercut this argument. There is no evidence of a properly constituted amendment that altered the terms of the plan and alerted members to that change; rather, top officials within Health Net made an executive decision to use outdated UCR data and kept that information from their beneficiaries by orchestrated phone scripts. When beneficiaries called to inquire about decreased reimbursement levels, they were

_____

[10] The language in the large-group plans, permitting Health Net to determine what is a reasonable charge for a particular service, was not sufficiently explicit to constitute a settlor's reservation of the right to use outdated UCR data for system-wide claims determinations. Contra Hamilton v. Air Jamaica, 945 F.2d 74, 77-78 (3d Cir. 1991) (upholding reservation of right to determine benefits on case-by-case basis where reservation was "part of the written promise" and limitation was "explicitly stated as part of the plan"). And the "rollback" was flatly contrary to the state regulation for small group plans. Thus as to both the small and large-group plans, Health Net Defendants' decision to apply an outdated version of the HIAA database was a discretionary act of plan administration and not a settlor function.

told only that Health Net had mistakenly used a different version of the HIAA database and had since adjusted to the appropriate database. Health Net did not mention that the "improper" UCR determinations were based on current provider charges, nor explain that the version of HIAA to which Health Net had converted was actually based on 1998 data. Beneficiaries who did not make affirmative inquiries were not provided with any information that Health Net had instituted a policy change. Furthermore, when the New Jersey Division of Banking and Insurance inquired about Health Net's use of outdated data, officials within the company only disclosed, and agreed to reimburse members for, the part of the rollback that began in July 2001. It was not until November of 2003, at this Court's preliminary injunction hearing, that Health Net disclosed its use of 1998 data beginning in 1999. This pattern of concealment simply does not bespeak a legitimate amendment.

Because the Health Net Defendants exercised their discretion as fiduciaries when deciding to revert to a previous year's UCR data for claims determinations, they are not entitled to the protection of the attorney-client privilege with respect to any documents pertaining to that decision.

> 4.    *Liability Exception*

Finally, Defendants challenge the Special Master's interpretation of the liability exception to the fiduciary exception on the grounds that it produces "facially inconsistent rulings" by protecting some communications while not protecting others. Specifically, Defendants argue that the Special Master erred in finding that "documents referring to Defendants' lobbying efforts or responding to compliance issues" and communications pertaining "to inquiries or investigations by governmental or regulatory agencies" did not fall within the ambit of the liability exception, while "communications exclusively pertaining to settlements and/or consent orders entered into between Defendants and governmental and/or regulatory agencies" did.

In deciding how to apply the liability exception, the Special Master balanced Defendants' right to confidential communications with their attorneys against the concern that an expansive approach to the liability exception would eviscerate the fiduciary exception. The Special Master decided to follow the logic of Cobell II, which held that the attorney-client privilege exists "where a trustee seeks legal advice *solely* in his own personal interest." 212 F.R.D. at 30 (emphasis in original). This articulation of the fiduciary exception draws a line between communications where the fiduciary is seeking advice for the benefit of its beneficiaries (advice that may also be in the fiduciary's interests) and communications where the fiduciary is only looking out for its own interests. Such a demarcation of communications makes sense in light of the rationale for the fiduciary exception explained above in Section III(C)(1). Where the fiduciary consults an attorney in its ordinary business, acting as a representative of its beneficiaries, it is not entitled to keep those communications secret from the attorney's real clients, i.e. the beneficiaries. On the other hand, when a fiduciary seeks legal advice on its own behalf, its beneficiaries are not entitled to view those communications. Thus where the fiduciary and beneficiary's interests are aligned, even in part, the fiduciary exception applies, but where their interests are not aligned, the fiduciary is entitled to protection of its communications under the liability exception.

