UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RENEE McCOY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>-against-<br><br>HEALTH NET, INC., HEALTH NET OF THE NORTHEAST, INC. and HEALTH NET OF NEW JERSEY, INC.,<br><br>Defendants. | Docket No. 03-CV-180(FSH)(PS) |
| ZEV and LINDA WACHTEL, individually and on behalf of their minor children, TORY, BRETT and JESSE WACHTEL, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>HEALTH NET, INC., HEALTH NET OF THE NORTHEAST, INC. and HEALTH NET OF NEW JERSEY, INC.,<br><br>Defendants. | Docket No. 01-CV-4183 (FSH) (PS) |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
TO STRIKE PRIVILEGE LOGS ## 37-53, AND FOR FEES AND COSTS DUE TO
HEALTH NET'S MISCONDUCT**

| | |
|---|---|
| SILLS CUMMIS<br>EPSTEIN & GROSS, P.C.<br>One Riverfront Plaza<br>Newark, New Jersey 07102-5400<br>973-643-7000 | POMERANTZ HAUDEK BLOCK<br>GROSSMAN & GROSS LLP<br>100 Park Avenue<br>New York, New York 10017-5516<br>212-661-1100 |

Table of Contents

Page

OVERVIEW .................................................................................................................... 1
HN HAS WAIVED PRIVILEGE ................................................................................... 2
HN'S CONTINUING CRIME FRAUD ......................................................................... 6
CERTAIN ITEMS ARE NOT PRIVILEGED AT ALL ............................................... 10
CONCLUSION .............................................................................................................. 11
APPENDIX A ................................................................................................................ 12

# OVERVIEW

HN has logged over 6,000 entries on privilege logs 37-53 since September 14, 2006 - - nearly 2 years after the close of document discovery and more than 3 years after the vast majority were created. As shown below, HN has waived its right to assert privilege as a result of prejudicial and inexcusable delay – in violation of court orders. *See* Appendix A (describing the logs and the dates of the logged items). Since Special Master Wolin's review of HN's then-outstanding 11 logs, HN has produced 42 additional privilege logs (logs 12-53) containing tens of thousands of entries. Plaintiffs previously moved to strike privilege logs ##12-36 on the basis that late production waives any assertion of privilege, and now move to strike logs ##37-53 on the same basis, incorporating their prior briefing.[1] Plaintiffs also seek an award of fees and costs from the beginning of HN's discovery violations (including not issuing timely privilege logs) in 2002. As was true of logs 12-36, the vast majority of these documents were created years ago, and should have been logged years ago. HN's logs produced long after the close of discovery (and after the Special Master's review) should be struck for lack of timeliness.

Aside from waiver, many documents should be pierced due to the crime-fraud exception under the *prima facie* case articulated by this Court on May 5, 2006. Finally, some documents are not subject to the attorney-client privilege at all, either because no lawyer is involved or because the document was distributed outside HN (such as to a regulator). Plaintiffs discuss these categories in detail below.

---

[1] HN repeats its meritless contention that a privilege log may be timely even if the documents contained therein should have been produced (or logged) years earlier. Plaintiffs respectfully refer the Court to its previously-cited cases as support that HN has waived its ability to log documents in 2006 long after the close of discovery on January 10, 2005.

## **HN HAS WAIVED PRIVILEGE**

The vast majority of these 4,000 entries on logs 37-53 are from 2003 or earlier. Their logging in the fall of 2006 means they are being logged between 3 and 6 years after their creation, and nearly two years after the December 17, 2004 Order required their immediate logging. HN's concealment of email backup tapes and these belated privilege logs go hand-in-hand. HN's privilege logs 37-53, logged for the first time in the fall of 2006, show that HN failed to disclose relevant evidence during the I/37 hearing about who at HN knew what and when relating to I/37 issues. Together with the over 800,000 pages produced since May 5, 2006 (as a result of this Court's May 5th Order), Plaintiffs are first obtaining critical, relevant evidence now, in the fall of 2006, about issues responsive to discovery requests promulgated in January of 2002. HN failed to meaningfully apprise the Court and Plaintiffs about the storehouse of relevant evidence located on email backups until March 2006. It is only because of those concealed emails that these documents (which were located on the same concealed email tapes) are being logged now.

