**FOR PUBLICATION**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ZEV AND LINDA WACHTEL, *et al.*, | Civ. Docket No.  01-4183 |
| Plaintiffs | Hon. Faith S. Hochberg, U.S.D.J. |
| v. | |
| HEALTH NET, INC., HEALTH NET OF THE NORTHEAST, INC., and HEALTH NET OF NEW JERSEY, INC. | |
| Defendants. | |

| | |
|---|---|
| RENEE MCCOY, individually and on behalf of all others similarly situated, | Civ. Docket No.  03-1801 |
| Plaintiffs | Hon. Faith S. Hochberg, U.S.D.J. |
| | **OPINION** |
| v. | |
| HEALTH NET, INC., HEALTH NET OF THE NORTHEAST, INC., and HEALTH NET OF NEW JERSEY, INC. | Date: December 6, 2006 |
| Defendants. | |

I.       **Introduction**

Plaintiff-beneficiaries have sued their healthcare insurance providers under ERISA, 29 U.S.C.

§ 1001 *et seq.*, for breach of fiduciary duty and other wrongs connected to the way in which Health

Net[1] reimburses out-of-network ("ONET") claims.  After a lengthy pattern of repeated and gross non-compliance with discovery emerged, exacerbated by representations to the Court that began to ring hollow, this Court granted a motion by Plaintiffs for a Hearing Under the Inherent Power of the Court to Preserve the Integrity of the Judicial Process and Under Federal Rule of Civil Procedure 37 ("Rule 37/Integrity Hearing"). This Court held eleven days of evidentiary hearings between October 2005 and March 2006 about, *inter alia,* whether Defendants were compliant with Court orders to retain, search, and produce e-mail and other electronic documents and candid in their representations to the Magistrate Judge and this Court about their restitution to beneficiaries.  This Court has reviewed the extensive briefing submitted by both parties as well as the parties' proposed findings of fact and conclusions of law.[2]

This opinion and related order rule upon Plaintiffs' motion for entry of default and for a

---

[1] As used in this Opinion, "Health Net" or "Defendants" refers collectively to all of the Health Net entities, regardless of geographic location.

[2] In letters dated April 6, 2006 and April 13, 2006, the parties advised Magistrate Judge Shwartz of their positions regarding the Plaintiffs' request for documents related to the Defendants' proposed findings of fact embodied in paragraphs 75 (concerning McCarter & English, LP Partner John Pendleton's opinion letter recommending the Second Restitution), 76 (concerning the Defendants' decision to accept that recommendation), and 106 (concerning General Counsel of Health Net of the Northeast ("HNNE") Paul Dominianni's communications with inside and outside counsel about the second restitution).  The Court does not adopt said proposed findings.  This Court hereby refers this issue to Magistrate Judge Shwartz for a ruling on whether the referenced proposed findings of fact constitute a partial waiver of the attorney/client privilege. This Court has not yet made a finding about whether these documents must independently be produced under the crime-fraud exception to the attorney-client privilege and work product protection.

The Plaintiffs also seek documents regarding former Governor Florio's activities in his capacity as a consultant who assessed Health Net's ONET claims payment policies and practices and its dealings with regulators. The Defendants referenced former Governor Florio's activities in response to the Plaintiffs' request for a fiduciary monitor.  Compare Plaintiffs' Proposed Conclusion of Law ¶150 with Defendants' Response at ¶33. Such request is hereby referred to Magistrate Judge Shwartz for a ruling on whether the documents shall be produced.

discovery monitor; Plaintiffs' applications to strike documents submitted by Defendants as summary

judgment and trial exhibits; Magistrate Judge Shwartz's Report and Recommendation that sanctions

be considered for Defendants' failure to produce emails during discovery and for Defendants'

decision to stop restoring and producing emails;[3] Defendants' appeal of Magistrate Judge Shwartz's

December 28, 2005 Order;[4] Plaintiffs' several motions to strike Defendants' privilege logs numbers

12 through 53;[5] Defendants' several motions to strike Plaintiffs' January 2, 2006 filing[6] and other

_____

[3] Defendants have been ordered to restore, search, and produce e-mails that were stored on back-up tapes and never searched or produced during the discovery period. After granting Health Net four previous extensions, the Court set a final deadline of September 30, 2006 for that production. In a September 27, 2006 Order, the Court rejected Health Net's request for a fifth extension and ordered Health Net to complete the restoration, review, and production of e-mails forthwith.

[4] This Court affirmed Magistrate Judge Shwartz's December 28, 2005 Order in its May 5, 2006 Opinion and reserved on Magistrate Judge Shwartz's recommendation of sanctions based on Health Net's failure to search the e-mails of all employees for responsive documents. Plaintiffs' Response to Defendants' Appeal of Magistrate Judge Shwartz's December 28, 2005 Order also seeks sanctions for Health Net's spoliation of documents. Spoliation of evidence is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Mosaid Tech., Inc. v. Samsung, 348 F. Supp. 2d 332, 335 (D.N.J. 2004) (citation omitted). The range of potential sanctions for spoliation includes dismissal of a claim or granting judgment in favor of a prejudiced party, suppression of evidence, an adverse inference, fines, attorneys' fees, and costs. Id. There is evidence of spoliation by Health Net in connection with Robert McCartt, a Rule 30(b)(6) witness regarding Health Net's practices for its California beneficiaries who deleted e-mails, as found in this Court's May 5, 2006 Opinion and Order, and there is additional evidence of spoliation that emerged in the Rule 37/Integrity Hearing. This Court will reserve on what sanctions in addition to those detailed herein may be appropriate because of this evidence of spoliation.

[5] Defendants moved to strike Plaintiffs' Reply in support of Plaintiffs' Motion to Strike Logs 14-22, or, in the alternative, for leave to file a surreply. This Court has considered both Plaintiffs' Reply and Defendants' Surreply. Plaintiffs' Motion to Strike Logs 24-36 also moved to review documents under the crime-fraud exception, for sanctions, and for fees and costs.

[6] Defendants moved to strike Plaintiffs' Brief in response to this Court's question posed at the Rule 37/Integrity Hearing on December 20, 2005 regarding the "meet and confer"

filings;[7] and Plaintiffs' motion to supplement the Rule 37 findings, for summary judgment, and for sanctions.[8]

The *Wachtel* and *McCoy* cases are two of the oldest on this Court's docket. The litigation has been fierce and without respite, through several changes of defense counsel. The docket sheet is 81 pages with 73 motions, 219 briefs, and 152 other applications to the Court. In sum, it gives new meaning to the term "scorched earth" litigation tactics. This litigation began more than five years ago and many of the events at issue in this Rule 37/Integrity Hearing go back even further.[9] This Court is extremely reluctant to sanction parties or counsel. Unfortunately, Health Net's repeated and unabated discovery abuses and lack of candor leave this Court no other choice in order to protect the integrity of the judicial process, remedy the prejudice suffered by Plaintiffs, punish the wrongdoers, and accord a measure of relief to the other parties and counsel in this case. When the abuses are as extreme as they are in this case, to refrain from sanctions is unfair to the parties who conduct themselves according to the rules.

---

procedures. The motion is denied.

[7] The Court denies Defendants' motions to strike Plaintiffs' reply briefs for their September 22, 2006 and October 6, 2006 motions, or, in the alternative, to grant Defendants leave to file a surreply because the delay in Plaintiffs' submissions was attributable to Defendants' delay in producing discovery. This Court will not accept any further late submissions from either party.

[8] This Court reserves on Plaintiffs' request to consider additional evidence for Plaintiffs' motion for summary judgment that Heath Net, Inc. is a fiduciary.

[9] A detailed description of the Plaintiffs' allegations in these cases is provided in this Court's Opinion granting class certification, dated August 5, 2004, and further factual background pertinent to this Opinion can be found in this Court's May 5, 2006 Opinion and Order.

## II.    Rule 37

Rule 37 of the Federal Rules of Civil Procedure governs sanctions against a party who fails to provide discovery as required by the discovery rules or a court order. The Court must analyze whether the defalcation is by the party, the attorney, or both. Rule 37 sanctions are available to the district court "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." Nat'l Hockey League v. Metro. Hockey Club, 427 U.S. 639, 643 (1976). The Court has broad discretion regarding the type and degree of sanctions it can impose, see Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co., 110 F.R.D. 363, 367 (D. Del. 1986) (citing Nat'l Hockey League, 427 U.S. at 642), but the sanctions must be just and related to the claims at issue. Estate of Spear v. Comm'r of Internal Revenue Serv., 41 F.3d 103, 109 (3d Cir. 1994) (citing Ins. Corp. of Ireland v. Compagnie Des Bauxites, 456 U.S. 694, 707 (1982)). Rule 37(b)(2) specifically provides for several sanctions, including discretion to deem facts as established, bar evidence, strike or dismiss pleadings, enter a default judgment, and find a party in contempt.

The Court also has inherent power to police litigant misconduct and impose sanctions on those who abuse the judicial process. See Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991). These inherent powers exist in addition to the formal rules and legislative dictates designed to assist district courts in their truth-seeking process. See id. at 46; see also Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 73 (3d Cir. 1995) (noting that, under Chambers, the Federal Rules of Civil Procedure and Congressional statutes do not exhaust the district courts' power to control misbehaving litigants). These powers include investigating whether a fraud has been committed upon the court and assessing attorneys' fees when a party has acted in bad faith. See Chambers, 501

U.S. at 44-46.

III.   **Findings of Fact[10]**

    A.   <u>Health Net's Lack of Candor to the Magistrate Judge and this Court concerning its Restitutions to the New Jersey Department of Banking and Insurance ("NJ-DOBI")</u>

Health Net's strategy to limit the scope of its disclosures to NJ-DOBI about its use of outdated data to calculate the UCR[11] for medical bill reimbursements led inexorably to discovery abuses and lack of candor in this case.[12] Health Net's small group employer plans in New Jersey are subject to state regulations requiring that Health Net must use the most recent data in calculating the UCR for certain services performed by ONET providers.[13] Large group plans are governed by

---

[10] The following findings of fact are made for purposes of Rule 37 sanctions only. These findings do not address whether any of the Plaintiffs' causes of action against Health Net have been proven on the merits of the pending case.

[11] "UCR" refers to the "usual, customary, and reasonable" charge for medical procedures.

[12] Plaintiffs allege misconduct by Health Net in administering health plans for beneficiaries who utilize ONET health care providers under the terms of their health plans. An ONET (or non-participating) provider is not part of Health Net's network of providers and does not have a contracted-for rate with Health Net. When Health Net beneficiaries use ONET providers, they receive reduced levels of coverage because Health Net does not cover the entire fee charged by these providers. In such cases, Health Net pays a percentage of the allowable charge for a particular procedure, known as the UCR. The beneficiary pays the remaining percentage of the UCR charge and is responsible for the rest of his/her medical bill that exceeds the UCR charge.

[13] The regulation provides that a "carrier shall pay covered charges for medical services on a reasonable and customary basis, or actual charges, and for hospital services, based on actual charges. Reasonable and Customary means a standard based on the Prevailing Health Charges System profile for New Jersey or other state when services are provided in such state. . . ." N.J.A.C. §11:21-7.13(a). The regulation further provides that UCR "shall be based on the 80th percentile of the profile" and requires that insurance companies "shall update their databases within 60 days after receipt of periodic updates released by the Prevailing Healthcare Charges

contractual language that does not expressly permit outdated data to be used for UCR.[14]  In its

Northeast plans, Health Net bases its UCR determinations on a nationwide database, known as the

Health Insurance Association of America  ("HIAA") or Prevailing Healthcare Charges System

("PHCS") database.[15]  The database is updated at least annually, but the insurer has the responsibility

for loading the data.  Health Net did not use the database in its updated form for several years at issue

in this case.  Thus, old costs were used to calculate current reimbursements.

Health Net's lack of candor to this Court and to Magistrate Judge Shwartz concerning its NJ-

DOBI restitutions includes: (1) asserting in its answers to interrogatories, affidavits, briefs,

pleadings, and motions that it was in "strict compliance" with all New Jersey regulations without

---

System."  N.J.A.C. §11:21-7.13(a)(2).

[14] This is a disputed issue on the merits.  Health Net contends that the use of back-dated data is permissible in large group plans; Plaintiffs contend that the contractual terms and non-disclosure to beneficiaries barred such use.  No merits determination is made at this time.  See, e.g., Physician's Health Services of New Jersey, Inc. Evidence of Coverage ("Usual, Customary, and Reasonable Charge ('UCR'):  the amount PHS determines to be the reasonable charge for a particular Service in the geographical area in which it is performed based upon a percentile of a modified nationwide database used for reimbursement to physicians, providers and hospitals"); Health Net Insurance of New York, Inc. Certificate of Coverage ("Usual, Customary, and Reasonable Charge" ('UCR') – means the amount we determine to be the reasonable charge for a particular service in the geographical area in which it is performed based upon...a percentile of a modified nationwide database applicable to the specific type of licensure of Provider"); and Health Net of Connecticut Subscriber Agreement ("Maximum Allowable Charge:  the amount Health Net determines to be the reasonable charge for a particular Covered Service in the geographical area in which it is performed based upon a percentile of a modified nationwide database applicable to the specific type of licensure of Provider.")  Health Net argues that it can use data from any year for large group plans based on the contract language "the amount we determine to be reasonable."

[15] The database is owned by Ingenix, Inc., a for-profit wholly owned subsidiary of United Healthcare.  It is represented to consist of charges for ONET services submitted by numerous insurance companies.  The Court has not yet reached the question of the propriety and adequacy of the Ingenix product as used in the instant case.