The Special Master's findings are consistent with this distinction. On the one hand, "documents referring to Defendants' lobbying efforts or responding to compliance issues" and communications pertaining "to inquiries or investigations by governmental or regulatory agencies" fall within the category of communications where Defendants act primarily for the benefit of their beneficiaries. Although Defendants may benefit from their lobbying and compliance efforts, legal advice sought in conjunction with those efforts is understood to be prepared for the benefit of the

18

plan or the beneficiaries.  See Cobell II, 212 F.R.D. at 29 (finding that "advice concerning legal compliance, alternatives, or strategy is part of the ordinary business of a trust and a trustee, and such legal communications and advice permit no claim of privilege").  In contrast, "communications exclusively pertaining to settlements and/or consent orders entered into between Defendants and governmental and/or regulatory agencies" involve instances where the beneficiaries' interests are no longer involved.  Once an investigation concludes with a finding of liability and/or settlement, only the trustee's personal exposure to liability remains at stake.  Consequently, any communications pertaining exclusively to settlements or consent orders should be protected by the attorney-client privilege.

The Special Master weighed Plaintiffs' and Defendants' competing conceptions of the liability exception and reached a conclusion based on a principled distinction between legal advice sought for the benefit of beneficiaries and that sought for the benefit of the fiduciary alone.  This Court considers in his conclusions *de novo* and finds the analysis to be correct.

## II.    Health Net, Inc.'s Motion Regarding Fiduciary Status

### A.    Background

The named Plaintiffs' plans are administered by Health Net of New Jersey, Inc.  A brief synopsis of the relationships between the various Health Net entities is relevant to this decision.  On January 1, 1999, First Option Health Plan of New Jersey, Inc. merged with Physician Health Services and changed its name to Physicians Health Services of New Jersey, Inc.  In 2001, Physicians Health Services became Health Net, Inc.  Health Net, Inc. is a national publicly-traded company that is the parent of Health Net of the Northeast, Inc.  Health Net of the Northeast is a wholly-owned subsidiary of Health Net, Inc.

19

Health Net of the Northeast is itself the parent company to a number of regulated subsidiaries, including Health Net of New Jersey, Inc., Health Net of New York, Inc., and Health Net of Connecticut, Inc.  Health Net, Inc. does not enter contracts with any employer groups, nor have state regulators approved Health Net, Inc. as a plan administrator.  Health Net, Inc. is not licensed by any state, including California, Arizona and Oregon to offer health care benefits to individuals or employer groups.  Its subsidiaries, such as Health Net of New Jersey, Inc., Health Net of New York, Inc. and Health Net of Connecticut, Inc. are approved to enter into contracts with employer groups or subscribers.

Health Net, Inc. entered into an Administrative Services Agreement ("ASA") with Health Net of the Northeast, under which Health Net, Inc. assumed the responsibility for making the policies governing medical reimbursements and other claims consistently nationwide and for ensuring compliance with federal and state law and contractual obligations.  Health Net of the Northeast further entered into ASAs with its state subsidiaries in New York, New Jersey and Connecticut; these ASAs incorporated by reference the services provided to Health Net of the Northeast by Health Net, Inc.  The ASAs provide that the plan subsidiaries "maintain all organizational and administrative capacity required in order to carry out its operations."  The ASAs allocate many critical functions to Health Net, Inc., including operations, finance, government relations, claim auditing, legal, marketing, medical management, actuarial and information technology.

The ASAs delegate to Health Net, Inc. the authority, *inter alia*, to audit the claims administration of Health Net's subsidiary state plans.  This authority includes the duty to audit the payment accuracy of the subsidiary plans, as well as provide executive recommendations for improvement.  Health Net, Inc. exercised this audit power when it audited MHN's (Health Net, Inc.'s

mental health subsidiary) reimbursement practices and issued an audit report on September 29, 2000 uncovering MHN's use of out-dated 1998 UCR data for out-of-network reimbursements in 2000. The eighteen page audit report analyzed MHN's claims adjudication procedures and made substantive recommendations for corrections/improvements.  Pursuant to the ASAs, Health Net Inc. provides financial support to its subsidiaries by developing financial policies and budgets, preparing appropriate federal, state and local tax returns, and providing financial planning and reporting services.  Health Net, Inc. also provides direct financial support to its plan subsidiaries through capital infusions, insolvency guaranties and loss funding.