By virtue of HN's violations and prejudicial logging, Plaintiffs were unaware of the existence of these documents until the fall of 2006, and gave up any possibility of pursuing the issue during the discovery period. For example, these logs show emails between Stephen Camper and Eileen O'Donnell from July 2000 regarding HN's "claims fiduciary policy." Log 49 items 757a-d. HN's "fiduciary" policy is particularly relevant to the issue of HNI's position that it is not a fiduciary in this litigation. Had they been logged timely, Plaintiffs could have deposed Stephen Camper and Eileen O'Donnell about the subject matter. By concealing their existence until now, HN has effectively foreclosed questioning on the entire topic.

These logs ##37-53 also show the piecemeal process by which HN has produced discovery (email strings are produced in incomplete pieces over years) making it impossible to

2

know when, if ever, the relevant universe of evidence has been gathered and produced on any single topic. This piecemeal production was also documented by Plaintiffs in prior motions to strike. The reason HN lists prior privilege logs in its column for duplicates is because parts of email strings were previously produced but incompletely. Thus, bits and pieces of the same email string may appear piecemeal in numerous different logs. For example, part of the email string that is set forth in log 49 item 224a-d appeared in part (incompletely) in prior logs 2 and 5. As another example, log 49 item 226b appeared in log 5 but without parts of the email string (items a and c). It is only now revealed that the Special Master did not have complete email strings to review. This incomplete production and logging makes for very inefficient review, and makes it impossible for the Court and Plaintiffs to know when an email string is complete (or not). It impedes a complete understanding of what the string comprises. This fractured production is compounded by inconsistent log descriptions.[2] Producing and logging documents in this manner is inefficient and unfair to the reviewer (whether Special Master Wolin, this Court or the Third Circuit). The Court and Plaintiffs cannot be expected to function in this fashion.

The prejudice to this Court and Plaintiffs by HN's inexcusably delayed production of privilege logs years after the close of discovery is amply demonstrated by these logs. HN's misconduct has forced the judicial process in this litigation to function in the blind. Relevant (and perhaps dispositive) documents about critical issues have come to the fore only long after they have been addressed in hearings, briefings, discovery conferences and Court orders. Had

---

[2]    As Plaintiffs have pointed out previously, HN will refer to the same exact document using different descriptions. For example, Log 49 items 54a is described as "claims processing" while item 32c describes the same email as "NY DOI audit." Log 49 item 41c describes an email as "NY DOI meeting response" while item 200b describes the same email as "draft letter." There are numerous similar examples of HN giving the exact same document different descriptions.

3

these emails been produced or logged timely, Plaintiffs and the Court could have averted years of effort. Plaintiffs could have questioned the knowledgeable parties about these items, and would have deposed many witnesses they did not depose, and would have not deposed many who they did. Had these emails been promptly logged, Plaintiffs could have made these motions challenging privilege 3-4 years ago.[3]

Had some or all of the documents been found not privileged, Plaintiffs could have questioned many HN deponents about them, including Pennell Hamilton, Barry Averill, Bill Carr, Eileen O'Donnell, Dan Sibol, Mike Sydlaske, Bob McCartt, Rae Joyce, Karen Davezac, Patty Weller, Maryann Gaynor, Jeff Folick, Franklin Tom, Paul Lambdin, Carol Richey, Dee Dee Iverson, Jerry Coil, Joan Kmotorka, Kate Longworth-Gentry, Greg McDonald, Tim Mondon, Gay Ann Williams, Chris Wing, Jay Gellert and others at their depositions. Another example of prejudice is Log 53 item 9b is a December 8, 2004 email from Phil Davis to Gellert, Rich, Erwin, Lynch and others regarding discovery in this litigation. Because Plaintiffs did not have this log sooner, it was unavailable when Marv Rich and Steve Lynch testified on March 2, 2005 that had learned of the litigation only the day before the depositions. Had Plaintiffs received this log timely, they could have confronted these witnesses, and shown that they were notified about discovery issues in this litigation in December 2004, four months prior to their depositions.