7

disclosing the existence of a NJ-DOBI investigation into its violation of New Jersey regulations; (2) violating Magistrate Judge Shwartz's July 23, 2003 Order by failing to disclose until the day of this Court's November 20, 2003 Preliminary Injunction hearing that Health Net's use of outdated data in calculating UCR extended back to 1999 (rather than mid-2001 as had been represented to NJ-DOBI); (3) falsely representing to this Court at the Preliminary Injunction hearing, in order to avoid the imposition of injunctive relief, that it had reached a "Second Restitution" with NJ-DOBI based upon nothing more than a vague seven minute phone call between General Counsel of HNNE Paul Dominianni, Esq. and NJ-DOBI that took place a mere hour before the court hearing, which did not in fact reach an agreement for a Second Restitution; (4) failing to proceed to pay the promised Second Restitution despite repeated representations to the Court that the Second Restitution was in progress; and (5) submitting a false and misleading certification from Paul Dominianni, Esq. to Magistrate Judge Shwartz, in response to her December 17, 2004 Order, that blamed the failure to accomplish the Second Restitution on the many steps needed to complete the task and on "inadequate continuity of work flow and personnel" without mentioning that, in fact, no steps had been taken to commence such restitution prior to Magistrate Judge Shwartz's Order and omitting to state that the calculations had already been made two years earlier. The number of instances and the extent of Health Net's lack of candor concerning its restitutions to NJ-DOBI, described in more detail below, will not be tolerated and justify sanctions against Health Net. Health Net has been represented by three separate law firms at various stages of this case, and the pervasive misconduct, as more fully described below, was consistent throughout all stages. From the lengthy pattern of misconduct, the Court concludes that Health Net, through its own in-house counsel and top executives, was responsible for many of the egregious actions in this case.

1.    *The First Restitution*

Health Net's "First Restitution" to NJ-DOBI[16] was the result of a December 23, 2002 Consent Order between Health Net and NJ-DOBI. The restitution was not disclosed when answers to interrogatories, affidavits, briefs, pleadings, and motions stated that Health Net was in "strict compliance" with all New Jersey regulations. Health Net also withheld relevant documents from Plaintiffs in order to cover-up the fact that it had used outdated UCR data beginning as early as 1999, rather than the mid-2001 date that had been represented to NJ-DOBI by Health Net's high ranking executives as the start date of the use of outdated data.

At an October 4, 2002 meeting, Health Net, through Vice President and Plan Counsel for HNNJ Eileen O'Donnell, Esq. and General Manager for Health Net in Pennsylvania and New Jersey, Dr. Joseph Singer, represented to NJ-DOBI officials that the use of outdated UCR data began systemically in July 2001 and continued through October 2002. Health Net told NJ-DOBI that it would identify the number of claims that were improperly processed and the financial value of those claims. NJ-DOBI, through its enforcement chief, Mr. Lee Barry, directed Health Net to reprocess claims that had been paid using outdated data and to reimburse members.

However, corporate officers at the highest levels within Health Net then knew that the systemic use of outdated data had actually begun in June 1999, and not in mid-July 2001, as had been represented to NJ-DOBI.[17] Nor was it just recently discovered, as was represented to this Court

---

[16] Health Net's "First Restitution" to NJ-DOBI refers to the repayment of claims improperly processed with outdated UCR data between July 2001 and October 2002.

[17] On June 7, 1999, Health Net issued Operations Alert #333, telling its employees to use the prior year's 1998 data to calculate reimbursement for beneficiaries' ONET claims. Prior to May 1999, Health Net had not updated its HIAA tapes containing UCR data since 1995. Health Net then used 1998 data to calculate beneficiaries' UCR reimbursements from May 1999 through

at the November 2003 hearing.  At an internal Health Net meeting in October 2002, the subject of

"HIAA Fee Schedule Change" arose and the participants discussed how to "go forth and sin no

more," "wash away the sins of the past" with regard to using outdated data, and estimate the financial

impact of these "sins."  While central to Plaintiffs' case and properly sought in discovery, neither

the document just quoted nor thousands of pages of germane documents were ever produced in

discovery that would have revealed the misrepresentation to NJ-DOBI.  They came to light only after

this Court convened the Rule 37 Hearing and itself asked probing questions that finally elicited them.

Despite the Magistrate Judge's numerous orders to produce such highly relevant discovery, Health

Net willfully did not do so.

---

October 2000.  In the summer of 2001, in an effort to lower its costs and increase its profits,
Health Net again reverted to using backdated 1998 HIAA data to compute UCR, beginning what
became euphemistically called the "rollback" period.  Operations Alert #493 directed that as of
July 31, 2001, all ONET claims would be reimbursed based on the 1998 HIAA fee schedule for
UCR.  If the claims processors could not find a particular procedure in the 1998 version of the
fee schedule, they were instructed to look in later-released schedules and if the procedure was not
listed in any designated schedule, the procedure would be priced at a mere 35% of the provider's
billed charge.  Shortly after the "rollback" went into effect, Jay Gellert, the CEO of Health Net,
Inc., wrote a letter to all plan Chief Executive Officers and Chief Financial Officers, including
HNNE Chief Executive Officer Barry Averill and HNNE Chief Financial Officer Pennell
Hamilton, directing Health Net's Eastern plans to find $8 million in additional savings for the
third and fourth quarters of 2001.  In response, Pennell Hamilton projected that HNNE would be
saving $2.8 million in the second half of 2001 as a result of the "implementation of 1998 HIAA
UCR pricing."

E-mails in 2002 sent to CFO Pennell Hamilton, Eileen O'Donnell, Esq., the Director of
Finance, and Dr. Joseph Singer calculated Health Net's estimated liability for using outdated data
to reimburse New Jersey small-group members' ONET claims from 1999 through June 2002.
Programmers produced an electronic file with the claims in question, the amounts originally paid
using outdated data, and the new amounts that would have been paid under current HIAA
schedules, going back to 1999.  Top executives from Health Net, Inc. were also aware that the
company was facing a direct risk from its use of outdated data.  In particular, a report discussed
at a December 10, 2002 Health Net, Inc. business initiatives meeting identified the "need to re-
process NJ Small Group OON [out-of-network] Physician claims from '99- forward to reflect
reimbursement at 80th percentile of then current HIAA."  The report estimated that the risk
amounted to $1.5 million.

Despite extensive top-level corporate knowledge of the use of outdated data prior to July 2001, Health Net did not disclose to NJ-DOBI any liability from 1999 through June 2001, cutting in half its period of liability. This decision led to the discovery abuses in the instant litigation, which appear calculated to avoid revealing that Health Net's 2002 Consent Order with NJ-DOBI rested upon misinformation. The 2002 Consent Order with NJ-DOBI required Health Net to provide proof of its compliance, including a list of the affected members and the amount of refund due to each member. Although Health Net computer programmers had created a file including use of outdated data to process claims going back to 1999, the spreadsheet that Health Net provided to NJ-DOBI only covered the period from July 2001 to October 2002, and the discovery in this case was obfuscated to make it look as if Health Net had only discovered its half-truths to NJ-DOBI on the eve of this Court's November 2003 Preliminary Injunction hearing, when in fact Health Net had known it all along.

Plaintiffs first learned of the NJ-DOBI investigation on February 5, 2003, when Renee McCoy, the named Plaintiff in the second case, saw a newspaper article about it. At a court conference in the *Wachtel* matter on February 13, 2003, Plaintiffs questioned why Health Net did not disclose to Plaintiffs' counsel the existence of the NJ-DOBI investigation, which directly affected Plaintiffs. They also questioned the candor of Health Net's answers to interrogatories, affidavits, briefs, motions, and pleadings where Health Net represented that it was in compliance with the New Jersey regulations. Health Net's counsel explained that "It was a case of Health Net's left hand not knowing what the right hand was doing."

Once Plaintiffs and this Court learned about the NJ-DOBI investigation, Health Net continued to withhold highly relevant documents. Plaintiffs filed the *McCoy* matter on April 22,

11

2003, alleging that Health Net breached its fiduciary duties and violated the terms of its contract with large group members by using outdated data to calculate ONET reimbursements. In numerous discovery demands and Court orders, Health Net was repeatedly required to produce discovery about its disclosures to NJ-DOBI.[18]  Plaintiffs sought discovery related to Eileen O'Donnell's December 12, 2002 letter to NJ-DOBI.[19]  Even though the Information Systems ("IS") department calculations and HIAA Group e-mails from 2002 described above were responsive to these Orders and to Plaintiffs' discovery demands, Health Net did not produce such documents to Plaintiffs, which would have revealed its failure to disclose to NJ-DOBI its use of outdated data as early as 1999. Ms. O'Donnell testified, both at this Court's Preliminary Injunction hearing in 2003 and during the Rule 37/Integrity Hearing, that she only learned about the use of outdated data extending back to 1999 when she was working on the *Wachtel* matter in November 2003. This Court does not make credibility findings at this time as to such testimony, although documents and e-mails in evidence

---

[18] See June 6, 2003 Order of Magistrate Judge Shwartz (ordering Health Net to advise the Plaintiffs "if its database can be queried to show, for the period January 1, 1998 to the present the amount of payments actually made to beneficiaries of the small employer plans for out of network charges and what the payments would have been had the claims been paid at the 80th percentile"); June 25, 2003 Order of Magistrate Judge Shwartz (ordering Defendants to provide a response to the Plaintiffs' demand for "documents, in whatever form they exist, related to Health Net's compliance with the state [New Jersey] consent order"); September 25, 2003 Order of Magistrate Judge Shwartz (ordering Plaintiffs to propound document demand requesting documents related to the contents of NJ-DOBI letter); and November 18, 2003 Order of Magistrate Judge Shwartz (ordering parties to meet and confer to discuss alleged deficiencies in Defendants' responses to discovery requests based on the NJ-DOBI letter.)

[19] On December 12, 2002, Health Net, through Ms. O'Donnell, submitted a letter to Lee Barry at NJ-DOBI proposing reimbursement to New Jersey small group members for Health Net's "incorrect use of the 1998 HIAA fee schedule from July 2001 to October 2002." Ms. O'Donnell explained that, "as [she] informed the Department at [their] last meeting, Health Net's regional management made a business decision in 2001 to revert to use of the 1998 HIAA fee schedule...which unintentionally also included the New Jersey small group market." She also sought to "wrap this all up in one Consent Order" by the end of the December.

suggest that Ms. O'Donnell was present at discussions where her Health Net superiors discussed the lack of timely HIAA data and the possibility of liability for claims as early as 1999.[20] This Court need not decide Ms. O'Donnell's credibility because it is absolutely clear that her superiors, such as CFO Pennell Hamilton, did know that the outdated data was used far earlier than July 2001. And those superiors also knew that Ms. O'Donnell was representing to NJ-DOBI that the onset of liability was in July 2001. Thus, the Health Net entities knew that their corporate representations to NJ-DOBI were misleading. Full compliance with discovery would have revealed that.

2.    *The "Second Restitution"*

Health Net exacerbated its lack of candor to this Court and discovery misconduct to Plaintiffs in events surrounding the promised "Second Restitution." The "Second Restitution" is a term coined by the parties to refer to Health Net's representation to this Court at the Preliminary Injunction

---

[20] At the October 16, 2002 HIAA group meeting, where an associate in the actuarial department was instructed to estimate the impact of the "sins of the past," Health Net tasked Ms. O'Donnell, Esq., along with Dr. Singer, to develop and present a plan to the Executive Management Team ("EMT") with regard to the same period. An actuarial associate's October 17, 2002 e-mail estimating the impact of the "sins of the past" explicitly covered the years from 1999 to 2002. Ms. O'Donnell and Dr. Singer's assignment to develop a plan to remedy the "sins of the past" would logically have been intended to cover the same period of time. Furthermore, on October 22, 2002, a member of Health Net's IS department wrote to the HIAA group, including Ms. O'Donnell, giving an "update" on dealing with outdated data from prior years. The IS employee explained that she and her staff would "create a test environment with the identified groups and claims going back to dates of service in 1999...includ[ing] the claims purged and archived off the system . . . [and] rerun the claims through the test system to obtain the correct fee." Two days later, on October 24, 2002, Ms. O'Donnell, on instructions from Health Net superiors, sent an e-mail entitled "Health Net update" to Gale Simon and Lee Barry at NJ-DOBI, closely tracking the language of the IS employee's e-mail from just two days before but conspicuously omitting the reference to dates of service in 1999. Furthermore, on December 3, 2002, Ms. O'Donnell asked the Director of Finance to work with the IS employee to "get further detail from the report from the test environment such that we could break the year 2001 down into months. we wanted to see what claims were paid incorrectly from July 2001, when the 'rollback' to the 1998 hiaa fee schedule took place to the date this fall 2002 when it was corrected for small group."

13

hearing on November 20, 2003 that Health Net had reached an agreement with NJ-DOBI to repay claims improperly processed between June 1999 and July 2001.[21] Testimony at the Rule 37 Hearing revealed that this Court's subsequent decision to hold a Preliminary Injunction hearing on November 20, 2003 caused a flurry of concern within Health Net. On November 20, 2003, about an hour before the Preliminary Injunction hearing commenced, HNNE General Counsel Dominianni placed a call to Lee Barry, Esq. at NJ-DOBI. The phone lines connected for seven minutes, including the time necessary for a secretary to get Mr. Barry on the line. Thus, the conversation was extremely short. Mr. Dominianni testified that he told Mr. Barry that Health Net had "a problem" from January 1, 1999 to July 2001; that the company intended to resolve it; that Mr. Barry concurred; and that an agreement to make the "Second Restitution" was formed. Mr. Barry testified that nothing substantive was disclosed by Health Net during the short call; that there was no representation by Mr. Dominianni about any further restitution; and that no agreement of any kind was made in the very short phone call. Significantly, Mr. Dominianni made no follow-up letter, e-mail, nor conversation of any kind to discuss, confirm, or conclude any agreement of any kind with NJ-DOBI, a large administrative agency of the State of New Jersey. This Court finds that no agreement to make a "Second Restitution" was made between Health Net and NJ-DOBI.

---

[21] In response to a July 23, 2003 Order of the Magistrate Judge, counsel at McCarter & English, LP "discovered" that Health Net had never loaded the 1999 HIAA data. Health Net had never told this attorney that the company's use of outdated data extended back earlier than July 2001. The McCarter attorney also received a Health Net spreadsheet in response to Plaintiffs' demand for back-up data for the December 2002 NJ-DOBI Consent Order. Health Net did not reveal that it had actually prepared the spreadsheet in 2002, prior to the NJ-DOBI consent order, nor that Health Net knew about underpayments to beneficiaries as a result of outdated data used from 1999 through 2002. Outside counsel "almost immediately" recommended to Health Net that it disclose this earlier use of outdated data to NJ-DOBI, make restitution, and disclose the issue in the instant case. Health Net did not, apparently, take that advice.