Health Net, Inc. involves itself with the claims administration of Health Net of the Northeast and its subsidiaries through direct policy initiatives and cross-staffing.[11]  For example, Jay Gellert, the CEO of Health Net, Inc., asked the Plan Presidents and CFOs of various subsidiaries to give him a "playbook" detailing plans to generate an additional $8 million in pre-tax income for the company. One of the items in the playbook was the plan to implement the "rollback" to use 1998 data for purposes of claims determinations.  Further, Health Net of the Northeast's Operations Department,

---

[11] For example, Health Net, Inc. maintains a National Medical Edit Logic Committee that develops overarching policies for edit rules and medical reimbursements to be implemented by its plan subsidiaries.  The Committee is staffed by representatives from all of Health Net's subsidiary plans, but is chaired by a Health Net, Inc. employee.  Any changes to the process for validation of medical edits must be formally approved by Health Net, Inc.'s Senior Vice President of Health Plan Operations.

The numerous incidents of cross-staffing between Health Net, Inc. and Health Net of the Northeast include the fact that Jeff Folick, a Health Net, Inc. executive, serves at the head of Health Net of the Northeast's Executive Management Team and therefore is involved in medical reimbursement and other policy determinations.  At one point Jeff Folick served simultaneously as President of Health Net of the Northeast and Executive Vice-President of Health Net, Inc. Moreover, several of Health Net of the Northeast department heads are also employed by Health Net, Inc., including Paul Dominianni, General Counsel for Health Net of the Northeast, whose actions are central to the alleged breach of fiduciary duty in this case.

which handles the day-to-day claims processing, appeals and grievances, and operates the call center which fields questions about benefits from beneficiaries, is chaired by a Health Net, Inc. employee. The Board of Directors of Health Net, Inc. maintains the authority to hire and fire the President of Health Net of the Northeast, and it has exercised that authority.

Finally, Health Net, Inc. has created nationwide policies and procedures throughout its subsidiaries so as "to operate under a single national plan." In May 2001, Health Net, Inc. decided to use Health Net of California's in-house Fee Negotiating Unit to support all subsidiaries' out-of-network claims.

B.    Legal Standard

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In other words, "summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Indiana Hosp., 843 F.2d 139, 143 (3d Cir. 1988). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable fact finder could return a verdict in favor of the nonmovant. Liberty Lobby, Inc., 477 U.S. at 248; In re Headquarters Dodge, 13 F.3d 674, 679 (3d Cir. 1993).

All facts and inferences must be construed in the light most favorable to the non-moving party. Peters v. Delaware River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994). The party seeking summary judgment always bears the initial burden of production. Celotex Corp., 477 U.S. at 323.

This requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or to demonstrate that the non-moving party has not shown the requisite facts relating to an essential element of an issue for which it bears the burden.  See id. at 322-23.

Once the party seeking summary judgment has carried this initial burden, the burden shifts to the non-moving party.  To avoid summary judgment, the non-moving party must demonstrate facts supporting each element for which it bears the burden, and it must establish the existence of "genuine issue[s] of material fact" justifying trial.  Miller, 843 F.2d at 143; see also Celotex Corp., 477 U.S. at 324.

If a moving party satisfies its initial burden of establishing a prima facie case for summary judgment, the opposing party "must do more than simply show that there is some metaphsyical doubt as to material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."  Id. at 587 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

C.      Definition Of A Fiduciary Under ERISA

ERISA creates liability for breaches of fiduciary duty "to the extent" that a person functions in a fiduciary capacity.  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A); Srein v. Frankford Trust Co., 323 F.3d 214 (3d Cir. 2003).  There are three ways to acquire fiduciary status under ERISA: 1) being named as the fiduciary in the instrument establishing the plan; 2) being named as a fiduciary pursuant to a procedure specified in the plan instrument; and 3) falling under the statutory definition of a fiduciary.  Green v. William Mason & Co., 996 F. Supp. 394, 397 (D.N.J. 1998) (citing Glaziers

23

& Glassworkers v. Newbridge Sec., 93 F.3d 1171, 1179 (3d Cir. 1996)).  Under ERISA:

> a person is a fiduciary with respect to a plant to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  The Supreme Court has articulated that ERISA "defines fiduciary not in terms of formal trusteeship, but in functional terms of control and authority over the plan."  Mertens v. Hewitt Assocs., 508 U.S. 248, 262 (1993); Srein, 323 F.3d at 220; see also Useden v. Acker, 947 F.2d 1563, 1577 (11th Cir. 1991) (holding that consideration of whether an entity is a fiduciary requires a "functional examination of [the defendant's] conduct in connection with the Plan.").  Under ERISA, a fiduciary is to be broadly construed.  Curcio v. John Hancock Mutual Life Ins. Co., 33 F.3d 226, 233 (3d Cir. 1996); Blatt v. Marshall and Lassman, 812 F.2d 810, 812 (2d Cir. 1987); Donovan v. Mercer, 747 F.2d 304, 308 (5th Cir. 1984) ("[i]t is clear that Congress intended the definition of 'fiduciary' under ERISA to be broadly construed").  However, where the duties entrusted to an entity are merely ministerial and it performs no more than administrative responsibilities, fiduciary status may be inappropriate.  Bd. of Trustees of W. Lake Superior Piping Indus. Pension Fund v. Am. Benefit Plan Adm'rs., Inc., 925 F. Supp. 1424, 1430 (D. Minn. 1996) (finding defendant's functions to be merely ministerial where the operative agreement provided defendant with (1) no discretion in fund administration; (2) no responsibility for legal, investment, consulting or accounting services; and (3) strict liability to Plaintiff for any act or omission performed outside the agreement).

24

D.     Factual Application

In this case, the question is whether a fiduciary duty arises from the Health Net, Inc.'s exercise of discretionary authority and control in administering and managing the plan.  The Court finds abundant evidence of Health Net, Inc.'s specific and pervasive authority and control in managing its subsidiary plans.

Health Net, Inc. relies on the ASAs between Health Net, Inc. and its state subsidiaries to argue that it carries out merely administrative or ministerial functions with respect to the plan beneficiaries and therefore is not an ERISA fiduciary.  In determining whether an entity is a fiduciary under ERISA, the Court is obligated to perform a functional analysis of the entities' "control and authority over the plan."  Srein, 323 F.3d at 220.  The Court must look beyond the formal titles contained in the ASAs and consider the day-to-day operations of Health Net, Inc. and the amount of authority and control it exercises over plan subsidiaries.  Id.  The Court finds ample evidence that Health Net, Inc. exerted substantial control over the day-to-day operations of the plans, the reimbursement policies, claims auditing, government relations, and medical management.  Moreover, the numerous Health Net, Inc. employees serving in management positions at Health Net of the Northeast, including but not limited to Paul Dominianni, Esq., reveals that Health Net, Inc. has created a corporate structure whereby authority and control is centralized.  Examples of this centralized authority and control abound factually.

The December 31, 2001 Market Conduct report issued by the New York Department of Insurance, which investigated Health Net of New York, found that Health Net, Inc. directed and controlled its subsidiary's conduct, in that there was "a tendency of Health Net management to operate the New York entities as part of the greater corporation overseen by the Parent rather than

as distinctly incorporated and regulated entities."

Another federal district court has also found Health Net, Inc. to be directly involved with claims adjudication. In In re Managed Care Litig., 298 F. Supp. 2d 1259, 1308-09 (S.D. Fla. 2003), Judge Moreno held that Health Net, Inc. and several other "HMO holding companies" were proper defendants in that multi-district litigation challenging medical reimbursement practices because "the parent corporations directly participated in formulating and implementing the auto-adjudication claim schemes." Id. at 1309. While Health Net, Inc. correctly asserts that In re Managed Care Litig. involved RICO (rather than ERISA) violations, Judge Moreno's factual finding that Health Net, Inc., as a parent corporation, formulated and implemented the claims procedures provides further support for the Court's determination that Health Net, Inc.'s activities as a parent corporation are more than sufficient factually to deny its motion for a summary judgment determination that it is not a fiduciary under ERISA.

The liability of an unnamed fiduciary is limited to the functions it performs. 29 C.F.R. § 2509.75-8. In this case, the fiduciary functions that Health Net, Inc. performs are related to medical reimbursement determinations. See, e.g., Eaton v. D'Amato, et al., 581 F. Supp. 743, 746-47 (D.D.C. 1980). Therefore, Health Net, Inc.'s motion for summary judgment is denied; Health Net, Inc. may be held liable if the Plaintiffs prevail on the merits of their claims.

An appropriate order will issue.

/s/ Faith S. Hochberg
Hon. Faith S. Hochberg, U.S.D.J.

26