Had the logs been produced timely, even if the documents were still being reviewed for privilege, Plaintiffs could have explored the basis of the asserted privilege with deponents, and at

---

[3] The logging of documents in 2006 that existed years earlier is contrary to the federal rules, and to Orders in this case, including the December 17, 2004 Order. Had these items been logged promptly 4 ½ years ago, there surely would have been a final dispositive ruling on their privilege and production by now. The prejudice to Plaintiffs from the severely belated logging is

4

least would have had a ballpark idea of their participation, or could have learned non-privileged information about the topic. As it stands, many of these individuals are now former employees including Hamilton, Averill, Carr, O'Donnell, Sibol, Sydlaske, Joyce, Davezac, Weller, Folick, Longworth-Gentry, Wing, Rich and many others. The prejudice is irremediable, as Plaintiffs documented in their I/37 submissions.[4]

HN has forfeited its right to continue asserting attorney-client privilege. Producing over 4,000 entries on a dozen privilege logs in the fall of 2006 primarily with documents from 2003 and earlier causes the same result as if HN had never come forward with a privilege log: it is virtually impossible for there to be a meaningful challenge to the privilege assertions prior to a final disposition (whether default judgment or trial). Had HN promptly logged, the vast majority of the time and effort spent since then (including the Court's efforts at the I/37 hearings and otherwise) would have been unnecessary.

As a result of the clear and irremediable prejudice from HN's unremitting misconduct for the past four years, Plaintiffs therefore respectfully request that the documents be produced by

---

incalculable. HN has managed to foist increased expense and years of delay by failing to log items promptly. It should forfeit its privilege assertions.

[4] While some of the logged emails belong to the most familiar (virtually household) names in this litigation (including O'Donnell, Dominianni, Singer, Sydlaske, Longworth-Gentry, Mondon, Carr, Gilmore, Davezac, Sibol, Messer, Chen, Gellert, Westen, Camper, Averill, Guerin and Kempf), some names are virtually or totally unfamiliar (including Dorina Paritsky, Ron Snyder, Andrea Wolff, Joanne Broom, Joyce Mulholland, Larry Johnson, Diane McMunn, Kathleen Lucido, Deborah Getty, Linda Brisbane, Kirsten Leivo, Linda Digregory, Wendy Gniady, Lori Longo, Jessica Moraitis, Jim Fullowan, Lisa Gabriel, Susan Walker). Some important principals have only become known through the I/37 hearing or the May 5th email production, including Messer, Lusheng Chen, Stephen Camper, Bob Morris, Paula Esposito, Sue Aylward, Mary Ellen Grom, Charlie Nostrand, Christine Pogany, Vickie Choma, Susan Palinkas, Laura Cretella, Jay Woloszynski, Bonnie Tuttle, Hector Samuel, Ramon Rodriguez, Christopher Bohrer, Cora Tellez, Joe Romano and others. These were people who were not deposed because Plaintiffs never heard of them or their roles were not revealed in produced documents.

virtue of HN's extremely belated production of these logs, and fees and costs awarded since HN's violations took root in January 2002 (if not earlier).

## HN'S CONTINUING CRIME FRAUD

HN's crime-fraud is continuing. The full extent of HN's fraud on the Court, perjured testimony, obstruction of justice, and other possible offenses (and how high within the company the misconduct went) will not be fully known until HN produces the emails it intentionally concealed, including those logged on privilege logs 12-53.

The relevance of the belated emails to crime fraud issues is clear. There are emails in June and July 2001 about UCR and "contract language" (just as the "rollback" was starting to roll) among O'Donnell and others. Log 45 items 16a-17e; log 44 items 80a-81f. When the "rollback" Op Alert 493 was issued in November 2001, there were emails regarding "cost initiatives."[5] Log 45 items 16a-17e, 19, 21a-22, 32-35; 40a-48u; 53a-58d; 65a-71c; log 49 items 24a-24i; 36a-36g.