Within a few hours of this phone call, McCarter & English partner John Pendleton, Esq. assured this Court at the Preliminary Injunction hearing that no injunctive relief was necessary because Health Net had agreed to a "Second Restitution" with NJ-DOBI for the earlier period of outdated data.  Mr. Pendleton stated:    "Health Net has since gone back to the New Jersey department, and there may be either an amendment to the consent order, or a separate - there is no investigation. We made disclosure that there are – we've discovered that in 1999 we hadn't paid, and so we're going to rectify that, that's about a $528,000 restitution program that we'll make to small group people in New Jersey." Ms. O'Donnell testified on November 20, 2003 that "we have gone back to the department [NJ-DOBI] to say that we have uncovered other errors and that we would propose, and they accepted our plan of remediation." Pendleton testified that he made these representations based on Dominianni, Esq.'s phone call an hour earlier.  O'Donnell later testified at the Rule 37 Hearing that she was told what to say by Pendleton.

Shortly after the November 2003 hearing, Health Net submitted an affidavit by CFO Pennell Hamilton dated January 15, 2004. He averred, under oath, that "as soon as representatives of Health Net of New Jersey, Inc. understood that Health Net of New Jersey, Inc. did not load the 1999 PHCS database and that it did not update the PHCS database within 60 days of receipt of the database, these representatives went to the New Jersey Department of Banking and Insurance ('NJ-DOBI') and notified the Department of this issue." Documents never produced in discovery (and only revealed upon inquiry of this Court during the Rule 37 hearing) show that Mr. Hamilton himself knew that Health Net had used outdated data in 1999 for UCR-based reimbursements at the very time that Ms. O'Donnell was making representations to NJ-DOBI that the use of outdated data began in July 2001. No notification was made to NJ-DOBI "as soon as" the dereliction was understood by Health Net's

15

CFO. The Hamilton affidavit was false.

During the year following the November 20, 2003 hearing, Health Net submitted briefs and letters claiming that the Second Restitution was "in the process" of being carried out. However, there is no evidence, during the entire year after the November 20, 2003 hearing, that any "process" for carrying out the Second Restitution ever took place. Outside counsel knew that. Inside counsel knew that. And Health Net knew that. At the Rule 37 Integrity Hearing, Mr. Dominianni testified vaguely that he "reached out" to several unidentified "IT people" at Health Net but that he never received any work product from those individuals and did nothing. This pattern of non-action continued for over a year. In an attempt to explain this inaction by Health Net to effectuate the promised Second Restitution, Dominianni, Esq. testified that "at the time [he] thought there was some chance that Mr. Barry may follow up and some chance that he may not." He further testified that he did not follow up with Mr. Barry to confirm or memorialize any agreement.[22] Outside counsel at McCarter & English repeatedly asked the client's inside general counsel to do something to honor the representations being made to this Court. Yet Heath Net did not communicate further with NJ-DOBI for more than a year nor did it ever commence a process for making a Second Restitution. Then the alarm went off.

On December 10, 2004, Plaintiffs wrote to the Court expressing their frustration and disbelief at the amount of time it was taking to commence the Second Restitution. On December 13, 2004, Magistrate Judge Shwartz began a series of conferences with the parties regarding various discovery matters and about the progress, or lack thereof, of the Second Restitution. The Court issued an Order

---

[22] This further supports the Court's conclusion that, despite a seven minute phone connection, no agreement was made by Dominianni with NJ-DOBI to make a Second Restitution.

demanding an explanation for why, over a year after it was promised in this Court's hearing, the Second Restitution had still not happened. Mr. Dominianni and others within HNNE then sprang into action for the first time. On December 14, 2004, a day after the first conference with Magistrate Judge Shwartz, Dominianni began a project brief to identify ONET claims that were paid at outdated HIAA fee schedules in New Jersey between January 1, 1999 and June 30, 2001; to recalculate the payments at the updated HIAA fee schedule; and to issue refund checks to members. The project brief required the identification of all claims—including the original, reprocessed, and refund amounts—by Friday, December 17, 2004, just three days later. In other words, the job was short and could be done in just three days.

In an effort to make it appear that the Second Restitution had been underway all along, Mr. Dominianni submitted an affidavit to this Court on January 4, 2005, blaming the failure to accomplish the Second Restitution on the great amount of work needed to complete the task and on "inadequate continuity of work flow and personnel." The affidavit failed to state that no work had been done to commence the restitution for over a year until Magistrate Judge Shwartz demanded an explanation. The affidavit also failed to state that by the date of the affidavit, Mr. Dominianni knew that the "work," i.e. the calculations for the Second Restitution, had already been done two years earlier. This Court finds that Mr. Dominianni's Certification was misleading. Outside counsel Pendleton, whose firm submitted the affidavit to this Court, testified that it was misleading. In explaining its own role in submitting the misleading affidavit, McCarter & English stated that its role was merely as "scrivener."

17

B.      Discovery Violations

Throughout this litigation, Defendants have employed an obstructionist approach to discovery. A great proportion of the problem originated with the client; however, counsel in certain instances also exacerbated the problem. Despite numerous specific Court Orders, Health Net never produced thousands and thousands of pages of relevant and responsive documents within the three-year-long discovery period. Many of these documents are highly relevant to the knowledge of key personnel at Health Net about the company's use of the outdated data described above. Yet, these documents appeared for the first time more than a year after the close of discovery, and only after this Court demanded them during the Rule 37/Integrity Hearing. Others appeared as Defendants' proposed trial exhibits and as exhibits to Defendants' summary judgment motions even though they had never been produced to Plaintiffs in discovery. Health Net did not even search for many documents until it decided to look for them for its own use at trial and for its defense at the Rule 37 Hearing. Despite repeated document demands, repeated court orders to produce, and repeated assurances that all appropriate e-mails were being produced, thousands of Health Net's employees' e-mails were never searched. Many others were lost permanently due to Health Net's e-mail retention/non-retention practices, which were only disclosed to the Court after the conclusion of the Rule 37/Integrity hearing. These practices were never disclosed to the Magistrate Judge who supervised discovery for over three years.[23] These non-compliant and deceptive discovery tactics

_____

[23] Defendants did not inform either Plaintiffs or the Magistrate Judge that e-mails were routinely sent to a back-up tape after 90 days; that employees generally could not search for their own e-mail older than 90 days; that deleted e-mails were lost forever upon transfer to the back-up tape; the numbers of e-mails that needed to be searched; the cost of such a search; or a plan for allocating the burden of e-mail production. If Defendants had candidly disclosed these issues to the Magistrate Judge, an appropriate order could have been tailored to deal with such issues and keep costs down. See, e.g., Zubulake v. UBS Warburg LLC, 217 F.R.D. 309 (S.D.N.Y. 2003). In

caused Plaintiffs to waste huge sums of time and money conducting numerous depositions of Health

Net witnesses without the benefit of their e-mails and other documents relevant to each deponent.

Such a vast amount of discovery now needs to be redone that the task is virtually impossible.

What follows is a selected summary of discovery abuses that came to light as a result of the

Rule 37/Integrity hearing.

1.    *Non-Production of Documents Responsive to Plaintiffs' Requests*

Throughout the course of the Rule 37/Integrity hearing, Defendants produced documents for

the first time that were never produced during the three-year-long discovery period in response to

Plaintiffs' document demands and pursuant to court orders. As late as November 2006, thousands

of pages emerged that were not produced in discovery. Many documents related to individuals

_____

Zubulake, the court set forth a three-step analysis for disputes regarding the scope and cost of
electronic data discovery. First, the parties must have a thorough understanding of the
responding party's computer system, both with respect to active and stored data. The court held
that the responding party should pay for the costs of producing responsive information for data
that is kept in an accessible format and that a court should consider cost-shifting only when
electronic data is relatively inaccessible, such as in backup tapes. Second, because the
cost-shifting analysis is so fact-intensive, the parties must determine what data may be found on
the inaccessible media. The court reasoned that a sensible approach in most cases is to require
the responding party to restore and produce responsive documents from a small sample of the
requested backup tapes. Last, the court listed several factors, in roughly their order of
importance, to consider when conducting the cost-shifting analysis: the extent to which the
request is specifically tailored to discover relevant information; the availability of such
information from other sources; the total cost of production, compared to the amount in
controversy; the total cost of production, compared to the resources available to each party; the
relative ability of each party to control costs and its incentive to do so; the importance of the
issues at stake in the litigation; and the relative benefits to the parties of obtaining the
information. Cost-sharing options could have been considered at the outset of discovery had
Health Net been candid with the Court about their e-mail policies and the expense of producing
that discovery. Defendants' lack of candor, however, foreclosed such an approach. Simply put,
Health Net did not even tell its outside counsel at McCarter & English about its 90-day back-up
tape system for storing e-mail. Therefore, outside counsel conducting discovery did not know,
when Health Net's employees were asked to search e-mail, that they could only look through the
most recent 90 days.

whom Plaintiffs had already deposed years earlier. The vast majority of the documents that were not produced had been properly requested by Plaintiffs.

Non-production was the rule rather than the exception in this case. As of November 17, 2003, after document requests by Plaintiffs in both the *McCoy* and *Wachtel* matters, Health Net had produced under 7,000 pages of discovery and specifically represented to the Court that it had produced all relevant documents. In fact, thousands of pages of documents were never produced during discovery. January 10, 2005 was the final deadline for document discovery (set by Magistrate Judge Shwartz after Health Net requested 15 extensions of the discovery deadline.)[24] Over 12,000 pages of documents never produced in discovery were offered in support of Defendants' Summary Judgment Motions. These documents had been demanded by Plaintiffs but never disclosed during the discovery period. Approximately 8,000 pages of never-produced documents were designated as trial exhibits. These, too, were properly within the scope of Plaintiffs' document demands. Defendants did not alert Plaintiffs or the Court about these 20,000 pages of never-produced discovery despite Plaintiffs' repeated entreaties asking whether Defendants' production was complete and seeking a certification of completeness of production pursuant to Magistrate Judge Shwartz's December 17, 2004 Order. Motions to compel were regularly made by Plaintiffs, using Magistrate Judge Shwartz's specific method pursuant to the Local Rules of this District. Health Net's argument that motions to compel were not made is specious.

Health Net's process for responding to discovery requests was utterly inadequate, relying on an in-house paralegal also responsible for approximately 60 other cases. Testimony at the Rule 37/Integrity Hearing revealed that when Health Net received document requests from Plaintiffs, it

---

[24] The Court later extended the deadline for fact discovery again until March 10, 2005.

did not disseminate a comprehensive notice to employees who could reasonably be anticipated to possess responsive documents. Instead, Health Net directed its outside counsel to work with HNNE's local paralegal who would approach selected individuals about certain specific documents pursuant to instructions from Health Net's outside counsel.[25]  Once he asked these specific individuals for specified documents, the paralegal generally did not follow up with them to see if they had further responsive documents unless specifically instructed to do so by outside counsel or by the senior litigation counsel for Health Net, Inc. Nor did the paralegal attempt to identify other employees with responsive documents. Health Net relied on the specified business people within the company to search and turn over whatever documents they thought were responsive, without verifying that the searches were sufficient. The process, in sum, was one of looking for selected specific documents by a specific person rather than all responsive documents from all Health Net employees who had such documents. Many of these specific employee-conducted searches managed to exclude inculpatory documents that were highly germane to Plaintiffs' requests.[26]  Similarly, in

_____

[25] Counsel at McCarter & English was never told about Health Net's e-mail storage system, and thus counsel's search for e-mails only retrieved e-mails less than 90 days old and only from specifically designated HNNE employees. HNNE's paralegal was the primary person at Health Net responsible for coordinating discovery and ensuring that documents were identified for production in this matter. Yet he testified to having no memory of numerous Court Orders requiring production of specific documents, nor of the Order requiring production of documents relevant to each deponent 24 hours prior to a deposition. This paralegal was also responsible for document production in scores of cases nationwide.

[26] For example, Plaintiffs' requests in both *Wachtel* and *McCoy* sought documents relating to the methodology used to compute UCR reimbursement. In response to a January 15, 2002 request from HNNE's paralegal about what methodology was used for determining UCR reimbursement from 1998 to the present, a Health Net employee e-mailed back a chronology of loading dates for various versions of the HIAA and MDR databases, illustrating that the 1998 HIAA database was loaded in 1999 and used until October 2000 and that the 1999 HIAA was never loaded. McCarter & English partner John Pendleton testified that he never received this document from Health Net and that he would have produced it to Plaintiffs, had he received it,

February and March of 2003, Plaintiffs requested the complete file related to the NJ-DOBI Investigation, including *but not limited to* correspondence between Health Net and NJ-DOBI.[27] Although these documents should have been produced to Plaintiffs in May 2003, they were not produced and first came to light in September 2005 as a result of the Rule 37 hearing. Plaintiffs' request also should have yielded Ms. O'Donnell's e-mails about the First Restitution, including internal e-mails on the topic, but Health Net did not produce them even remotely comprehensively. Magistrate Judge Shwartz's July 23, 2003 Order reinforced this by ordering Health Net to disclose

---

because it was responsive to Plaintiffs' first request for documents in *McCoy*. Although Plaintiffs did not receive this document until the fall of 2005, Mr. Pendleton could not explain why the e-mail had not been produced.

   In another example, Plaintiffs served a document request on Defendants in the *McCoy* litigation on September 22, 2004 that sought "All documents to or from Health Net, Inc. or to or from any Health Net entity regardless of geographic location pertaining to . . . claims processing for ONET (out-of-network) claims; ONET health care costs; . . . assessment of ONET health care costs for any Health Net entity; budgeting for ONET reimbursement; . . . [or] any recommendations or instructions of the Executive Management Committee pertaining to ONET reimbursement." This document demand followed Magistrate Judge Shwartz's August 18, 2004 Order, which required all Health Net entities, regardless of geographic location, to respond to Plaintiffs' discovery demands. In addition, Health Net, Inc. was already under the obligation to respond to all discovery demands in the *McCoy* case pursuant to Magistrate Judge Shwartz's November 18, 2003 Order. Nevertheless, Defendants did not produce CFO Pennell Hamilton's now infamous "Playbook" Memorandum to the CEO and top management of Health Net—which laid out HNNE's plan to generate an additional $8 million in pre-tax income by the use of outdated data for UCR reimbursements. The memorandum was clearly responsive to Plaintiffs' requests and should have been timely produced, and it might never have been disclosed had the Rule 37 Hearing not been convened. There is a pattern of contemptuous disregard of Court Orders by Health Net.