There were critical emails in January and February 2002 (coincident with Plaintiffs' discovery requests) among Gilmore, Davezac and O'Donnell regarding UCR, "NJ DOBI fee schedule inquiry" or "statutory interpretation." Log 49 items 20a-d, 240 a-d, 243a-b, 249a-f;

---

[5] A DOI filing in November 2001 and the "draft UCR response" in December 2001. Log 45 items 33b-d; 34g-i; 49a-b. (Plaintiffs do not recall reference to a DOI investigation in this time frame relating to UCR).

259; 217a-b; 237a-b; 239a-c; 253a-h; 254a-d; 266; 366a-c.[6] *See also* log 41 items 1a-6g ("case status" emails in February and March of 2002).[7]

There are emails in early 2002 relating to discovery in this case, and early motions. Log 49 items 271a-g; 274a; 865a. In August-October 2002, there were "regulation comparisons" between HN counsel, and emails about the "fee schedule inquiry" and "NJ small group OON claims payment mandate." Log 49 items 230a; 272a-b, 800a-f; 859a-d.[8] *See also* O'Donnell emails re "NJ mandate" and re "NJ small group requirements." Log 43 items 51a-d, 201a-202f. *See* log 44 item 33a (10/14/02 email between Davezac and Joe Kempf re "ONET reimbursement"). Virtually all of log 39 is emails from July through October 2002, with most in August 2002 (including many involving O'Donnell and Dominianni).

Plaintiffs have previously demonstrated that HN has failed to provide emails during the critical period leading up to the First Restitution, failing to produce email tapes for December 2002 for every May 5th Custodian other than Dominianni. Log 40 contains many emails among O'Donnell, Dominianni, Singer, McAleenan, Jerry Coil (MHN CEO), Nancy Diamond (in-house MHN counsel) and others in November and December of 2002. *See* log 40 items 35-80f. Many entries relate to an "MHN report" which has not previously been disclosed and likely bears on the fraud on DOBI with the First Restitution. *See* Log 40 items 44-53. There are many emails

---

[6] There are emails in April-July, 2003 between Stephen Camper and Lori Longo and Jessica Moraitis regarding "NJ statutory interpretation." Log 49 items 724a-b; 764a-b.

[7] Virtually all of Log 41 involves Guardian personnel (Richard White, Sanford Herman, Terence Lynch). HN has denied that there is a written joint defense agreement. Plaintiffs contend that without a written joint defense agreement, HN cannot shield emails with Guardian, such as those on logs 39 and 41.

[8] On October 11, 2002, this Court denied HN's motions to dismiss and for summary judgment on the basis of compliance with the NJ Regulation.

relating to "claims reprocessing" among HIAA principals, including O'Donnell, McAleenan, Diamond, and others, in November 2002. Log 40 items 41-42g.

Just before and after the deficient First Restitution, there were many emails among Dominianni, O'Donnell, McAleenan, and others. Log 43 items 28a-29m, 51a-d, 80a-83i, 84a-e; and 289a-b; log 49 items 313a-h; 348a, 574a-i; log 43 items 49a-c (re "MHN fee calculation").[9]

There were emails among O'Donnell, Dominianni and Guerin about the NY restitution in the spring of 2003 (which went back to 1999, further contradicting their assertion that they did not learn of it until the fall of 2003). Log 49 items 32a- 35b; 37a-46b; 48a-51c; 123a-e; 163a-c; 173a-b; 427b; 547a. Westen knew in April 2003 about the NYDOI market conduct report (which expressly found HN to be using Outdated Data back to 1999). Log 48 items 14a-17; log 49 items 521a; 543a-c; 581a-b; 585; 591a-b; 598; 614a-b; 625a-b; 630a-d; 631a-b; 633b; 638-639; 642-644b; 645; 657; 659a-c; 661a-e; 663a-668; 671a-b; log 44 34a-36f, 55a-j (emails between Davezac and Vickie Choma).