[27] Plaintiffs wrote to Defendants on May 2, 2003 with a detailed list of deficiencies in Defendants' response to the request. Plaintiffs wrote again on May 23, 2003, stating that Defendants' production was incomplete and demanding production of various documents, including "all back up materials and documentation including memos, instructions, descriptions, explanations for (such things as what the UCR amount from the outdated data was, what the updated UCR amount is, and anything about how the restitution amounts were arrived at) calculations and data underlying the restitution amounts sent out by Health Net to subscribers." This demand called for the e-mails and memoranda created by the HIAA Group in 2002.

"all emails containing information related to the HIAA issue and Consent Order." Still, many of the emails covered by Plaintiffs' request and Magistrate Judge Shwartz's Order were never produced; they turned up only because this Court took the extraordinary step of convening a Rule 37 hearing.[28]

Defendants' boilerplate "burdensome" objections did not excuse their obligations to produce e-mails within their possession after Plaintiffs contested the inadequate production and Magistrate Judge Shwartz ruled on them in Plaintiffs' favor. According to John Pendleton, Esq., after Plaintiffs served their discovery demands on Defendants, Defendants would respond with objections and a limited number of responsive documents that were by no means complete. After "meet and confer" sessions, Magistrate Judge Shwartz considered Defendants' objections based on whatever grounds they raised and entered Orders stating the discovery that Defendants had to produce. Health Net, while represented by McCarter & English, unilaterally decided that if the Magistrate Judge did not expressly state that she was ruling on their "burdensome" objections, they could continue to withhold documents. Health Net never told the Magistrate Judge that it was not complying with her discovery orders in this fashion--it just withheld documents. This Court finds that Health Net's latest argument —to wit, that their "burdensome" objections were never ruled upon by the Magistrate

---

[28] Notably, because Ms. O'Donnell's e-mails were kept by her from going automatically to a tape, e-mail searches should have produced these documents. However, Health Net counsel could not agree as to whether Ms. O'Donnell was ever asked to do a comprehensive search of her e-mails for relevant documents. Ms. O'Donnell testified that she was never asked to do, and that she never did, a comprehensive e-mail search. Outside counsel testified that she thought that Ms. O'Donnell had turned over all the e-mails that existed on the "HIAA issue" when she produced a few e-mails between herself and NJ-DOBI. Inside counsel testified that Ms. O'Donnell was aware of the document requests in this case and aware of the need to look through her e-mail files to produce all responsive e-mails. Given this inconsistent and contradictory account of the e-mail search process for just one key individual's e-mails, it is not surprising that so many relevant and responsive e-mails were never produced.

Judge, and that Defendants therefore could continue to rely on those objections to withhold discovery ever after Court Orders to produce —is utterly without merit.  It is not made in good faith.  The Magistrate Judge heard scores of oral arguments on all discovery obligations pressed by Defendants, and she ruled.  Those rulings deserved compliance.

This Court also finds that the "meet and confer" process was compromised by Health Net's wilful failure to identify to the Plaintiffs the full range of documents that were responsive to Plaintiffs' document requests.  As a result, the Plaintiffs could not engage in meaningful dialogue to reduce the scope of the documents requested without knowing the total number of documents that existed.  Health Net's claim that Plaintiffs never moved to compel production of certain documents is absurd.  Plaintiffs <u>did</u> move to compel on many occasions.[29]  And the Court ruled in Plaintiffs' favor over and over again.  Health Net willfully chose not to disclose the existence of thousands of responsive documents and not to disclose their electronic document system.  In sum, there was a vast failure to search for relevant documents and vast non-production as described in more detail below.

2.    *Failure to Preserve and Search E-mails*

Although Health Net's in-house and outside counsel agree that Health Net was obligated throughout this litigation to produce e-mails in response to Plaintiffs' document demands, a vast

---

[29] John Pendleton, Esq. testified that although Magistrate Judge Shwartz's procedure for motions to compel is informal, the end result is the same as a formal motion to compel.  In fact, such informal procedures are required by this District's local rules.  See Local Civ. R. 37.1(a)(1) (requiring any discovery dispute to be presented by telephone conference call or letter to the Magistrate Judge before any formal motion may be filed).  Plaintiffs' numerous requests for Court intervention based on Defendants' deficient responses to discovery requests certainly belie any argument that Plaintiffs' did not seek to compel discovery.  Furthermore, as described elsewhere in this Opinion and in this Court's December 13, 2005 Opinion affirming Magistrate Judge Shwartz's grant of sanctions, many of Health Net's "misunderstandings" concerning discovery obligations in these cases have been a ruse to avoid production.

24

quantity of highly relevant e-mails from Health Net employees' accounts were never searched for and never produced during the discovery period. Throughout the lengthy discovery period, Plaintiffs repeatedly expressed concern that Defendants were improperly withholding responsive documents and Health Net's outside counsel Pendleton repeatedly provided blanket assurances that Health Net was fully producing responsive documents.[30]   Magistrate Judge Shwartz relied on these representations by Pendleton, noting in a May 9, 2003 Order that the parties "acknowledged their obligation to retain potentially relevant evidence related to this case."

On March 11, 2004, Plaintiffs' counsel again wrote to Defendants' counsel, memorializing a meet and confer session, and voiced concern that "virtually every deponent has spoken about documents that were not previously produced to us." On May 28, 2004, Magistrate Judge Shwartz ordered defense counsel to "further ensure that an appropriate communication is sent to those employees who may have responsive documents" and directed them to "make additional inquiries of those individuals they believe would be most responsible for the production of responsive documents." On August 18, 2004, she ordered all Health Net entities to produce certifications setting forth (1) their retention policies; (2) steps taken to ensure preservation of information potentially relevant to these cases; (3) a copy of any notice to preserve; (4) a list of individuals to whom the notice was provided; and (5) how the preservation was implemented and monitored.

---

[30] See Plaintiffs' March 28, 2002 letter asking Defendants for the purported basis for any withholding and John Pendleton, Esq.'s response that Health Net understood its discovery obligations, had abided by them, would continue to do so, and had provided Plaintiffs with all of the responsive documents that were in its possession and were ascertainable at the time; see also Plaintiffs' April 1, 2003 letter reiterating an earlier request for written assurance that Health Net had satisfied its obligations to preserve potentially relevant evidence and Mr. Pendleton's response to Magistrate Judge Shwartz that Health Net was familiar with its obligations to preserve evidence, had fulfilled them, and did not require Court intervention. Neither representation by Pendleton to Magistrate Judge Shwartz proved to be accurate.

In September 2004, Defendants attempted to persuade Magistrate Judge Shwartz not to enter a document preservation order in this case, reasoning that they were already under an obligation to preserve all documents relevant to this matter in the Multi-District Litigation ("MDL") ongoing in Florida. Magistrate Judge Shwartz disagreed and ordered counsel to remind their clients of their litigation and document preservation duties. See October 17, 2005 Opinion. On October 7 and 13, 2004, she directed the parties to submit a joint proposed form of notice to preserve records and a consent order setting forth the date on which the Defendants would produce supplemental certifications concerning the records preservation issues raised at earlier hearings. After two years of litigation, in October 2004, pursuant to Court Order, Health Net for the first time sent out a preservation notice to all of Health Net, Inc.'s and its subsidiaries' employees reminding them of the MDL preservation order and that the pending *Wachtel* and *McCoy* litigation required them to preserve all documents relating to ONET claims.

Yet even with this Court intervention, spoliation was a serious and ongoing problem at Health Net. On October 17, 2005, Magistrate Judge Shwartz granted Plaintiffs' request for a spoliation inference with regard to e-mails deleted by Robert McCartt, Health Net's Rule 30(b)(6) witness regarding its claims practices for California beneficiaries. Magistrate Judge Shwartz found that "despite clear directives to preserve evidence and clear demands for such evidence, it appears that many of the defendant's high-level employees were entirely unaware of either this litigation or their obligation to preserve documents." Id. at 20. This Court affirmed this inference in its May 5, 2006 opinion.

It was not until the conclusion of the Rule 37/Integrity Hearing that this Court finally understood the cause of these preservation problems. As highly relevant e-mails kept appearing for

the first time during the Rule 37/Integrity Hearing, this Court kept asking from October 2005 through March 2006 why they had never been produced during discovery. This Court's repeated query for an explanation was never met with a candid answer from defense counsel. On February 28, 2006, this Court learned for the first time that Health Net used an e-mail retention policy that automatically removed e-mails from employees' active files and sent them to back-up disks every 90 days. E-mails older than 90 days were not searched--ever. During the preceding four years of litigation, Health Net never told the Magistrate Judge this crucial fact, and Health Net never told the McCarter counsel tasked with discovery production this fact. Health Net did tell new outside counsel at Epstein Becker in March 2005 after discovery had ended; Epstein Becker and Herve Gouraige, Esq. did not notify the Court or Plaintiffs of this systematic failure to search. Health Net never searched the back-up disks during the three years of open discovery and never disclosed that it did not search e-mails over 90 days old for even its most centrally involved personnel.

Further adding to spoliation, any e-mails that an employee deleted within 30 days of receipt were lost permanently upon transfer to storage at 90 days.[31] Thus, when Health Net asked its employees to search their own e-mails for documents responsive to Plaintiffs' demands, those employees could only search e-mails on their active server or those they had chosen to archive before each 90 day back-up. It was not candid of Health Net to keep this information about the 90 day

---

[31] Counsel at McCarter & English, LLP, the outside firm during the discovery period, testified that she was unaware of Health Net's practice of putting e-mails on backup tapes 90 days after creation, which made it impossible for most employees to access the e-mails through a search of their own. Nor was she told of Health Net's practice of permitting employees to delete e-mails within 30 days of creation or receipt, which could result in spoliation. Her method of "searching" e-mails was to ask certain specific employees to search their own e-mails. In most cases, this meant that employees were only "searching" the most recent 90 days of e-mails, which means the search was of a mere three month window of time often years after the events that are the subject of the litigation took place. It meant that a "search" was not a search at all.

back-up system from Plaintiffs, their own outside counsel at McCarter, Magistrate Judge Shwartz, and this Court throughout the entire discovery period.

Health Net did not even begin to conduct its own search of employees' backed-up e-mails until Plaintiffs moved for a Rule 37/Integrity Hearing. Throughout the several months of the Rule 37/Integrity hearing, and after warnings from the Court, Defendants found vast numbers of non-produced documents that were responsive to discovery demands and previously ordered to be produced. Rather than candidly reveal the derelictions in discovery, Defendants stated that they "elected to restore certain limited e-mail files from their legacy e-mail systems for current and former employees who appear[ed] to be central to the issues set forth in [Plaintiffs'] motion." See November 11, 2005 Herve Gouraige, Esq. Letter to Magistrate Judge Shwartz. It is simply astonishing that after years of discovery orders entered against Health Net, the term "elected" is used in such a letter. Health Net had been under Court Order to search those files for years and had not done so. On October 18, 2005, this Court ordered that Defendants could not use such documents as evidence at the Rule 37 Hearing when they had never been produced during discovery. As a result of the October 18th Order, the Defendants made a unilateral and groundless decision to stop restoring and searching their back-up e-mails for production to Plaintiffs because they would not be able to use those emails for themselves at the Rule 37 hearing.[32] Upon learning that Defendants had stopped reviewing restored e-mails, this Court, on November 16, 2005, referred to Magistrate Judge Shwartz

_____

[32] On December 28, 2005, Magistrate Judge Shwartz entered an Order recommending that this Court "consider, as part of the Rule 37 proceedings, whether or not sanctions should. . .be imposed for: (1) the defendants' failure to produce e-mails during discovery; and (2) the defendants' unilateral and legally baseless decision to stop restoring and producing the e-mails." December 28, 2005 Order on Informal Application & Order to Show Cause. The Court adopts that recommendation.

the resolution of whether or not sanctions should be imposed against Herve Gouraige, Esq. of Epstein Becker.[33]

Even more shocking, Herve Gouraige, Esq. had eight months earlier objected to searching back-up e-mails and had been overruled by the Court and ordered to produce them. Gouraige had argued in March 2005 that searching Health Net's entire e-mail system for responsive documents would be "unduly burdensome and prohibitively expensive" and concluded that Health Net's "only obligation [with regard to searching e-mails] at this point is to produce responsive e-mails from [certain West-Coast] individuals [who were recently deposed]." Magistrate Judge Shwartz rejected Gouraige's burdensome objections in an Order on April 5, 2005, which specifically referenced Gouraige's March 31, 2005 letter. Health Net was ordered to "provide plaintiffs with all outstanding discovery responses to all outstanding discovery demands including but not limited to those that were the subject of this Court's Order of December 17, 2004."

Despite this ruling, Health Net "interpreted" the April 5th Order to absolve them of any further discovery obligations with respect to e-mail files, with the exception of their obligation to produce "newly discovered" documents pursuant to Rule 26(c). November 10, 2005 Letter to Magistrate Judge Shwartz. Magistrate Judge Shwartz again soundly rejected this argument, finding that her Order unambiguously required the production of all responsive discovery. December 28, 2005 Order of Magistrate Judge Shwartz. This Court affirmed Judge Shwartz's decision on May 5,

---

[33] Pursuant to the referral, Magistrate Judge Shwartz issued an Order to Show Cause directing the Defendants to "show cause in writing . . . why sanctions should not be imposed upon Herve Gouraige, Esq. for his argument that the defendants were justified to halt the restoration and production of e-mails based on the ruling that precluded the defendants from introducing at the Rule 37 hearing previously undisclosed evidence." December 28, 2005 Order on Informal Application & Order to Show Cause. Magistrate Judge Shwartz's November 3, 2006 Report and Recommendation recommends sanctions to be determined by this Court.