There are emails in May-July of 2003 from Hamilton, Tom Messer and Dominianni (among others) discussing "fee schedule" and "payment of claims" and "discovery." Log 49 items 530a-b; 542a-e; 545a-c; 558a-559c; 564a-b; 569a-e; 573a-b; 577a-g; 578; 579a-c; 586a-b; 595a-b; 613a-c; 623a-g; 632d; 636a-c; 758; 803a-d. The IT HIAA personnel (including Rae Joyce, Patty Weller, Christine Pogany, along with Dominianni and others) discussed data issues

---

[9] Although the original DOBI complainant in June 2002 involved MHN, HN did not include MHN's use of Outdated Data in either the First or Second Restitutions. In fact, it was not until the late summer of 2006 that Plaintiffs discovered that HN actuaries Tom Messer and Lusheng Chen had calculated MHN's liability for outdated data as of November, 2002. PHS O'Donnell 8190936-42 (attached to Plaintiffs' September 1, 2006 brief opposing HN's motion to strike Plaintiffs' August 11, 2006 submission). Plaintiffs did not depose either Messer or Chen because their roles were not known during the discovery period.

8

in June 2003, the same month Judge Shwartz issued her June 6, 2003 Order requiring HN to disclose whether its database could be queried to disclose the delta between HIAA 80th percentile and HN payments from January 1, 1998 through the present. Log 49 740a-e; 611.

HN's responses to DOBI in the summer of 2003 (before DOBI was alerted to Outdated Data going back before the "rollback" period) were discussed by O'Donnell and Dominianni, among others. Log 49 items 576a-f; 606a-c; log 43 items 59a-c. *See also* Log 43 items 212a-213b (emails in late June, 2004 among O'Donnell and Laura Cretella (among others) about "DOBI inquiry").

Gilmore and Camper exchanged emails in July 2003 regarding "fee schedule history." Log 49 item 711. *See also* Log 43 items 65a-66g; 70a-b (Gilmore's July 2003 emails); 534-535c; 549-552b; 776a-f; 777a-g; 791e; 803a-d; 821a-b. *See also* Log 43 items 91a-92d (O'Donnell, Kempf and others discussing MHN claims in the summer of 2003). (Plaintiffs did not depose Joe Kempf or Stephen Camper, among many others, because their extensive roles in this litigation were unknown prior to the emails produced long after discovery was over).

Gilmore and Camper discussed the "court order" with Wendy Gniady, Dale Koch, and Paula Esposito. Log 49 item 684. (The "court order" may be a reference to Judge Shwartz's Order dated July 23, 2003 ordering production of all emails related to "HIAA issue and Consent Order" as well as HIAA tapes and backup documentation for Wachtel ONET services).

There are emails in January 2005 regarding "claims spreadsheet preparation." Log 43 items 259a-h. The Court will recall the effort spent during the I/37 hearing trying to ascertain why Paul Dominianni's January 4, 2005 Certification referred to the creation of spreadsheets for the Second Restitution when the HIAA group was aware of spreadsheets back to 1999 created in

9

November 2002 based on the November 1, 2002 project brief, without learning that this email existed and may shed light on the Court's inquiry.

As HN well knows, Plaintiffs have been forced to expend enormous resources prosecuting issues that would never have been in dispute in the first place absent HN's fraud on the court and discovery misconduct. The documented I/37 violations were part of HN's well-orchestrated strategy to make the case disappear before the merits could be reached. Only the harshest sanctions will deter similar strategies by HN and other litigants who would subvert the integrity of the Court.

## CERTAIN ITEMS ARE NOT PRIVILEGED AT ALL

Several items were produced to independent governmental agencies in New Jersey and New York and so are not properly considered privileged. Log 49 items 211b; 652b, 656a-c (listing documents sent to Bruce Borofsky and Lou Felice of NYDOI). Other items mistakenly list Vickie Choma as an "Esq." when she is not a lawyer. Log 49 items 215a-216d; 221a-d; 241a-d; 244a-f; 255a-258c; 859a-d. She is correctly listed without "Esq." in log 49 items 331, 375d (re MSR guidelines); 746a; 787a-c (re "rule compliance") and in log 44 items 51a-55j. Often the "from" and "to" are blank. See, e.g., Log 49 item 788 dated August 15, 2002 (regarding "legal update" without to or from). Other times, a single non-lawyer individual is listed. *See, e.g.,* log 49 item 490a (only Julie Lyons listed re "actuary conference"). There is no privilege assertion that can credibly be made for many of these documents. It is only the overwhelming vastness of the number (and their lateness) that has immunized them.