2006. Health Net's decision to ignore Magistrate Judge Shwartz's Order to produce e-mails was bold, bald, and baseless. The Court will not tolerate such abuses of discovery, lack of candor about e-mail retention practices, and deliberate indifference to the rulings of Magistrate Judge Shwartz.

3.    *Pattern of Violation and Disregard of Court Discovery Orders*

Magistrate Judge Shwartz has issued dozens and dozens of orders since the summer of 2003 in furtherance of her efforts to supervise discovery and pretrial procedures in this case.[34] The Health Net Defendants have ignored many of these Orders by "interpreting" them to avoid their discovery obligations. Below is a partial list of such Orders and Defendants' response to them.

- **June 6, 2003**: Judge Shwartz required Health Net to produce "all communications between defendant Health Net and the Department of Banking and Insurance related to Health Net's compliance with the state consent order." Health Net violated this Order by failing to disclose all of Ms. O'Donnell's responsive communications during the discovery period.

- **June 25, 2003**: Judge Shwartz ordered Defendants to "provide a response to plaintiffs' demand for documents, in whatever form they exist, related to Health Net's compliance with the state [of New Jersey's] consent order." Health Net violated this Order by not producing numerous HIAA Group documents, which were responsive to this Order during the discovery period.[35]

- **July 23, 2003**: Judge Shwartz ordered Health Net to disclose "all emails containing information related to the HIAA issue and Consent Order." Health Net violated this Order by failing to produce the HIAA Group emails and other internal emails reflecting Health Net's actions relating to the HIAA issue and the NJ-DOBI Consent Order. *See* Judge Shwartz's Order of March 9, 2006. Health Net's outside counsel acknowledged during the Rule 37 Hearing that Ms. O'Donnell's e-mails concerning the NJ-DOBI issues should have been produced in 2003 when discovery about the First Restitution was underway.

---

[34] Prior to Judge Shwartz's appointment, then Magistrate Judge Chesler was assigned to this litigation.

[35] Most of these documents were never produced in discovery. For a document to "emerge" only in response to this Court's demand at the Rule 37/Integrity Hearing is not "production" as required by the discovery rules of the Federal Rules of Civil Procedure.

- **September 25, 2003**: Judge Shwartz's Order required Plaintiffs to "propound a document demand, attaching the letter of Healthnet to the Department of Banking and Insurance, dated December 22, 2002, requesting documents related to the contents of that letter, including but not limited to any communications with the Department regarding compliance with the consent order and how restitution was computed." Plaintiffs did propound this request, which should have elicited the HIAA Group emails during the discovery period; they were not produced in discovery.

- **November 5, 2003**: Judge Shwartz ordered Defendants to "produce all non-privileged documents reflecting investigations of Healthnet Northeast by insurance regulators" and reminded Health Net that it had "a continuing obligation to produce such documents." Documents about Health Net's underpayment of claims, c.g., by its vendor Landmark, the New York Department of Insurance's investigation of such underpayments, and Health Net's restitution of those claims were responsive to this Order and were not produced. See Judge Shwartz's Order of March 3, 2005.

- **November 18, 2003**: Judge Shwartz ordered Health Net, Inc. to respond to all discovery demands in the *McCoy* case and her **January 13, 2004** Order required Health Net, Inc. to produce "any and all documents responsive to the plaintiffs' document demands or provide a certification of a witness indicating that [Health Net, Inc.] has no responsive documents." Health Net, Inc. did not comply with this order, even for its CEO, Jay Gellert. Health Net did not reveal until September 2006 that Health Net, Inc. did in fact have responsive documents. See Magistrate Judge Shwartz's November 15, 2006 Report and Recommendation.[36]

- **November 18, 2003**: Judge Shwartz ordered Defendants to "identify an individual who can certify whether or not there are any past or current investigations by state regulators regarding the defendants' use of outdated UCR or HIAA data and provide such a certification no later than November 26, 2003." Judge Shwartz reiterated this Order on **January 13, 2004**, ordering Health Net to "provide a certification as to whether or not there are past or current investigations by state regulators regarding the defendants' use of outdated UCR or HIAA data." Nearly a year later, Health Net disclosed the existence of a California investigation, which it had been negotiating for six months. On **December 17, 2004**, Judge Shwartz again ordered rolling production of investigative materials, including those from the California investigation and reminded Health Net of its

---

[36] Defendants filed a Motion for Reconsideration of the November 15, 2006 Report and Recommendation on December 1, 2006, which is currently pending before Magistrate Judge Shwartz.

responsibilities for production. She explained that she was requiring such production because of repeated incidents of non-disclosure by Health Net. Health Net claimed that its late production of California material was due to the lack of clarity in the discovery order as to the term "rolling basis." After a lengthy hearing, Magistrate Judge Shwartz rejected the explanation and ordered sanctions against Defendants, which were affirmed. See December 13, 2005 Opinion affirming Magistrate Judge Shwartz's February 16, 2005 Opinion and Order.

- **January 13, 2004**: Judge Shwartz required Health Net to produce "memoranda from any department regarding prior years' data" as well as "memoranda regarding the financial effect of using different databases." Health Net never produced an actuarial associate's October 17, 2002 email attaching actuarial estimates for the use of outdated data for claims from 1999 through 2002 in response to this Order. HNNE's actuarial estimates of liability for ONET claims in New York should have also been produced in response to this Order, but were not. Again and again, it was only the extraordinary process of the Rule 37 Hearing that brought these documents to light. Judge Shwartz also required Health Net to produce executive committee meeting minutes, which this Court was forced to order again during the Integrity/Rule 37 hearing. Yet Health Net had not yet produced such minutes in November 2006, over a year later. See Judge Shwartz's November 13, 2006 Report and Recommendation.[37]

- **December 17, 2004**: Judge Shwartz ordered Defendants' counsel to "ask each witness before their depositions whether or not they have documents responsive to the discovery demands and any and all responsive documents that were not previously produced shall be produced no later than 24 hours before the deposition." Health Net violated this Order by continually producing relevant, responsive documents from deponents only after they were deposed. The primary person at Health Net responsible for coordinating and ensuring that documents were identified for production in this matter was never told about Judge Shwartz's December 17, 2004 Order. Furthermore, Defendants' counsel knew at the time of multiple depositions that they had not completed review of each deponent's e-mails in advance of those depositions but did not disclose that fact to Plaintiffs or Judge Shwartz, despite the Judge's Order. This silence implied that Defendants had complied with the Order, when in fact they had not. This violated Court Orders, deceived the adversary, and wasted the time and money of the adversary. Merely recompensing wasted legal fees does not deter this type of misconduct.

---

[37] Defendants filed a Motion for Reconsideration of the November 13, 2006 Report and Recommendation on November 28, 2006, which is currently pending before Magistrate Judge Shwartz.

- **April 5, 2005**: Judge Shwartz ordered Defendants to produce "all outstanding discovery responses to all outstanding discovery demands, including but not limited to those that were the subject of this Court's Order of December 17, 2004." Despite this Order, which considered and rejected Health Net's burdensomeness objections, Health Net did not do a comprehensive search of employee e-mails. See Magistrate Judge Shwartz's December 28, 2005 Order. See also May 5, 2006 Opinion and Order affirming Judge Shwartz's January 30, 2006 and March 9, 2006 Orders. Health Net simply ignored Magistrate Judge Shwartz and granted itself a burdensomeness objection.

Defendants' strategy has been a concerted war to waste huge time and resources of Plaintiffs in pursuing this litigation. It gives "scorched earth litigation" a new standard of brashness. Defendants have also forced the Court to devote years to police discovery abuses over and over again. Defendants continue to ignore the Court's rulings over and over again. Defendants' persistent pattern of delay, defiance of Court Orders, evasive responses to Plaintiffs' discovery requests, and lack of candor have resulted in crushing prejudice to Plaintiffs in the form of forgetful witnesses and extraordinary expenditures of time, effort, and money. The wanton waste of judicial resources caused by Health Net, as exemplified herein, is equally staggering.[38]

## IV.   Conclusions of Law

### A.   Legal Standards

Rule 37 of the Federal Rules of Civil Procedure authorizes the Court to sanction a party for discovery abuses. The rule's purposes are to: (1) penalize the culpable party or attorney; (2) deter others from engaging in similar conduct; (3) compensate the court and other parties for the expense caused by the abusive conduct; and (4) compel discovery and disclosure. See, e.g., Nat'l Hockey

---

[38] The Magistrate Judge has issued over 110 orders in this case, many ordering Defendants to produce documents they were already required to produce, and this Court has issued over 55 Orders and Opinions based on numerous hearings and appeals of the Magistrate Judge's decisions.

League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976) and Carlucci v. Piper Aircraft Corp., 775 F.2d 1440, 1453 (11th Cir. 1985). Under Rule 37(b), the court may sanction a lawyer or a litigant for failure to obey any order to provide or permit discovery.[39] Rule 37(c)(1) also provides that "[a] party that without substantial justification fails to disclose information required by . . . [Fed. R. Civ. P. 26] is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." The Rule authorizes this Court to impose other appropriate sanctions in response to such discovery abuse, including payment of reasonable expenses caused by the abuse and any of the actions authorized under Rule 37(b)(2)(A), (B) and (C) outlined above.[40] This Court has kept a careful watch to ascertain to what extent the discovery lapses are the result of the party's malfeasance or the lawyer's malfeasance to ensure that

---

[39] Specifically, Rule 37(b)(2) provides that: "If a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(A)     An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B)     An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;

(C)     An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(D)     In lieu of any of the foregoing orders or in addition thereto, an order treating as contempt of court the failure to obey any orders except an order to submit to a physical or mental examination; . . .

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorneys' fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."

[40] Rule 37(a) provides the authority for a court to enter a compulsion order and other sanctions in response to a party's failure to make disclosure or cooperate in discovery. For the purposes of subdivision (a), an evasive or incomplete disclosure, answer or response is to be treated as a failure to disclose, answer or respond. Fed. R. Civ. P. 37(a)(3).

any sanctions only redress the appropriate wrongdoer.

In addition to Rule 37 powers, a district court's inherent powers include an investigation of whether a fraud has been committed upon the court and the power to dismiss a suit outright in response to litigation abuses.[41]   A court also has the power to assess attorney's fees when it finds that a party has "acted in bad faith, vexatiously, wantonly or for oppressive reasons," a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order," or "a fraud has been practiced upon it, or that the very temple of justice has been defiled." Chambers, 501 U.S. at 45-46 (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59 (1975), Universal Oil Prods. Co. v. Root Refining Co., 328 U.S. 575, 580 (1946), and Hutto v. Finney, 437 U.S. 678, 689 (1978)). "Because of their very potency, inherent powers must be exercised with restraint and discretion. . . . [A] primary aspect of [which] is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Chambers, 501 U.S. at 44-45 (citations omitted).

In the Third Circuit, "a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified." Republic of Philippines, 43 F.3d at 74.  The Court of Appeals instructs district courts to be guided in their application of their inherent powers by the same considerations that guide them in the imposition of sanctions under the Federal Rules: *first* a court

---

[41] See Chambers v. NASCO, Inc., 501 U.S. 32, 44-46 (1991); Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 73 n.10 (3d Cir. 1995) (citing Eash v. Riggins Trucking Inc., 757 F.2d 557, 556 (3d Cir. 1985)).  However, when there is conduct in the course of litigation that could be adequately sanctioned under the Federal Rules of Civil Procedure, a district court should ordinarily rely on the Rules rather than on its inherent powers. Chambers, 501 U.S. at 50; In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions, 278 F.3d 175, 189 (3d Cir. 2002).

considers the conduct at issue and explains why the conduct warrants sanctioning, and *second* it considers the range of permissible sanctions and explains why less severe alternatives to the sanction imposed are inadequate or inappropriate. Id. The Third Circuit has advised that "a pattern of wrongdoing may require a stiffer sanction than an isolated incident" and that "a grave wrongdoing may compel a more severe sanction than might a minor infraction." Id. Further, "wrongdoing that actually prejudices the wrongdoer's opponent or hinders the administration of justice may demand a stronger response than wrongdoing that . . . fails to achieve its untoward object." Id.

When, as in this case, a court is asked to sanction a party by depriving the party of the right to proceed with or defend against a claim, the court applies the analysis established in Poulis v. State Farm Fire and Casualty Co., 747 F.2d 863 (3d Cir. 1984). See Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1148 (3d Cir. 1990) (citing Poulis for the general analysis to apply); Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 919 (3d Cir. 1992) (same). Under Poulis, a Court considers:

> (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

Poulis, 747 F.2d at 868. Not all six factors are necessary for the entry of default. Hoxworth, 980 F.2d at 919.

B.    Analysis

Plaintiffs move for a default judgment as a sanction. This is the most severe sanction. This case has been fraught with repeated discovery failures by Health Net as well as dishonest representations to the Court. Both this Court and Magistrate Judge Shwartz have said this before.

36

This Court is hard-pressed to find a worse case of litigation abuse, yet is also cognizant of the Third Circuit's preference for deciding cases on their merits. Scarborough v. Eubanks, 747 F.2d 871, 878 (3d Cir. 1984) ("[D]oubts should be resolved in favor of reaching a decision on the merits . . . and alternative sanctions should be used) (internal citations omitted); see also Ruhle v. Hous. Auth. of City of Pittsburgh, 54 Fed. Appx. 61, 62 n.1 (3d Cir. 2002) (citing Medunic v. Lederer, 533 F.2d 891, 893-94 (3d Cir. 1976)) ("Entry of default is generally disfavored and we have long indicated our preference that cases be decided on the merits."). Default is an extreme sanction that must be reserved for instances in which it is justly merited. See, e.g., Poulis, 747 F.2d at 867-68, 869-70 (describing default as drastic sanction and reiterating that it should be reserved for cases comparable to Nat'l Hockey League v. Metro. Hockey Club, 427 U.S. 639 (1976)); Harris v. City of Philadelphia, 47 F.3d 1311, 1331 (3d Cir. 1995) (noting that flagrant discovery violation is required to support dismissal of an entire suit or imposition of default judgment).