10

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court strike HN's Privilege Log #37-53 in addition to striking Privilege Logs ##12-36. In addition, Plaintiffs request review under the Court's crime fraud protocol. Plaintiffs respectfully request that the Court impose fees and costs for the entire period of the litigation.

Dated: November 27, 2006
Newark, New Jersey

Respectfully Submitted,

**SILLS CUMMIS EPSTEIN & GROSS P.C.**
One Riverfront Plaza
Newark, NJ 07102
(973) 643-5899

_____
Barry M. Epstein

_____
Barbara Gail Quackenbos

**POMERANTZ HAUDEK BLOCK
 GROSSMAN & GROSS LLP**
100 Park Avenue
New York, NY 10017-5516
(212) 661-1100

_____
D. Brian Hufford
Co Lead Counsel

**THE ALPERT LAW FIRM, PA.**

_____
Tampa, FL 33604
(813) 223-4131

**CUNEO GILBERT & LADUCA, L.L.P.**
507 C Street, NE
Washington, DC 20002
(202) 789-3960

11

# APPENDIX A

## SYNOPSIS OF LOGS 37-53

### Privilege Log #37 (dated September 15, 2006)

Log 37 has 1,494 entries, 1,460 of which are from 2004, 1 from 2003 and 33 from 2005.

### Privilege Log #38 (dated September 15, 2006)

Log 38 has 379 entries, 375 are from 2001, 3 from 2002 and 1 from 2004.

### Privilege Log #39 (dated September 22, 2006)

Log 39 has 598 entries, 594 from 2002, 3 from 2001 and one without a year.

### Privilege Log #40 (dated September 22, 2006)

Log 40 has 247 entries, 1 from 1999, 4 from 2000, 52 from 201, 159 from 2002 and 31 from 2003.

### Privilege Log #41 (dated September 22, 2006)

Log 41 has 183 entries, 16 from 2001 and 167 from 2002.

### Privilege Log # 42 (dated September 22, 2006)

Log 42 has 5 entries, all from 2003.

### Privilege Log # 43 (revised October 23, 2006)

Log 43 has 1,126 entries, 29 from 2001, 48 from 2002, 294 from 2003, 711 from 2004 and 44 from 2005.

### Privilege Log # 44 (revised October 23, 2006)

Log 44 has 213 entries, 20 from 1999, 79 from 2000, 45 from 2001 and 69 from 2002.

### Privilege Log # 45 (revised October 23, 2006)

Log 45 has 238 entries, 9 from 2000, 220 from 2001 and 9 from 2002.

12

### Privilege Log # 46 (revised October 23, 2006)

Log 46 has 198 entries, 101 from 2001, 2 from 2002, 94 from 2004 and 1 from 2005.

### Privilege Log # 47 (dated October 6, 2006)

Log 47 has 46 entries, 25 from 2000 and 21 from 2001.

### Privilege Log # 48 (dated October 6, 2006)

Log 48 has 35 entries, 5 from 1999, 23 from 2000 and 7 from 2003.

### Privilege Log # 49 (dated October 20, 2006); 49 Supplement (Nov. 3, 2006)

Privilege log 49 (and its supplement) has over 2,300 entries, the vast majority from 2003 and earlier.

### Privilege Log # 50 (dated November 3, 2006)

Log 50 has 120 entries, 2 from 1998, 14 from 1999, 85 from 2000, 12 from 2001 and 7 from 2002.

### Privilege Log # 51 (dated November 3, 2006)

Log 51 has 8 entries, 1 from 200, 3 from 2001, 2 from 2002 and 2 from 2003.

### Privilege Log # 52 (dated November 3, 2006)

Log 52 has 31 entries, 1 from 1999, 27 from 2000 and 2 from 2001.

### Privilege Log #53 (dated November 17, 2006)

Log 53 has 417 entries, 5 from 2000, 14 from 2001, 5 from 2002, 2 from 2003, 372 from 2004 and 19 from 2005.