This Court has considered a wide range of conduct by Defendants in this litigation and concludes that the repeated nature of that conduct and flagrant disregard of the adversary and the Magistrate Judge's Orders warrant strong sanctions. As outlined above, the fifth Poulis factor requires this Court to consider the effectiveness of sanctions other than default when weighing whether to impose that most severe of sanctions. See Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co., 110 F.R.D. 363, 368 n. 9 (D. Del. 1986) (citing Poulis, 747 F.2d at 869, 870) ("The existence of effective alternative sanctions is of central importance in determining in the first instance whether to enter a default judgment under Rule 37(b).") In deciding which such sanctions to impose, this Court has ensured that the sanction addresses the harm. See Chambers, 501 U.S. at 44-45; Republic of Philippines, 43 F.3d at 74. The victims of Health Net's litigation tactics in this

case include both Plaintiffs and the judicial process.

The Defendants have harmed the Plaintiffs in this case by: (1) deliberately failing to timely search and produce responsive documents and thereby causing Plaintiffs to take scores of depositions and prepare their lay and expert witnesses for trial without the discovery that they had properly sought; (2) willfully concealing that no effective search was ever conducted for electronic documents; (3) deliberately causing Plaintiffs to conduct depositions hindered by an incomplete set of each deponents' documents, and causing Plaintiffs to prepare their case, including the summary judgment motions, without full discovery; (4) forcing Plaintiffs to seek Court intervention over and over again, wasting a huge amount of time and money in order to secure responses to their discovery requests when good faith compliance with the Federal Rules of Civil Procedure would have made such continuous costly intervention unnecessary; (5) employing a strategy of delay that has cost Plaintiffs inordinate amounts of time and money and has deprived them of the testimony of witnesses whose memories have faded in the years since this litigation began; and (6) concealing Defendants' non-compliance with discovery orders from the Plaintiffs by systematically ignoring adverse rulings.

The Health Net Defendants have violated the integrity of this Court's judicial processes by: (1) ignoring adverse orders of Magistrate Judge Shwartz and acting as if their burdensomeness objections had been granted when they had been briefed, considered, and rejected by the Magistrate Judge; (2) disingenuously claiming that they could not understand clear orders of the Magistrate Judge; (3) submitting false and misleading statements in court papers, affidavits, and testimony at the Preliminary Injunction hearing in an effort to make it appear that an agreement with NJ-DOBI had been negotiated regarding a "Second Restitution" when no such agreement existed; (4) stating at the Court hearing that the 1999-2001 use of outdated data was "just discovered" before the Court's

Preliminary Injunction hearing, when in fact Health Net's CFO and executives had known for a long time that the outdated data had been used far earlier than July 2001; (5) submitting a false affidavit by Health Net's CFO Hamilton; (6) submitting a false affidavit by HNNE General Counsel Dominianni in response to the Magistrate Judge's demand for an explanation as to why the "Second Restitution" repeatedly described to the Court as "in progress" had in fact never even been commenced; (7) failing to disclose to this court or to the Magistrate Judge during three years of discovery that e-mails older than 90 days were never searched when proper discovery requests sought historic information from a period more than 90 days earlier; (8) permitting spoliation of electronic discovery by allowing employee deleted e-mails to be purged and lost, when e-mails were automatically sent to back-up tapes after 90 days, while at the same time having outside counsel inform the Magistrate Judge that a document preservation order was not needed because Health Net knew its obligations to preserve documents as evidence; (9) failing to disclose and avoiding production of damaging documents that would have shown to Plaintiffs that Health Net management knew that the use of outdated data was wrong and done to increase profits; and (10) keeping even their own outside counsel (other than the Epstein Becker firm) unaware of their e-mail procedures that resulted in widespread dereliction of their discovery obligations.

The Court has considered the range of sanctions available under the Federal Rules of Civil Procedure and under this Court's inherent powers and has determined that each of the sanctions imposed below redresses Health Net's misconduct and is absolutely necessary to remedy the harm to Plaintiffs and the Court. Given Defendants' extensive discovery violations and lack of candor, this Court concludes that less severe alternatives are inadequate because they do not appropriately protect the integrity of the judicial process, remedy the prejudice suffered by the Plaintiffs, and

punish the wrongdoer.  This Court reserves on default judgment as a sanction until all the class action issues have been resolved.

### 1.    *Deeming Facts Admitted Under Rule 37(b)(2)(A)*

As described above, throughout this litigation Plaintiffs sought information about the Defendants' use of certain databases for calculating beneficiaries' reimbursement for ONET medical bills.  Plaintiffs repeatedly demanded documents on this issue, and Magistrate Judge Shwartz repeatedly ordered Defendants to produce such documents.  Yet Defendants never disclosed the most revealing documents on the topic during discovery.  Deprived of relevant discovery, Plaintiffs had no way to know that high-level officials within Health Net had known about the company's use of outdated data extending back to 1999 when they were negotiating with NJ-DOBI to reimburse members.  The most incriminating e-mails revealing these officials' knowledge did not emerge until this Court posed pointed and probing questions to outside counsel at the Rule 37/Integrity Hearing.  Only then, did Health Net "elect to restore certain limited e-mail files from their legacy e-mail systems for current and former employees who appear[ed] to be central" to the hearing.  See November 10, 2005 Letter of Herve Gouraige at 2.  And even then, that search was of one official's e-mails for a mere two month period.

When considering whether to deem facts admitted as a sanction for litigation misconduct, this Court uses a sliding scale and balances: "(1) culpability (including willfulness and bad faith, and whether the client was responsible or solely the attorney); (2) prejudice; and (3) whether lesser sanctions would have been effective."  Estate of Spear, 41 F.3d at 111.  In such a balancing, the prejudice factor subsumes the requirement that the sanction be specifically related to the claim at issue.  Id.  Willfulness and bad faith are not prerequisites for imposing this sanction but their

presence will enhance the case for sanctions. Id. at 112. The imposition of sanctions in the absence of bad faith generally requires a strong showing of prejudice. Id. at 116.

The evidence shows that Health Net itself, acting through its officials and in-house counsel, chose not to disclose highly relevant discovery about Health Net's use of outdated data to shave UCR rates and thereby reduce reimbursements to beneficiaries. Health Net concealed key facts about its dealings with NJ-DOBI on the issue. Health Net employed an electronic mail policy that did not permit employees to search emails that were more than 90 days old, unless employees affirmatively and independently chose to save and archive those emails. No notice was timely broadcast to relevant employees to save their e-mails. Yet outside counsel resisted a preservation order. Health Net itself did not conduct independent searches of stored emails and did not so inform its outside counsel (other than Epstein Becker, who entered the litigation after discovery was concluded). Thus, when outside counsel asked employees to search for emails in response to Plaintiffs' document requests and Court Orders, that counsel did not know from Health Net that these employees could not access "historic" e-mail beyond the most current three month period. Furthermore, even though one employee, Ms. O'Donnell, herself retained e-mails by overriding the automatic archive system, her files from the relevant time period were not thoroughly searched to respond to Plaintiffs' discovery requests.[42] Thus, even when Health Net employees could search their emails, their searches were sporadic rather than systematic.

The content of the undisclosed emails leads compellingly to the inference that Health Net wilfully and in bad faith concealed those emails from Plaintiffs. Many of the emails demanded by

---

[42] As stated above, two in-house counsel (O'Donnell and Hilda Gonzalez, Esqs.) and one outside counsel all point fingers at each other for this lapse by Health Net.

the Court at the Rule 37 Hearing revealed that top level Health Net officials knew that Health Net had used outdated data to calculate UCR as early as 1999, failed to disclose this knowledge to NJ-DOBI, and thus made the misleading claim of "recent discovery" to this Court and Plaintiffs. For example, Integrity 99, which was revealed for the first time during the Integrity Hearing, contained hand-written notes by Health Net's Director of Finance from an October 2002 meeting of high-level Health Net personnel about the HIAA back-dating issue. The notes indicate that the meeting participants, including Eileen O'Donnell, Esq. and CFO Pennell Hamilton, had discussed Health Net's failure to load the 1999 HIAA database and the resulting potential liability for the use of outdated data for that time period. Plaintiffs questioned Ms. O'Donnell, Mr. Hamilton, and the Director of Finance about the notes and the meeting for the first time at the Rule 37 Hearing. Each witness claimed to have no meaningful knowledge or memory of the meeting's substance. Thus, the non-production of this document during discovery deprived Plaintiffs of the chance to question three witnesses whose memory in 2002-2003 would have been fresher than in late 2005.

Two months later in the Integrity Hearing, Integrity 168 came to light. Integrity 168 clarified the notes in Integrity 99 and confirmed that these witnesses had integral roles in assessing the liability risk of using outdated HIAA data. They discussed plans to "wash away the sins of the past" and to "go forth and sin no more." Plaintiffs never had the chance to question the witnesses on this incriminating document. These emails directly contradicted the Health Net CFO's affidavit that swore under pains and penalties of perjury that as soon as representatives at Health Net realized that the company had used outdated data going back to 1999, they disclosed this to NJ-DOBI. The interference of wilful non-production and bad faith in failing to comply with discovery obligations is unavoidable.

42

The systemic pattern of non-production seriously prejudiced Plaintiffs and wasted judicial resources. Even during the Integrity Hearing itself, Plaintiffs did not have Integrity 168 when questioning the key HIAA meeting participants and thus could not probe their claimed lack of knowledge about Integrity 99. Plaintiffs did not have key information about Health Net personnel's knowledge of outdated data in 1999 to challenge Health Net counsel's statements to the Court, repeatedly, that the early malfeasance had just "recently" been discovered. Plaintiffs did not have the documents during countless depositions, nor when filing their summary judgment motions. This information relates directly to Plaintiffs' claims that Health Net breached its fiduciary duties to beneficiaries. Defendants' wilful non-disclosure gave them a clear litigation advantage. Plaintiffs will never be able to use the documents effectively now, when witnesses' memories have faded.

In light of the significance of the documents withheld from Plaintiffs, the deliberate and wilful nature of the non-disclosure, and the prejudice suffered by Plaintiffs, this Court finds that aggressive sanctions are necessary to remedy the harm done to Plaintiffs, to punish Defendants for their behavior, and to make clear that such litigation tactics will not be condoned. Thus, this Court will deem established for the purposes of this litigation the facts found in this Opinion regarding Health Net's knowing and wilful use of outdated data; Health Net and its officials' actions to hide the full scope of its conduct from NJ-DOBI; Health Net's false claims of "recent discovery" of the 1999-July 2001 malfeasance to avoid injunctive relief; Health Net's false claim that a Second Restitution was negotiated with NJ-DOBI; Health Net's false statement that a Second Restitution was "in progress;" and Health Net's false affidavit by General Counsel Dominianni in an attempt to cover up the prior misstatements to this Court. These facts will be deemed admitted for all purposes, including equitable relief.

43

2.     *Precluding Evidence under Rule 37(c)(1) and Rule 37(b)(2)(B)*

Defendants gave approximately 20,000 pages of previously unproduced discovery to Plaintiffs in the form of documents attached to certifications in support of Health Net's June 10, 2005 motion for summary judgment and as designated trial exhibits.  Plaintiffs move to strike the exhibits because the vast quantity of the documents were never produced during discovery.

Rule 37(c)(1) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed."   Rule 37(c) was revised in 1993 to provide a self-executing sanction for the failure to make a disclosure required by Rule 26(a) without the need for a motion under Rule 37(a)(2)(A).  It was further amended in 2000 to add failure to comply with Rule 26(e)(2) as a ground for sanctions.  "This automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at trial, at a hearing, or on a motion, such as one under Rule 56 [for summary judgment.]" Advisory Committee's notes to 1993 Amendments.

In deciding whether to impose sanctions against Defendants under Rule 37(c)(1), this court considers: (1) prejudice or surprise to the Plaintiffs; (2) the ability of Plaintiffs to cure the prejudice; (3) the likelihood of disruption; and (4) the Defendants' bad faith or unwillingness to comply.  See Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3d Cir. 1995).  These factors are nearly identical to the factors this Court considers when deciding to exclude evidence under Rule

37(b)(2):[43] (1) the prejudice or surprise to Plaintiffs; (2) the ability of Plaintiffs to cure that prejudice;

(3) the extent to which the evidence would disrupt the orderly and efficient trial of the case or other

cases in the court; and (4) bad faith or willfulness of Defendants in failing to comply with the court's

order. See Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894 (3d Cir. 1977)

(overruled on other grounds, 777 F.2d 113 (3d Cir. 1985)).

Plaintiffs certainly suffered surprise. Plaintiffs' counsel repeatedly asked Defendants'

counsel during the several years of discovery whether Defendants had completed their production.

Defendants had numerous opportunities during that time to notify the Plaintiffs about any impending

document production, even as late as when they submitted their Final Pretrial Order exhibit list.

However, Defendants remained silent, allowed discovery to close, and submitted their final exhibit

list, which included 8,000 never-disclosed pages as trial exhibits. Additionally, for the first time in

their June 10, 2005 Summary Judgment motion, Defendants decided to drop another 12,000 non-

disclosed pages. There was not even the courtesy of telling Plaintiffs that the 20,000 pages were

---

[43] Rule 37(b)(2) requires that a court order must be violated before a court may impose
sanctions. Fed. R. Civ. P. 37 ("If a party . . . fails to obey an order to provide or permit discovery
. . . the court in which the action is pending may make such orders in regard to the failure as are
just, and among the others the following . . . (b) An order . . . prohibiting that party from
introducing designated matters into evidence.") In this case, the Court ordered all document
production to be completed by January 10, 2005, and on April 5, 2005 Magistrate Judge Shwartz
further ordered Health Net by April 15, 2005 to provide Plaintiffs with "all outstanding discovery
responses to all outstanding discovery demands including but not limited to those that were the
subject of this Court's Order of December 17, 2004." Health Net did not comply. Its June 10,
2005 Summary Judgment exhibits and Trial exhibits included documents never produced during
discovery despite multiple court orders to do so. Health Net's argument that the production
simply constituted a Rule 26(e)(2) "supplemental production" is absurd and is belied by the fact
that many of the 20,000 pages had not been "recently acquired" by Defendants, but rather had
been in their possession for years. The pattern of ignoring adverse Court orders is systemic and
without any genuine defense.

never produced in discovery.

Plaintiffs also suffered prejudice. Prejudice from an adversary's failure to file a timely or adequate discovery response may include the irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs imposed on the opposing party. Scarborough v. Eubanks, 747 F.2d 871, 876 (3d Cir. 1984). All of this prejudice occurred in this case. Prejudice need not be irremediable, even in the context of dismissal or default, and may include the burden imposed by impeding a party's ability to prepare effectively a full and complete trial strategy and the burden a party must bear when forced to file motions in response to the strategic discovery tactics of an adversary. Ware v. Rodale Press, Inc., 322 F.3d 218, 222-23 (3d Cir. 2003). Plaintiffs had little time to absorb the new material and no effective opportunity to depose witnesses nor to incorporate such a vast amount of material into their own motion for summary judgment. Plaintiffs even had to waste time and money to realize that the exhibits were new and to review those exhibits, which unfairly detracted from Plaintiffs' allotted time to respond to Health Net's summary judgment motion. Plaintiffs did not have the new material for depositions that occurred during discovery and thus could not question deponents about those documents. Finally, Plaintiffs were forced to file a request with the Court to strike the late exhibits in response to Defendants' strategic discovery delay. This is more than ample prejudice under Third Circuit precedent to weigh in favor of precluding the never-produced exhibits.

Defendants argue that Plaintiffs could cure the prejudice they suffered in the three months before the then-scheduled September 19, 2005 trial date, or during the time spent waiting for the Third Circuit to rule on Defendants' appeal of class certification. This rationale has been strongly rejected, however, where defendants have resisted their discovery obligations in "a remarkable

pattern of delay and obfuscation," such as exists in this case to an unprecedented degree. Compare Jankins v. TDC Mgm't Corp., 21 F.3d 436, 444 (D.C. Cir. 1994) (finding preclusion sanction proper, even though prejudice to plaintiffs would be minor due to postponement of trial date, where defendants engaged in wilful misconduct by failing to provide court-ordered discovery sufficiently in advance of the trial date) with Kotes v. Super Fresh Food Mkts. Inc., 157 F.R.D. 18, 20 (E.D. Pa. 1994) (finding preclusion unwarranted where *neither* party fully complied with the scheduling order and the Rule 26 disclosure requirements, their questionable conduct did not clearly evidence bad faith, and a "revised trial date permit[ted] the parties to cure any prejudice caused by their *mutual* failure to properly complete discovery") (emphasis added). Defendants' strategic delays have disrupted this Court's and the Magistrate Judge's attempts to manage this case to trial in an efficient manner. Defendants have adopted a persistent pattern of delay and obfuscation, which has been instrumental in ensuring that this case had not reached a trial on the merits despite having been on this Court's docket for over 5 years.

Finally, this is not a case of inadvertent or negligent failure to disclose the existence of additional discovery. Defendants had the opportunity, but instead they chose not to notify Plaintiffs or the Court that they were planning to rely on documents that had never before been produced. When Defendants wrote to the Court on March 31, 2005 to outline which categories of documents they had not yet produced to Plaintiffs, they failed to mention that they were gathering and planning to use additional unproduced documents consisting of reams of additional Evidences of Coverage and Statements of Benefits. Nor did the Defendants alert Plaintiffs or the Court to these additional documents at the Final Pretrial Conference in May 2005. Such knowing silence constitutes sufficient evidence that Defendants chose not to produce the belated discovery until a moment when its impact

47

would be most acute.  Furthermore, Defendants' repetitive pattern of strategic delays only further supports the conclusion that this incident was, like Health Net's other discovery violations, committed in bad faith.  Plaintiffs' request to strike is granted.

3.   *Striking Defendants' Privilege Assertions in Log Nos. 12-13, 14-22, 23, 24-36, and 37-53 under Rule 26(b)(5) and Striking Defendants' Late-Designated Witnesses under Rule 37(c)(1)*

The purpose of a privilege log is to identify for the opposing side those documents that exist in response to a document request but are not being produced because of a privilege assertion.  The privilege log then allows the court and counsel to determine whether there should be a further inquiry into the bases for the assertion.  This process cannot begin if the documents, which are the subjects of the log, are never identified in discovery.  Local Civ. R. 34.1 and Fed. R. Civ. P. 26(b)(5) govern the production of privilege logs in discovery.   The Advisory Committee Notes to the 1993 Amendments of Rule 26(b)(5) state:

> A party must notify other parties if it is withholding materials otherwise subject to disclosure under the rule or pursuant to a discovery request because it is asserting a claim of privilege or work product protection. <u>To withhold materials without such notice</u> is contrary to the rule, subjects the party to sanctions under Rule 37(b)(2), and may be viewed as a waiver of the privilege or protection.  (emphasis added)

Courts have interpreted Rule 26 to require production of a privilege log within a sufficient amount of time after a document request is served in order to preserve the privilege of documents called for in the production.  <u>See</u> <u>Burlington N. & Santa Fe Ry. Co. v. United States District Court</u>, 408 F.3d 1142 (9th Cir. 2005) (finding waiver of privilege where log was not filed until five months after the document request); <u>see also</u> <u>Get-A-Grip, II, Inc. v. Hornell Brewing Co.</u>, 2000 WL 1201385 (E.D. Pa. Aug. 8, 2000) (finding waiver where privilege log was approximately two months late).  Health Net's conduct abused both the adversary and the Court's effort to manage this litigation.

48

On January 5, 2006, Plaintiffs filed a Motion to strike Defendants' Privilege Logs 12 and 13 as untimely. Defendants served Log 12 on December 16, 2005, two years after the scheduled close of discovery. It includes communications from the files of six witnesses whom Magistrate Judge Shwartz had allowed Defendants to designate late as trial witnesses provided that Plaintiffs had an opportunity to depose those individuals. See Magistrate Judge Shwartz Opinion and Order of August 31, 2005. The Magistrate Judge had set rules requiring complete document discovery for each witness prior to the deposition. See Magistrate Judge Shwartz's December 17, 2004 Order. Defendants conceded at oral argument that they (1) failed to provide full document discovery for such late-designated witnesses prior to their depositions, and (2) failed to so inform Plaintiffs counsel. See 11/22/05 Tr. 11:17-14:8 and 03/09/06 Tr. 33:8-15. Thus, this illustrates a continued pattern of concealed non-compliance with Court Orders and waste of Plaintiffs' resources. Because the precondition set by Court Order for the late designation of Defendants' witnesses was violated without notice to Plaintiffs or any effort to avoid wasting Plaintiffs' resources, the Court will not order the depositions to be retaken but will instead bar Defendants' use of any late-designated witnesses produced for depositions without full document production in advance as a Rule 37 sanction for the repeated concealed violation of Court orders.

Log 13, served on December 19, 2005, is comprised of documents related to Ms. O'Donnell that Defendants never produced in discovery. They only emerged upon Court Order at the Rule 37/Integrity Hearing. Plaintiffs argue that both logs are untimely because the documents were never produced in discovery. Defendants counter that the logs were timely because Defendants served the privilege logs within days of producing the corresponding documents during the Integrity Hearing on December 14th (Log 12) and December 9th (Log 13) 2005. On March 9, 2006, the Court heard

49

oral argument on the Motion.  Plaintiffs have since also moved to strike Privilege Logs numbered 14 through 53 on the same grounds.

Defendants' arguments conflate the proper timing question.  At the March 9, 2006 hearing, Defendants conceded that there are two timing issues: first, the timeliness of the production of documents, and second, the timeliness of the log of privilege claims arising from those documents.  To "de-conflate" Defendants' argument, they claim that although the documents were years late, the logging was on time because the logs were served on Plaintiffs within days of Defendants' identification of the documents.  This argument borders on facetious.  The issue is not the number of days between the document and log; it is the number of years that passed without even identifying the document in the first place.  The Court finds that the documents were never produced during discovery, and the privilege claim is waived.  Thus the logs created for the first time during the Rule 37/Integrity Hearing are stricken, and the documents should be turned over forthwith.

To "produce" a document because the Court has found it necessary to convene a Rule 37 Hearing and then itself demand production after Defendants ignored prior Court orders to produce them is not "production" in discovery.  Such documents were never produced nor identified nor logged during discovery.  They would not have seen the light of day had the Court not taken the extraordinary step of convening an Integrity Hearing to look into litigation abuses by Health Net.  The vast majority of the documents identified in Logs 12 and 13 were not identified in discovery.  Defendants' attorneys could not even answer the Court's question as to whether the documents referenced in Logs 12 and 13 should have been produced two years before the Integrity Hearing.  The witnesses whose documents are listed in Log 12 were already deposed by Plaintiffs before the bulk of such documents were identified in the privilege log.  These depositions should have been

conducted pursuant to the Magistrate Judge's Orders that all documents of witnesses had to be produced and/or logged <u>prior</u> to depositions. As noted above, this did not happen. No one from Defendants' legal team ever told Magistrate Judge Shwartz or Plaintiffs that the depositions were proceeding without full document disclosure. Nor were many of Health Net's witnesses even asked to search for relevant documents leading up to their depositions, despite Magistrate Judge Shwartz's December 17, 2004 Order to do so. This is abusive and contemptuous of Magistrate Judge Shwartz's Orders and of the adversary. Log 13 lists hundreds of e-mails to and from Eileen O'Donnell, dated in 2002 and 2003, which should have been identified during the discovery period but were not. Health Net never even searched for them during the discovery period.[44]

The privilege identified in logs 14, 16-23, 24-36, and 37-53 is similarly waived as extraordinarily untimely. Health Net never searched for these documents during discovery. Log 14 contains entries of regulatory documents dating back to 2001 and to December 2004/January 2005, which are related to the California Department of Managed Health Care investigation of Health Net. Magistrate Judge Shwartz's Orders of December 17, 2004 and February 15, 2005 had long ago ordered that they be produced. Indeed, Magistrate Judge Shwartz had already granted sanctions against Health Net for its failure to timely produce documents related to the California regulators' investigations of the Health Net entities' handling of ONET reimbursements. In light of this history, the non-production/logging of these documents is abusive.[45]

---

[44] This Court is concerned about all the other Health Net litigation pending in this country, lest the same cavalier attitude toward document production pervade them as well.

[45] The remainder of the documents in Log 14 relate to a New York Department of Insurance investigation and are dated September 2005 through November 2005. Magistrate Judge Shwartz's February 15 and March 1, 2005 Orders require monthly certifications requiring the status of any and all ongoing investigations of the Health Net entities related to their out of

Health Net next argues that their boilerplate one-word "burdensome" objections to the Plaintiffs' discovery requests relieved them of the duty to identify/log documents. This is yet another example of Health Net granting itself a ruling 180 degrees opposite of the Magistrate Judge's order to produce, so ordered after hearing any and all burdensomeness objections pressed by Defendants in argument before the Magistrate Judge. Defendants argue that if they put a boilerplate "burdensome" objection on a form, and the documents were thereafter ordered to be produced by Magistrate Judge Shwartz, her order was not a ruling rejecting their objection unless she voiced the words "I reject your burdensomeness objection." Often, Defendants did not even argue that production was burdensome. Even more audacious, Defendants did not inform the adversary or Magistrate Judge Shwartz of their unique method of silently overruling the Magistrate Judge.

Throughout the long discovery period in this case the parties brought disputes that they could not resolve on their own to Magistrate Judge Shwartz for resolution. Magistrate Judge Shwartz, after hearing from the parties, would rule on discovery requests, taking into account the objections raised by Defendants. Magistrate Judge Shwartz then entered orders reflecting the discovery remaining for Defendants to produce. If Defendants planned to withhold further documents after such rulings based upon the assertion of the attorney-client privilege, they were obligated to log their assertions of privilege right then and there. To not do so is a violation of a Court Order to produce, a lack of candor to the Magistrate Judge,[46] and a waiver of the privilege.

---

network activities. This particular subset of documents dated in the last quarter of 2005 is not clearly late, nor will the January 2006 log date for them be deemed unduly late. Thus, the Court will not strike the privilege assertions numbered 1-21 on Log 14 at this time.

[46] Defense counsel argues that they notified the Court at the end of discovery that "emails are backed up" and that "there are back up systems that may have preserved" emails in their

Defendants try to shift their own burden away by arguing that Plaintiffs' counsel was obligated, pursuant to Local Rule 26.1, to affirmatively ask Health Net's counsel about the company's backed-up email systems and how emails were maintained or stored, and, presumably, that Defendants could mislead by silence if the question was not asked. Section (d) was added to Local Rule 26.1, effective October 6, 2003, to address the emerging issue of discovery of digital information, including computer-based data. Rule 26.1(d) states that:

> "(1) Prior to a Fed. R. Civ. P. 26(f) conference [initial discovery conference], counsel shall review with the client the client's information management systems including computer-based and other digital systems, in order to understand how information is stored and how it can be retrieved. . . . counsel shall further review with the client the client's information files, including currently maintained computer files as well as historical, archival back-up, and legacy computer files, whether in current or historic media or formats. . .
>
> (3) Duty to Meet and Confer. During the Fed. R. Civ. P. 26(f) conference, the parties shall confer and attempt to agree on computer based and other digital discovery matters, including the following:
>
> > (a) Preservation and production of digital information; . . . whether restoration of deleted digital information may be necessary; whether back up or historic legacy data is within the scope of discovery . . . "

Defendants' attempt to shift blame fails. First, the Rule applies to counsel's obligations before and at the initial discovery conference, which occurred in both the *Wachtel* and *McCoy* matters <u>before</u> Rule 26.1(d) was adopted. Second, even assuming that the Rule had applied, it requires the involvement of <u>both</u> counsel. Counsel for Defendants are first to have reviewed its client's information management systems, and that did not occur here. Without Health Net's disclosure of its system to defense counsel, there is no way that the parties can have a frank

_____

March 15, 2005 letter to Magistrate Judge Shwartz. This did <u>not</u> disclose that the backed-up e-mails were inaccessible to Health Net employees asked to search their e-mails and that Health Net itself <u>never searched</u> such e-mails.

discussion under their duty to meet and confer. As Defendants' attorneys have testified, for most of this litigation they did not know about Health Net's policy of storing e-mails on back-up tapes after 90 days nor about the fact that employees could delete emails within 30 days, thereby causing the emails to be lost permanently. See Certification of Barry M. Kazan, Esq. dated March 15, 2006 (stating that the earliest any attorney at Epstein Becker & Green was aware of these facts was early March 2005); 03/09/06 Tr. 22:13-18 (attorneys at Morgan Lewis & Bockius were not aware in November 2005 of these facts); 03/01/06 Tr. 4:19-5:21 (counsel at McCarter & English who was handling discovery was not aware of these facts until the spring of 2006.)  Given this lack of knowledge by Defendants' attorneys, it is disingenuous to suggest that Plaintiffs are the ones at fault for not asking Health Net's counsel about the company's backed up email systems.

This Court grants the motion to strike the privilege assertions on Defendants' Privilege Logs 12-14 (except entries # 1 – # 21 on Log 14) and on Logs 16-23, Logs 24-36, and Logs 37-53 which were created before March 10, 2005—the deadline for fact discovery, after numerous extensions –and requires production of all documents identified therein to Plaintiffs by December 18, 2006.[47] The Court will not strike the privilege assertions in Log 15 on this ground. This Log was created pursuant to Magistrate Judge Shwartz's Order of December 12, 2005, which sought information as to Defendants' compliance with the discovery process.  It contains written instructions from Health Net's in-house and outside counsel to Health Net employees about discovery production. Based upon the record developed in this case, including the evidence gathered

---

[47] Health Net shall submit the documents in Log 14 relating to a New York Department of Insurance investigation, numbered 1-21, to this Court by December 18, 2006 and are referred to the Special Master for evaluation of the privilege claim.

at the hearings and the findings embodied in various Orders concerning Defendants' failure to adequately preserve documents and failure to produce responsive documents despite knowing that such discovery was sought, the Court orders the parties to submit briefs, as set forth in the accompanying Order, that explain whether In Re Grand Jury, 445 F. 3d 266 (3d Cir. 2006), voids the assertion of the privilege over the documents identified in Log 15.  The Court will have Magistrate Judge Shwartz rule on whether or not In Re Grand Jury voids the assertion of the privilege and requires the production of the documents identified on Log 15.

In order to expedite Defendants' complete production of backed-up e-mails, as ordered by this Court's May 5, 2006 Order, and to prevent the need for further motions by Plaintiffs to strike Defendants privilege logs, Defendants shall forthwith produce any e-mails created before March 10, 2005 that are uncovered through their review of backup tapes.  Defendants shall not review or withhold such e-mails for privilege, as this Court has determined that the privilege over such e-mails has been waived. E-mails produced from the search that are dated after March 10, 2005 may still be reviewed for privilege and logged accordingly.

4.     *Potential Sanctions against Herve Gouraige, Esq.*

Mr. Gouraige is a partner at Epstein Becker. He and his firm were successor counsel to McCarter & English, although for a time both firms represented Health Net during discovery. During the Integrity Hearing, after Mr. Gouraige was barred from affirmatively using documents never produced in discovery, he decided that it was not necessary to continue document production to Plaintiffs despite Court Orders to do so.  Gouraige's November 10, 2005 letter to the Court states: "[a]t the October 18, 2005 Rule 37 hearing, the Court indicated that defendants cannot use

documents that were produced after the close of discovery. . . Given this statement, defendants *stopped the process of reviewing the restored emails* and further analyzed their obligation to supplement their production of documents." November 10, 2005 Letter of Herve Gouraige, Esq. (emphasis added). This Court referred the matter of Mr. Gouraige's conduct to Magistrate Judge Shwartz, who issued a Report and Recommendation on November 3, 2006 finding sanctionable conduct. This Court reserves on imposing sanctions on Mr. Gouraige until it has had an opportunity to fully consider the objections to such Report and Recommendation.

5.     *Monetary Sanctions*

Rule 37(b) provides that, in addition to any of the sanctions authorized by the Rule, "the court *shall* require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2) (emphasis added). Attorney's fees and expenses are also authorized under Rule 37(c)(1) upon a finding that a party failed to disclose information without substantial justification. Fed. R. Civ. P. 37(c)(1). This Court has found that Health Net repeatedly and systemically violated discovery orders, in violation of Rule 37(b)(2), and that they improperly withheld documents in violation of Rule 37(c)(1). This Court has considered whether Health Net or its counsel are blameworthy for each dereliction, as set forth above. As a result of these failures by Health Net, Plaintiffs were forced to file countless motions to compel, which were not honored by Health Net even after the Magistrate Judge granted the motion, requiring repeated motion practice on the same issues over and over again. Plaintiffs then had to resort to the exceptional motion for

56

a Rule 37/Integrity Hearing, which has involved 11 days of hearings, extensive legal briefing, and additional depositions of certain witnesses, all at huge expense to Plaintiffs. Therefore, pursuant to Rule 37(b)(2) and 37(c)(1), this Court will require Health Net forthwith to pay the Plaintiffs' reasonable attorneys' fees and expenses incurred in connection with the Rule 37/Integrity hearing and all briefing in connection therein as well as Plaintiffs' motions brought to invoke discovery compliance *after* an Order of the Magistrate Judge or the Court had so ordered and Health Net had still not complied, as set forth in this Opinion. Should Plaintiffs choose to re-depose any of the witnesses whose documents were not completely searched or produced prior to their depositions in violation of Court Order, Defendants shall bear all costs and attorneys fees of such renewed depositions.

This Court also has the authority, under its inherent powers, to impose a fine on parties who interfere with the efficient functioning of the Court. See In re Tutu Wells Contamination Litig., 120 F.3d 368, 385 (3d Cir. 1997) (overruled on other grounds by Comuso v. Nat'l R.R. Passenger Corp., 267 F.3d 331, 338-339 (3d Cir. 2001)) (finding that fines made payable to the court may be imposed to ensure that the parties do not interfere with the functioning of the court); Prosser v. Prosser, 186 F.3d 403, 407 (3d Cir. 1999) (court may impose fine under its inherent power so long as court gives notice that it is considering sanctions under that power); In re Prudential Ins. Co. of Am. Sales Practices Litig., 169 F.R.D. 598, 617 (D.N.J. 1997) (imposing $1 million fine payable to the Court that "recogniz[ed] the unnecessary consumption of the Court's time and resources with regard to the issue of document destruction" and "inform[ed] Prudential and public of the gravity of repeated incidents of document destruction and the need of the Court to preserve and protect its jurisdiction and the integrity of the proceedings before it"); see also United States v. Philip Morris USA Inc., 327

F. Supp. 2d 21 (D.D.C. 2004) (imposing monetary sanction of $2,750,000, to be paid to the Court Registry as punishment for egregious violation of preservation order and to reflect the reckless disregard and gross indifference displayed toward discovery and document preservation obligations).

On December 28, 2005, Magistrate Judge Shwartz entered an Order recommending that this Court "consider, as part of the Rule 37 proceedings, whether or not sanctions should. . .be imposed for: (1) the defendants failure to produce e-mails during discovery; and (2) the defendants unilateral and legally baseless decision to stop restoring and producing the e-mails." December 28, 2005 Order on Informal Application & Order to Show Cause.  This Court has adopted Magistrate Judge Shwartz's recommendation that this Court consider Health Net's wilful actions and determine if any relief is warranted as part of the Rule 37/Integrity proceedings. This Court has also made its own findings that Health Net intentionally withheld relevant and responsive discovery in violation of Court Orders. This intentional discovery abuse is systemic and shocking. Health Net's abuses have caused the unnecessary drain of court time and resources and have seriously interfered with the functioning of this Court. It has taken enormous time away from other litigants.[48]  Therefore, this Court will impose a fine to be paid by Health Net to the Clerk of this Court.  In order to consider the potential impact of a financial sanction on the Health Net companies, this Court will consider public filings concerning the Health Net Defendants' financial stability.  See In re Prudential Ins. 169 F.R.D. at 617 (considering the impact of sanction on company's financial stability). Health Net shall

---

[48] The Court estimates that Health Net's case management alone has utilized approximately one-third of a law clerk's time in the District Court's chambers for five years and a significant percentage of the Magistrate Judge's and her law clerk's time.  Every litigant is entitled to the time of the court, but no litigant has ever before so wasted judicial resources in two chambers by failing to conduct discovery in good faith according to the rules, and willfully and repeatedly evading court orders to produce discovery.

submit public filings, including but not limited to statements submitted to the Securities and Exchange Commission, as well as a submission not longer than ten pages to help the Court assess the financial situation of Health Net by December 18, 2006 in accordance with the Order accompanying this Opinion.

6.    *Discovery Monitor*

In addition to the other relief considered herein, Plaintiffs move for the appointment of a discovery monitor or discovery special master to ensure that Defendants are meeting their obligations. Health Net has repeatedly violated Court orders for discovery. After the revelations at the Rule 37/Integrity Hearing about Defendants' failure to preserve and search e-mails, this Court again ordered Defendants to restore, search, and produce e-mails from their back-up files.[49] These searches may not be complete.[50]

_____

[49] On September 22, 2006, Defendants filed a "Motion on Short Notice for Relief from the July 14, 2006 Order" that informed the Court that they would not be able to complete the restoration, review, and production of e-mails and attachments for the 59 individuals identified in the Court's May 5, 2006 Order by September 30, 2006, the deadline set by this Court in its July 14, 2006 Order. Defendants' request was the *fifth extension* this Court has entertained, and the e-mails should have been produced long ago in response to Plaintiffs' document demands and in compliance with numerous court orders dating back as far as 2003. On September 27, 2006, the Court denied the Defendants' fifth request for an extension, noting that this Court's July 14, 2006 extension ordered that "the September 30, 2006 deadline is FINAL and the Court will not entertain any further requests for an extension as to the restoration and production of backed-up e-mails." This Court reserves on a per day sanction for lateness until it knows how many days it took Health Net beyond the final deadline to finally comply with the Court's order.

[50] The Court denies Defendants' August 18, 2006 Motion to Strike Plaintiffs' Letter-Motion Dated August 11, 2006 (in which Plaintiffs alerted the Court to irregularities in Defendants' e-mail searches and production, including the production of documents in July 2006 that Defendants certified they had searched and produced in the fall of 2005). The Court again reiterates that the parties in this case must file motions and not letters. The Court will not consider any further letter-motions to this Court; this ruling does not affect Magistrate Judge Shwartz's procedures. The Court also denies Defendants' Motion to Strike Plaintiffs' Response

Federal Rule of Civil Procedure 53 governs the appointment of masters by a district court. Subpart (1)(C) provides that a court may appoint a master to address pretrial matters that cannot be addressed effectively and timely by an available district judge or magistrate judge of the district. Fed. R. Civ. P. 53(1)(C). Such pretrial masters shall only be appointed "when the need is clear" and may be called in for additional help in managing complex litigation. Fed. R. Civ. P. 53 Advisory Committee Notes (2003 Amendments). Their duties may include matters that could be addressed by a judge, such as reviewing discovery documents for privilege, or duties that a judge might not feel free to undertake, such as certain kinds of investigations. Id.

The dockets of these cases reveal the extensive and unprecedented amount of judicial time spent on managing and adjudicating this matter. This Court and the Magistrate Judge have issued over one hundred and sixty (160) Opinions and Orders in these cases, the vast majority of which have dealt with discovery, appeals of the Magistrate Judge's discovery rulings, and with this Court's Rule 37/Integrity Hearing. Many of the Orders and Opinions were necessary because Health Net ignored a prior Court Order on the same issue. The parties' briefs and other submissions giving rise to these Opinions and Orders exceed three hundred and fifty (350) in number. The docket sheet alone is 81 pages long. The Magistrate Judge spent hundreds of hours in conference with the parties about discovery disputes in these cases, and this Court held hearings on eleven different days in an attempt to unravel Defendants' discovery violations. This Court appointed a Special Master for a specific task who devoted an extensive amount of time to reviewing Defendants' numerous claims

---

to Health Net's June 23, 2006 Responses Regarding its E-mail Production. This Court may ask the Discovery Monitor to verify the completeness of Defendants' answers and/or order any additional responses.

of privilege on privilege logs (other than the ones struck in this Opinion). Almost all of this extraordinary drain on the Court's resources is attributable to Health Net's recalcitrance in complying with Court Orders. As a result, this Court has unnecessarily had to divert its attention from other cases and litigants on its docket.

Defendants' actions have led to a serious disruption in this Court's functioning, and thus this Court finds that the need is clear for help in the form of a separate Special Master to monitor discovery compliance to ensure that all documents ordered to be produced have been produced and that all of the Court's discovery Orders have been complied with. This Court will issue an Order, pursuant to Fed. R. Civ. P. 53, outlining the Special Master's duties after the Court has selected such Master and he/she has filed an affidavit disclosing whether there is any ground for disqualification under 28 U.S.C. §455. Fed. R. Civ. P. 53(b)(3). Because, as described above, Defendants unreasonable behavior has occasioned the need to appoint a master to review their compliance with this Courts' Orders for production of responsive discovery, this Court will require that Health Net pay the entirety of the Special Master's fees. Fed. R. Civ. P. 53 Advisory Committee Notes, Subdivision (h) (2003 Amendments).

## V.   Conclusion

This Court, the Magistrate Judge, and the parties have already devoted more than five years to this litigation. The vast majority of this time, unfortunately, has been spent dealing with Defendants' persistently obstructionist tactics in evading discovery. This Court has carefully considered the sanctions available to address Defendants' behavior and has decided to impose sanctions severe enough to reflect the harm incurred. Any lesser sanctions than those imposed herein

would not be sufficient to remedy the prejudice suffered by the Plaintiffs or to punish Defendants' disrespect and abuse of this Court's procedures.

An appropriate Order will issue.[51]

/s/ Faith S. Hochberg
Hon. Faith S. Hochberg, U.S.D.J.

---

[51] Any party who appeals this decision to the U.S. Court of Appeals for the Third Circuit shall request consolidation of this matter with any other appeal of the Court's pretrial Orders so that this case can be readied for trial.